# <u>EXHIBIT A</u>

Confidential - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                FOR THE DISTRICT OF NEW JERSEY
 3                         -  -  -
 4
       MICHAEL SIMONS,            :   CIVIL ACTION
 5              Plaintiff,        :
                                  :
 6          v.                    :
                                  :
 7      BOSTON SCIENTIFIC         :
        CORPORATION, GARY         :
 8      LICKOVITCH, SAMUEL CONAWAY :
        AND JOHN DOES 1-30,       :   NO.
 9              Defendants.       :   2:15-cv-07519-MCA-LDW
                         -  -  -
10
                       April 27, 2016
11
                         -  -  -
12     CONFIDNETIAL - SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
13              Videotaped deposition of MICHAEL J.
14     SIMONS taken pursuant to notice, was held at the law
15     offices of Morgan, Lewis & Bockius LLP, 502 Carnegie
16     Center Drive, Suite 301, Princeton, New Jersey,
17     beginning at 9:18 a.m., on the above date, before
18     Ann Marie Mitchell, a Federally Approved Certified
19     Realtime Reporter, Registered Diplomate Reporter,
20     Certified Court Reporter and Notary Public for the
21     State of New Jersey.
22                         -  -  -
23
24              GOLKOW TECHNOLOGIES, INC.
              877.370.3377 ph | 917.591.5672 fax
25                  deps@golkow.com
```

Confidential - Subject to Further Confidentiality Review

Page 22

1    A.    Not that I can recall, not
2  specifically in prep.
3    Q.    I want to ask some more background
4  questions.
5          Have you been a party to any law --
6  go ahead.
7    A.    Can I step back?
8          Yes.  I've spoken to my current
9  fiancee about the case.
10   Q.    What's her name?
11   A.    Anna Knighten.
12   Q.    Are you back together with her?
13   A.    I am.
14   Q.    Okay.  And are -- you said she's a
15 fiancee?
16   A.    Yes.  We spoke about she was called
17 by a lawyer from Boston Scientific to ask if she was
18 interested in testifying.
19   Q.    Okay.  And are you scheduled to be
20 married to her?
21   A.    I am.
22   Q.    When is your wedding date?
23   A.    We have it scheduled for July 6th of
24 this year.
25   Q.    Okay.  And where does she live?

Page 23

1    A.    She lives in Memphis, Tennessee.  Or
2  I'm sorry, Olive Branch, Mississippi is the exact
3  town, right outside of Memphis.
4    Q.    Is your plan that you'll move down to
5  Mississippi or that she'll move to New Jersey after
6  you get married?
7    A.    Plan is that I have a job that I
8  travel quite a bit, so I'm going to keep residence
9  in both places because I have children in New
10 Jersey, and so kind of split my time.
11   Q.    All right.  So other than this
12 lawsuit, have you been a named party in any
13 litigation?
14   A.    Could you clarify litigation?
15   Q.    Yeah.  Any legal matter in which --
16 that is in front of a court.
17   A.    Yes.
18   Q.    What other litigation have you been
19 involved in?
20   A.    So I've been divorced.
21   Q.    Okay.
22   A.    And that was January of 2013.
23   Q.    Okay.  Anything else?
24   A.    I've had several -- I think two
25 restraining orders put against me by my ex-wife.

Page 24

1    Q.    Is that Lacia Simons?
2    A.    Yes.
3    Q.    Okay.  Anything else?
4    A.    And there was a court case years ago,
5  I forget the exact date, that because of a phone
6  call from my ex-wife, I was brought up on charges of
7  child endangerment.
8    Q.    Anything else?
9    A.    And finally, I had a DUI.
10   Q.    Any other litigation that you've been
11 involved with?
12   A.    Not that I can recall.
13   Q.    Have you ever sued anyone before?
14   A.    No.
15   Q.    Have you been a witness, a testifying
16 witness, so giving testimony in court or in a
17 situation like this, where you've given testimony
18 under oath in any proceeding?
19   A.    We began doing it in the restraining
20 order case and stopped and settled that.
21   Q.    So tell me about the restraining
22 order case.  Right now you just referred to it as
23 one case.  Earlier you said there were several
24 restraining orders, so --
25   A.    Yeah.  So this is over the course of

Page 25

1  three-and-a-half years.
2    Q.    Okay.
3    A.    The restraining order, as I
4  understand it, is common practice from her divorce
5  attorney.  In each case, the restraining order was
6  dropped in exchange for a change of some consent
7  order or financial situation.
8    Q.    And was the basis for seeking the
9  restraining order each occasion the same thing, or
10 were there different events that led to --
11   A.    Verbal confrontations, no physical.
12   Q.    Were you accused of physical abuse by
13 Lacia ever?
14   A.    No, no.  I was accused of a threat to
15 her.
16   Q.    Okay.  What was the alleged threat?
17   A.    She had tape recorded me -- for one
18 of the cases she had tape recorded me with an
19 argument in the driveway of my home when she was
20 threatening to take my children on my night, and I
21 had made a comment to her which she recorded on her
22 iPhone.
23   Q.    What was the comment?
24   A.    The comment was, if you're attempting
25 to take my children, I'm going to attempt to take

Confidential - Subject to Further Confidentiality Review

Page 26

1 them from you as well.
2     Q.     That's it?
3     A.     Yeah.  I'm going to -- but it was
4 worded in the fact of if you attempt to take my
5 children, you won't have them as well.
6 Subsequently, she did not think it was a threat for
7 several days and then filed a restraining order.
8     Q.     And just to be clear, Lacia Simons
9 has never accused you of physical abuse?
10    A.     She has not accused me.
11    Q.     Have you ever filed for bankruptcy?
12    A.     No.
13    Q.     And other than this -- just to
14 finalize the earlier line of questioning, other than
15 your testimony here today and your testimony in the
16 restraining order proceeding or proceedings, have
17 you testified as a witness in any other case?
18    A.     No.
19    Q.     You graduated from Gettysburg College
20 in 1993.  Correct?
21    A.     Yes, sir.
22    Q.     Have you had any further education
23 after that?
24    A.     No.
25    Q.     I want to just go through your

Page 27

1 employment history prior to coming to Boston
2 Scientific.
3            My understanding is your first job
4 out of college was with InPhoto Surveillance; is
5 that correct?
6     A.     That's correct.
7     Q.     And you worked there from June of '93
8 till approximately September of 1996?
9     A.     Yes.  Approximately two-and-a-half.
10    Q.     Okay.  And what did you do for them?
11    A.     I was a sales rep.
12    Q.     And what does InPhoto Surveillance
13 do?
14    A.     InPhoto Surveillance is a
15 surveillance company that rents investigators to
16 investigate insurance fraud and workmen's
17 compensation.
18    Q.     Where were you -- where did you work
19 for InPhoto Surveillance?
20    A.     I had the state of New York as a
21 territory.
22    Q.     And after that you took a job with
23 Pfizer; is that right?
24    A.     Pfizer Pharmaceuticals.  That's
25 correct.

Page 28

1     Q.     And was there any period of
2 unemployment between InPhoto Surveillance and
3 Pfizer?
4     A.     There was an overlap -- yes.  I
5 was -- I went from one job to the other.
6     Q.     You left your job at InPhoto so that
7 you could start at Pfizer, is that --
8     A.     That's correct.
9     Q.     And you worked at Pfizer for two
10 years or a year-and-a-half?
11    A.     No.  I worked at Pfizer for a little
12 longer than that.
13    Q.     Okay.
14    A.     Because I didn't start with Boston
15 Scientific till 2000.
16    Q.     So approximately September of '96
17 through February of 2000?
18    A.     Till March 2000.  To my recollection
19 that's when training started.
20    Q.     And what did you do at Pfizer?
21    A.     I had several different jobs.  I was
22 a sales rep, and then I was an institutional
23 hospital rep.
24    Q.     Okay.
25    A.     So I was promoted once.

Page 29

1     Q.     And why did you leave your employment
2 at Pfizer?
3     A.     Because an offer was made to me by
4 Boston Scientific.
5     Q.     So you voluntarily left your
6 employment at both InPhoto and Pfizer; is that
7 correct?
8     A.     That's correct.
9     Q.     And on each occasion you voluntarily
10 left to accept other employment?
11    A.     That's correct.
12    Q.     And to accept better employment?
13    A.     In my opinion, yes.
14    Q.     Was each move an increase in salary
15 for you?
16    A.     It was.  I'm sorry.  That's not
17 correct.
18    Q.     Okay.
19    A.     Pfizer was a decrease in salary.  The
20 reason I took the job is I saw Pfizer as more as a
21 career than a small company like InPhoto
22 Surveillance.
23    Q.     Okay.
24    A.     So initially a decrease but
25 eventually worked into an increase.

Confidential - Subject to Further Confidentiality Review

Page 30

1    Q.    Got it. Did you receive corrective
2 counseling or employment discipline at either Pfizer
3 or InPhoto Surveillance?
4    A.    Never.
5    Q.    Anybody ever raise complaints about
6 you at either of those places of employment?
7    A.    Never.
8    Q.    Did you ever raise concerns or
9 complaints at either of those places of employment?
10    A.    Never.
11    Q.    Did you have any other jobs before
12 going to Boston Scientific and after you graduated
13 from Gettysburg other than InPhoto and Pfizer?
14    A.    No, sir.
15    Q.    All right. What's your current
16 address?
17    A.    34 Wanamaker Avenue.
18    Q.    City?
19    A.    I'm sorry, Waldwick, New Jersey
20 07463.
21    Q.    And you live alone there?
22    A.    My children are there half the time.
23    Q.    Okay. And so your children are
24 children -- two daughters that you had with Lacia
25 Simons?

Page 31

1    A.    That's correct.
2    Q.    And they're Calie and Keira?
3    A.    That's correct.
4    Q.    How old are they?
5    A.    10 and 7.
6    Q.    Who is what age?
7    A.    Calie is 10, C-A-L-I-E. And Keira,
8 K-E-I-R-A, is 7. 8 tomorrow.
9    Q.    And you resumed visitation rights
10 with them?
11    A.    That's correct.
12    Q.    Okay. You lost them after your DUI
13 for a period of time. Correct?
14    A.    No.
15    Q.    No? Okay.
16    A.    I -- that was my wife's decision, not
17 any court decision.
18    Q.    Okay.
19    A.    She was reluctant to give them to me
20 and I was reluctant to press the issue until I
21 proved to her that, you know, I was on the path to
22 recovery.
23    Q.    And when did you get to the point --
24 how long have you had visitation rights with them
25 voluntarily?

Page 32

1    A.    Since summer of '14. I'm sorry,
2 summer of '15.
3        MR. MARTIN: '15.
4        THE WITNESS: Yeah, after the DUI.
5 It was a short period of time where I saw them at
6 games and practices and supervised to appease my
7 wife and make her more comfortable.
8 BY MR. KNAPP:
9    Q.    Got it. And with respect to -- so I
10 just want to go through your marital history then.
11        Lacia you said you divorced in 2013,
12 January 2013?
13    A.    Yes.
14    Q.    And when did you get married to her?
15    A.    April of 2005.
16    Q.    All right. And then prior to Lacia,
17 you were married to a woman by the name of Barbara
18 Simons?
19    A.    That's correct.
20    Q.    Okay. And what are the dates of your
21 marriage, wedding? When did you get married to her?
22    A.    It was December. I'm not exactly
23 sure of the year. I was married for five years, I
24 believe. Probably December of '98 maybe.
25    Q.    And when did you separate or divorce

Page 33

1 Barbara?
2    A.    I don't recall the exact month, but
3 the marriage was about five years.
4    Q.    Was it -- presumably it was before
5 April 2005. Right?
6    A.    Yes, yes. It was several -- it was
7 probably two years before that.
8    Q.    Okay. We're now approximately
9 sometime in 2003?
10    A.    2003, something like that. '98 to
11 2003 sounds correct.
12    Q.    And then you mentioned you're
13 currently engaged to Anna Knighten.
14        Did she previously work at Boston
15 Scientific?
16    A.    She did.
17    Q.    Is that how you met or --
18    A.    Yes.
19    Q.    What was her role?
20    A.    She was a sales rep for Boston
21 Scientific. At first she was -- held the title of
22 interventional sales specialist and then eventually
23 moved to become a peripheral sales representative.
24    Q.    And she's not at Boston Scientific
25 any longer. Correct?

**Page 34**

1  A.  She is not.
2  Q.  Where does she work now?
3  A.  She works for a company called EKOS
4  Corporation, E-K-O-S.
5  Q.  When did she cease her employment
6  with Boston Scientific?
7  A.  She initially ceased her employment
8  with Boston Scientific when she moved from Memphis
9  to New Jersey several years ago, I guess sometime in
10  '13, May of '13.
11  Q.  Okay.  And --
12  A.  And then she was terminated from
13  Boston Scientific or let go in a reduction in force
14  for Boston Scientific.  She had gotten another job
15  with Bayer Corporation, and Boston Scientific had
16  bought Bayer and then they did a reduction in force
17  and she was reduced in December of 2014.
18  Q.  So I just want to make sure I'm
19  understanding this right.
20  She moved from Memphis to New Jersey
21  I assume to be with you.  Correct?
22  A.  Yes.
23  Q.  Okay.  And at that time she quit her
24  employment with Boston Scientific?
25  A.  Yes.  She resigned.

**Page 35**

1  Q.  Okay.  But then she resumed
2  employment with Boston Scientific?
3  A.  She initially took a job with a
4  company called CSI.
5  Q.  Okay.
6  A.  And found that job to be not
7  something she was interested in doing, so she
8  resigned from there and then found employment with
9  Bayer Corporation.
10  Q.  I get it.  Okay.
11  A.  And then from there, Bayer and Boston
12  Scientific decided they needed to do a reduction in
13  force.
14  Q.  Got it.
15  A.  So she was caught up in that.
16  Q.  Okay.  I understand.  And how did you
17  two meet then?
18  A.  We initially met because when I was a
19  sales rep at Boston Scientific, she came to New York
20  as a field trainee to work with me.
21  Q.  So she was a field trainee for your
22  region?
23  A.  No.  She was in the Memphis region
24  and trained -- and I was a field trainer, so she
25  worked with me for a week.  That's common practice

**Page 36**

1  when you're a new hire.
2  Q.  And when was that?
3  A.  I would be guessing if I told you.
4  It was probably eight years prior to her moving up
5  to me.
6  Q.  Okay.
7  A.  But I don't know the exact date.
8  Q.  And then I take it you'd see her at
9  sales meetings and other events or --
10  A.  We were friendly, to say hello at
11  sales meetings, yeah.
12  Q.  Yeah.  Okay.  All right.  I want to
13  turn to your employment since leaving Boston
14  Scientific in April 2015.
15  Your last day of work at Boston
16  Scientific was April 20, 2015; is that right?
17  A.  That sounds correct.
18  Q.  How many jobs have you had since
19  then?
20  A.  One.
21  Q.  And who or what is the name of your
22  employer?
23  A.  Control Medical.
24  Q.  Okay.  You started working for them
25  when?

**Page 37**

1  A.  Mid October.
2  Q.  October '15?
3  A.  Yes.  I think that's the date they
4  have for me starting.
5  Q.  2015.  Right?
6  A.  Correct.
7  Q.  And what's your job with Control
8  Medical?
9  A.  I'm the regional director of sales
10  for the Northeast.
11  Q.  And is that the job that you were
12  hired into, or have you been --
13  A.  No.  That's the job I was hired into.
14  Q.  And what does Control Medical sell?
15  A.  So Control Medical has several
16  products.  They sell a thrombectomy device for
17  peripherals and coronaries.  They sell a
18  micropuncture kit currently.  And in the near future
19  they'll be launching several new products, which I'm
20  not exactly familiar with right now, but they're
21  in -- they're in trials to get them to market.
22  Q.  Do they compete with Boston
23  Scientific at all?
24  A.  No.  I think thrombectomy, Boston
25  Scientific had it and they acquired it after they

Confidential - Subject to Further Confidentiality Review

Page 50

1  knowledge.
2      Q.    All right.  Let's move on then.
3            You are an alcoholic.  Correct?
4      A.    I am.
5      Q.    Okay.  And how many times have you
6  received treatment?
7      A.    So over the course of my life, two --
8  three times.
9      Q.    I'm aware of the treatment you
10  received in March/April 2015 time frame.
11           When else have you received
12  treatment?
13     A.    So after my court case for
14  endangering the welfare of a child, I went to an
15  outpatient center called High Focus.
16     Q.    High Focus?
17     A.    Yes.
18     Q.    Okay.  When was that?
19     A.    Again, I struggle with the exact
20  dates, but I believe it was March through June time
21  frame, probably three years prior, so probably '12.
22     Q.    Okay.
23     A.    '11 or '12, I'm not exactly positive.
24     Q.    Okay.
25     A.    And then in an attempt to save my

Page 51

1  marriage, I went to Hazelden for ten days and
2  realized it wasn't for me, in Minnesota.  And
3  basically -- basically with my ex-wife saying if you
4  don't go, we're done.
5      Q.    And that was Lacia?
6      A.    Yes.
7      Q.    And when was that treatment?
8      A.    I would say that was actually a year
9  prior to that, '11 or --
10     Q.    So about 2011, '12?
11     A.    Yeah.
12     Q.    Or 2010 or '11?
13     A.    Yeah.
14     Q.    And when you say ten days in you
15  realized it wasn't for you, what do you mean by
16  that?
17     A.    Well, the reason I left is because I
18  found out my insurance would not cover inpatient
19  rehab, my Boston Scientific insurance, until I had
20  completed an outpatient.  And so I chose not to pay
21  35 thousand dollars to continue treatment that
22  insurance would not cover.
23     Q.    But you did then immediately go to
24  outpatient.  Right?
25     A.    I did not go to outpatient.

Page 52

1      Q.    Any other reason you left Hazelden?
2      A.    I didn't believe I was an alcoholic
3  at that point.
4      Q.    You say at that point.  I take it now
5  looking back you acknowledge you were an alcoholic
6  at that point?
7      A.    Could you explain that question to me
8  better?  I mean, clearly I didn't acknowledge I was
9  an alcoholic at that point.  There's -- there's a
10  bunch of debate about when alcoholism starts,
11  whether at birth or whether you work yourself into
12  that through drinking, so I can't tell you if I
13  believe I was an alcoholic then or not.
14     Q.    At what point do you believe you
15  became an alcoholic?
16     A.    A very difficult question.  I think
17  my drinking escalated post my divorce.  And I
18  believe in my heart that I became an alcoholic when
19  I began to get consequences from alcohol.
20     Q.    When did the consequences start?
21     A.    I would say the consequences started
22  right before entering rehab were the biggest
23  consequences that I experienced from alcohol.
24     Q.    And were there consequences prior to
25  that?

Page 53

1      A.    It depends on whose viewpoint you're
2  looking at, whether you're talking to my ex-wife and
3  thinking that I, you know, was drinking with
4  children.  But no, no significant consequences as
5  far as loss of job or -- not in my opinion.
6      Q.    How about corrective counseling,
7  final written warning, that sort of thing?
8      A.    Yeah.  I did receive two of those.
9      Q.    Were those -- are those consequences
10  of drinking in your mind?
11     A.    I did not -- they are consequences of
12  drinking.  I did not completely agree with
13  everything in either of those.
14     Q.    When did the drinking start affecting
15  your work?
16     A.    It's hard to put a pinpoint date on
17  it.  I'm not sure it ever affected my ability to do
18  the job or to do the job very well.
19     Q.    Is that your testimony today?
20     A.    It's my belief that I was still
21  performing at a high level.
22     Q.    It didn't have any impact on your
23  job?
24     A.    I'm not saying it didn't have any
25  impact.  My testimony is that I believe I was still

Confidential - Subject to Further Confidentiality Review

Page 54

1 a competent manager and still extremely successful
2 in the goals that were set forward for me by Boston
3 Scientific as far as achieving quota and making
4 sales.
5     Q.     When did it start impacting your job?
6     A.     I would say when Sam Conaway gave me
7 a corrective action, that in that instance,
8 obviously in the minds of my superiors had an issue
9 with it.
10     Q.     What prompted you to seek treatment
11 in March of 2015?
12     A.     I had just reached the end of my rope
13 with drinking and I had hit my bottom and I was
14 ready to get help finally.
15     Q.     And how long was that treatment?
16 That was inpatient treatment.  Right?
17     A.     Inpatient for 30 days.
18     Q.     And where was that?
19     A.     California.
20     Q.     And what was the name of the center?
21     A.     Sound Landings, Solid Landings.
22     Q.     Did your drinking impact your life,
23 so I'm expanding it beyond work, prior to March
24 2015?  Did it have adverse consequences in your
25 life?

Page 55

1     A.     It did.
2     Q.     How so?
3     A.     Strained relationship with family and
4 loved ones.  Over the course of years, it affected
5 my visitation with my children.
6     Q.     Any other way?
7     A.     You know, it depends on how you look
8 at it.  I had a negative relationship with my
9 ex-wife, Lacia.
10     Q.     Did -- so your divorce became final
11 with Lacia in January 2014; is that correct?
12     A.     Correct.
13     Q.     I think you said earlier that kind of
14 caused you to increase your drinking; is that right?
15     A.     It gave me the opportunity to drink
16 more and more freely.
17     Q.     And you did.  Correct?
18     A.     Yes.
19     Q.     And do you recall part of what
20 started was you started binge drinking?
21     A.     I started drinking, yes, more at a
22 time than before.
23     Q.     Do you recall reporting to others
24 that you engaged in binge drinking?
25     A.     No.

Page 56

1     Q.     Did you engage in four-day binges
2 where you'd drink two bottles of liquor a day for
3 four days?
4     A.     No.
5     Q.     Did you ever report engaging in binge
6 drinking for four days at a time?
7     A.     That I can recall, I did not.
8     Q.     Did your drinking change your
9 behavior at all?
10     A.     Yes.
11     Q.     How so?
12     A.     I was not as happy a person.  I think
13 it caused some extreme or -- moods, either good or
14 bad.  And I was much quicker to arguments.
15     Q.     Temper?
16     A.     Yes.
17     Q.     Did it cause you to have slurred
18 speech?
19     A.     Not that I knew of, but I've heard it
20 has, yes.
21     Q.     You don't dispute that it caused you
22 to have slurred speech?
23     A.     As I just said, I didn't hear it from
24 myself, but other people have told me that I had.
25     Q.     Do you deny it?

Page 57

1     A.     I think I just answered the question
2 that I don't deny that other people have told me I
3 had.
4     Q.     Do you deny that you had slurred
5 speech?
6     A.     I don't know if I had slurred speech.
7     Q.     Did it cause you to fail -- failure
8 to recall things?
9     A.     Yes.
10     Q.     Did it make it difficult to
11 concentrate?
12     A.     At times.
13     Q.     Did it make you less focused?
14     A.     Yes, I believe so, at times.
15     Q.     Did it create -- did you ever have
16 blackouts where you couldn't remember things?
17     A.     No.  Infrequently.
18     Q.     How frequent?
19     A.     There would be vast amount of times
20 that I was fine, not blackouts.
21     Q.     Excuse me.  I interrupted you.
22          When you did have blackouts, what
23 happened?
24     A.     I had no negative consequences that I
25 can recall from a blackout.

Confidential - Subject to Further Confidentiality Review

Page 58

1    Q.    How many times do you think you had a
2  blackout in the last -- in 2014 and 2015?
3    A.    I don't recall ever having a
4  blackout. I recall not remembering small things
5  that had happened during the course of an evening,
6  but never a full blackout where patches of time were
7  gone.
8    Q.    Do you recall the incidence when you
9  were at a restaurant with Anna Knighten and you had
10  called the police because you thought somebody had
11  stolen your car?
12    A.    I don't recall that.
13    Q.    And the police gave you a ride home
14  and your car was in your driveway?
15    A.    I don't recall that.
16    Q.    Okay. Do you deny that happened?
17    A.    I don't recall that. I don't know if
18  it happened.
19    Q.    Okay. Is it possible?
20         MR. MARTIN: He just answered the
21  question. Possibility is not an appropriate
22  question.
23  BY MR. KNAPP:
24    Q.    Is it possible that happened?
25         MR. MARTIN: If you don't recall, you

Page 59

1  answer the question.
2         THE WITNESS: I don't recall.
3  BY MR. KNAPP:
4    Q.    Is it possible, whether you recall or
5  not?
6         MR. MARTIN: Anything is possible.
7         THE WITNESS: Anything is possible.
8  BY MR. KNAPP:
9    Q.    So it is?
10    A.    Yes.
11    Q.    Did you become more physically
12  confrontational as a result of your drinking?
13    A.    No.
14    Q.    Did you become more lethargic or did
15  you -- about things?
16    A.    At times.
17    Q.    What was your -- did you just -- you
18  know, in the final months of your alcoholism before
19  you sought treatment in March 2015, how often a week
20  would you drink?
21    A.    I would venture to say it varied, but
22  probably five days, five nights a week.
23    Q.    And when would you start drinking on
24  any given day?
25    A.    Usually after the workday was

Page 60

1  complete.
2    Q.    Your testimony is you only drink at
3  night?
4    A.    No.
5         MR. MARTIN: That's not what he said.
6  BY MR. KNAPP:
7    Q.    Okay. Did you ever drink during the
8  workday?
9    A.    I've drank during traditional work
10  hours, yes.
11    Q.    Okay. Did you ever drink during your
12  employment at Boston Scientific?
13    A.    Yes.
14    Q.    Did drinking affect your judgment?
15    A.    Yes.
16    Q.    Did it cause you to say or do things
17  that you probably wouldn't have done if you hadn't
18  been drinking?
19    A.    Yes.
20    Q.    Did you consume illegal drugs while
21  you were drinking?
22    A.    No.
23    Q.    Did you ever consume illegal drugs
24  like cocaine at any work meetings or sales meetings?
25    A.    No.

Page 61

1    Q.    Have you drunk -- have you consumed
2  alcohol at all since being released from the
3  treatment facility in California in April 2015?
4    A.    I have. It has not been a perfect
5  journey.
6    Q.    Tell me about that.
7    A.    It's been on a rare occasion a couple
8  of times for short periods of time, which I quickly
9  caught myself and reentered the AA program.
10    Q.    And when were those -- are those --
11  do you refer to those as relapses?
12    A.    I do.
13    Q.    Okay. And when did those relapses
14  occur?
15    A.    To my recollection, I don't have
16  specific dates, but summertime and then maybe into
17  the fall. It was when -- before I started with
18  Control Medical.
19    Q.    Okay. When you say summer and fall,
20  you're referring to the summer and fall of 2015?
21    A.    That's correct.
22    Q.    Did you lie about your drinking to
23  others?
24    A.    Yes.
25    Q.    Did you lie about your drinking to

Confidential - Subject to Further Confidentiality Review

Page 62

1  others at Boston Scientific?
2       A.    Not that I can recall.
3       Q.    Did your drinking cause you to miss
4  work meetings?
5       A.    No.
6       Q.    Did it cause you to be late for work
7  meetings?
8       A.    No.
9       Q.    Did it cause you to be absent from
10 work meetings or work events?
11      A.    No.
12      Q.    Never?
13      A.    No.
14      Q.    Did it cause others to ask you not to
15 participate in meetings or work events?
16      A.    No.
17      Q.    Never?
18      A.    No.  Not that I can recall.
19      Q.    Do you recall a work visit at
20 Columbia Presbyterian with Peter Dunn?
21      A.    I had many work visits with Pete Dunn
22 at Columbia Presbyterian.
23      Q.    Do you recall a meeting with a
24 cardiologist whose patient had died with a Boston
25 Scientific device inside of him, and the

Page 63

1  cardiologist asked you to come meet with him after
2  that death?
3       A.    I don't recall that.
4       Q.    Do you recall Pete Dunn waiting with
5  you in the hallway outside of this physician's
6  office and telling you, you're drunk, go home?
7       A.    No.
8       Q.    You don't recall anything like that
9  at all?
10      A.    No.
11      Q.    Is it possible that happened?
12      A.    No.
13      Q.    Would Pete --
14      A.    I don't believe so.
15      Q.    Would Pete Dunn be lying if he said
16 that?
17      A.    I don't think Pete Dunn lies.
18      Q.    Okay.  So if he said that, it would
19 be true?
20      A.    I believe he believes it to be true.
21      Q.    Do you recall leaving and not going
22 into that meeting?
23      A.    I don't know what meeting you're
24 talking about, so I can't say either way.
25      Q.    Do you think that would be something

Page 64

1  you'd remember, if a subordinate of yours said, I
2  don't want you to come into this meeting with this
3  cardiologist who just had a patient who died with a
4  device inside of him because I think you're drunk?
5       A.    I don't think that was ever said to
6  me that I recall.
7       Q.    You think you'd remember that if it
8  was?
9       A.    I think I will.
10      Q.    Do you recall any of your employees
11 ever asking you if you'd been drinking?
12      A.    No.
13      Q.    Do you recall telling any of your
14 subordinate employees that you had alcoholism?
15      A.    I did.
16      Q.    Who did you tell that you had
17 alcoholism?
18      A.    I don't think I put it as alcoholism,
19 to my recollection.  I think I put it to a drinking
20 problem.
21      Q.    Who did you tell that you had a
22 drinking problem?
23      A.    I had spoken to several of my
24 subordinates.
25      Q.    Who?

Page 65

1       A.    Joe Peabody, Pete Dunn, Tom Garrett,
2  Michele Polk.  And I believe that the other members
3  of my team, I just said that I was going away on
4  leave.  I remembered telling Sam Conaway as well
5  before I left for treatment that I was going away on
6  leave.
7       Q.    So to the extent you had discussions
8  with Joe Peabody, Pete Dunn, Tom Garrett and Michele
9  Polk that you had a drinking problem, was that all
10 in one meeting where you told all of them at the
11 same time, or did you have separate conversations
12 with them?
13      A.    Phone conversations individually.
14      Q.    Individualized?
15      A.    Yeah.  I also told Camille Chang
16 Gilmore, the head of HR, that I've identified that I
17 have the disease of alcoholism.
18      Q.    And to the extent you told Joe, Pete,
19 Tom and Michele that you had a drinking problem, was
20 this in March 2015 or prior to that?
21      A.    I believe I had discussions with Joe
22 Peabody prior to that, feeling as if, you know,
23 because of my divorce, I was drinking more than I
24 should, but I didn't classify it as a drinking
25 problem.  But the others, I believe it was toward

Confidential - Subject to Further Confidentiality Review

---

**Page 70**

1    Q.    Did you tell anybody at Boston
2  Scientific that you had been arrested?
3    A.    I had spoken to Anna Knighten.
4    Q.    Your girlfriend?
5    A.    Yes.
6    Q.    Okay. Anybody else?
7    A.    I believe she spoke with a Chris
8  Hodge. And I believe when I got out, I had spoken
9  to Tom Garrett and Joe Peabody.
10    Q.    So Tom and Joe are subordinates.
11  Right?
12    A.    Yes.
13    Q.    And Tom already knew about it because
14  he came to your house and you weren't there and
15  called the police and they said you were in jail.
16  Right?
17    A.    I think he went to the police station
18  and had a discussion with them, and they said they
19  weren't allowed to disclose where I was, but I was
20  in a safe place.
21    Q.    Who is Chris -- was it Hodges?
22    A.    Chris Hodge, H-O-D-G-E. He's a
23  friend that works at Boston Scientific, not a
24  subordinate.
25    Q.    Did you ever tell any of your

---

**Page 71**

1  supervisors that I wasn't working Monday and Tuesday
2  because I was in jail?
3    A.    No.
4    Q.    Okay. Anything like that?
5    A.    No.
6    Q.    Why not?
7    A.    I didn't feel that it would reflect
8  positively on me in the work space.
9    Q.    Did you think you could be fired for
10  that?
11    A.    I would doubt I would have been with
12  explaining the reasoning behind it. No, I don't
13  think it would be warranted to fire someone for --
14  for that.
15    Q.    Because you thought it was all
16  unjustified. Right?
17    A.    Because I thought it was, yeah,
18  overpolicing and overboard.
19    Q.    Right.
20    A.    Yes.
21    Q.    You didn't want to take the risk of
22  what might happen and let them know?
23    A.    I didn't see that it would benefit me
24  in any way and reflect positively.
25    Q.    Did you take vacation for those two

---

**Page 72**

1  days that you were in jail?
2    A.    I did not take vacation.
3    Q.    Your supervisors assumed you were
4  working those two days. Right?
5    A.    So there's an assumption at Boston
6  Scientific that people work flexible hours. And
7  every single manager or sales leader that I've had
8  understands that as sales reps don't work 9:00 to
9  5:00 jobs, so you take time when you need time. But
10  it's clear that we have an exorbitant amount of
11  hours that we work, so they're okay with working on
12  a flexible schedule.
13    Q.    Did you ever fire any of your
14  subordinates?
15    A.    I have.
16    Q.    How many?
17    A.    So I let go of -- I just want to get
18  this accurate.
19    I let go of at least one, and I'm not
20  positive -- no. I let go of two, and I'm not
21  positive if the third one resigned before we let him
22  go, but we certainly had him on an action plan.
23    Q.    Who -- what are the names of the two
24  or three folks that you fired?
25    A.    To my recollection, and I'm sorry if

---

**Page 73**

1  I'm missing one, but Jack Condon.
2    Q.    Okay.
3    A.    Andrew McNelly and Chris Beck.
4    Q.    How about Kevin Slovak?
5    A.    Kevin Slovak, yes.
6    Q.    You fired him too?
7    A.    I forgot about that. We had to let
8  Kevin go, yes.
9    Q.    Okay. Why did you fire Kevin?
10    A.    I had heard reports that he was
11  ineffective in the field and causing more issues
12  than he was helping the sales process.
13    Q.    Is there any incident that caused you
14  to make that decision?
15    A.    There were several incidents that
16  were reported to me where customers felt he was
17  inappropriate in their labs.
18    Q.    How so?
19    A.    Not knowing specific protocol,
20  meaning breaking a sterile field during a procedure,
21  not focused on the job as far as talking to other
22  reps and being bothersome to techs and nurses while
23  procedures were going on. And frankly, I didn't
24  feel that he put the effort in to learning the
25  product lines in as much detail as he should have.

---

Confidential - Subject to Further Confidentiality Review

Page 74

1    Q.    Why was Chris Beck let go?

2    A.    Chris Beck was let go because he was
3  ineffective at the role.

4    Q.    Was there an incident that kind of
5  was the straw that broke the camel's back with him?

6    A.    No specific incident. He just didn't
7  show competency in simple tasks that we asked of our
8  sales representatives as far as inventory, sales,
9  customer relationships.

10   Q.    How about Andrew McNelly?

11   A.    Similar to Chris Beck. He just
12 showed inconsistent in the competencies we look for
13 in a sales representative.

14   Q.    No particular event that led to his
15 discharge?

16   A.    Not that I recall a specific event.
17 It was a buildup of incompetence.

18   Q.    How about Jack Condon?

19   A.    Jack Condon, he had customer reports
20 against him, and he had been banned from several
21 hospital systems because of aggressive behavior in
22 sales.

23   Q.    Do you recall, did you have regularly
24 scheduled Monday calls with your boss?

25   A.    Gary Lickovitch?

Page 75

1    Q.    Before Gary.

2    A.    Paul Reilly?

3    Q.    Yeah.

4    A.    I can't tell you if it was Monday.
5  We had regular calls with him, though.

6    Q.    Who was your director back when you
7  were incarcerated?

8    A.    Paul Reilly.

9    Q.    Do you recall that at that time you
10 had regularly scheduled Monday calls with Mr. Ryan?

11   A.    Mr. Reilly?

12   Q.    Reilly, excuse me.

13   A.    As I said, I don't recall if they
14 were on Monday, but we had regular scheduled calls.

15   Q.    Did your drinking cause you to be so
16 drunk at dinners with clients that you had
17 difficulty communicating?

18   A.    No.

19   Q.    Do you recall being intoxicated on
20 the phone during the workday when your subordinates
21 called you?

22   A.    I believe that's happened rarely.

23   Q.    How many times do you think it's
24 happened?

25   A.    Several.

Page 76

1    Q.    Three?

2    A.    I think that would be accurate. In
3  that range. It wasn't often:

4    Q.    Do you recall specific incidences?

5    A.    No.

6              - - -

7        (Deposition Exhibit No. Simons-1,

8     Biopsychosocial Intake Assessment, Bates

9     stamped SOLID LANDING_000005 through SOLID

10    LANDING_000014, was marked for

11    identification.)

12             - - -

13 BY MR. KNAPP:

14   Q.    Mr. Simons, I'm showing you what's
15 been marked as Exhibit 1. This is an intake
16 assessment that we received from your provider of
17 inpatient treatment in March and April of 2015. So
18 I'm going to ask you some questions with respect to
19 what's in here.

20        You'll see the assessment date is
21 March 14, 2015 up on the top of the first page.

22        Do you see that?

23   A.    Uh-huh.

24   Q.    Is that the date that you commenced
25 your treatment?

Page 77

1    A.    I believe I went out the 13th.

2    Q.    Okay. Do you recall having an intake
3  meeting?

4    A.    I did.

5    Q.    Where you provided information, they
6  asked questions and you answered them?

7    A.    I did, yeah.

8    Q.    If you look down towards the bottom,
9  there's a question, "What are the reasons for
10 seeking treatment now?"

11        Do you see that?

12   A.    Uh-huh.

13   MR. KNAPP:  Okay. And I should note
14 that this document, this exhibit, is confidential,
15 subject to the protective order. And we'll say the
16 testimony relating to it should also be such.

17        MR. MARTIN:  Thank you. We agree to
18 that.

19 BY MR. KNAPP:

20   Q.    It says, "Patient says he has been
21 drinking for 'a very'" long "'time,' starting in
22 high school."

23        Do you see that?

24   A.    Yes.

25   Q.    Okay. "Over the years, patient says

Confidential - Subject to Further Confidentiality Review

Page 86

1    Q.    I'm not sure.
2          It says, "Patient meets medical
3    necessity for Alcohol Dependence at the Detox level
4    of care.  Patient's symptoms result in significant
5    impairments in functioning, as evidenced by
6    plaintiff's deteriorating occupational functioning,
7    deteriorating social functioning, and deteriorating
8    interpersonal relationships."
9          Do you see that?
10   A.    Yes.
11   Q.    Do you agree with that, that at that
12   point there were significant impairments in your
13   functioning?
14   A.    I agree with that certain areas of my
15   life were suffering because of drinking.
16   Q.    And how was the drinking
17   significantly impacting your occupational or work
18   functioning?
19   A.    I -- well, clearly the perception of
20   me had changed with Sam Conaway and then
21   subsequently Gary Lickovitch.  So my ability to --
22   for them to consider me effective I think had
23   been -- had been changed, their perception of me.
24   Q.    You keep talking about people's
25   perception of you and their view of you as opposed

Page 87

1    to what you were doing.  And my question was, how
2    did it impact your job functioning.
3          And is it your testimony that the
4    only way it impacted your job functioning is because
5    other people had issues with you?
6    A.    No, no.  I believe maybe I became
7    less patient with people.  I believe that even when
8    I wasn't under the influence of alcohol, that you
9    still have negative effects as far as patience
10   level, tolerance of things.  I believe it changes
11   when you're an active alcoholic.  I believe it has
12   the possibility to change some of your personality
13   traits.
14   Q.    Got it.  Do you recall reporting in
15   your treatment session that you "distrust certain
16   men because I see them as competition in the
17   workplace and for...chicks"?
18         MR. MARTIN:  Just answer the
19   question, do you recall.
20         THE WITNESS:  No.
21         - - -
22         (Deposition Exhibit No. Simons-2,
23   Group Sessions, Wednesday, April 1, 2015,
24   Bates stamped SOLID LANDING_000293, was
25   marked for identification.)

Page 88

1          - - -
2    BY MR. KNAPP:
3    Q.    Showing you what's been marked as
4    Exhibit 2, Mr. Simons, this is notes of Solid
5    Landings from a group session on April 1, 2015.
6          And if you read the paragraph that's
7    labeled "Individual Assessment/Intervention," do you
8    see that?
9    A.    Yes.
10         Okay.
11   Q.    This has you saying in quotes, "I
12   still distrust certain men because I see them as
13   competition in the workplace and for the chicks."
14         Is it possible you said that?
15   A.    It's possible.
16   Q.    Okay.  What did you mean by that?
17   A.    Well, first, if you understand the
18   atmosphere, it was five men and there was somewhat
19   of a camaraderie and joking atmosphere in there
20   where you were trying to get a laugh from people.
21   But I had the feeling throughout the time that I
22   spent with Sam Conaway that he was threatened by my
23   presence because it took away from attention that he
24   got.
25   Q.    Okay.  This says you "distrust

Page 89

1    certain men because I see them as competition in the
2    workplace."
3          Did you?
4    A.    I don't think that's accurate.  I
5    think probably as I sit here today what I would mean
6    is that I distrust certain men in charge of my
7    career, because they see us as competition.
8    Q.    So it's them that's feeling
9    competitive, not you?
10   A.    Oh, I think we both are competitive.
11   And that's the nature of the business that we're in.
12   Q.    Did you find Gary Lickovitch -- did
13   you feel competitive with him?  Did you see him as a
14   competitive threat?
15   A.    No, I didn't.
16   Q.    How about Sam Conaway?
17   A.    I think Sam viewed me possibly as a
18   competitive threat.
19   Q.    How about you?
20   A.    I did not see Sam as a competitive
21   threat, no.
22   Q.    Is there anybody else in the
23   workplace that you would have -- any men in the
24   Boston Scientific workplace that you saw as
25   competition?

Confidential - Subject to Further Confidentiality Review

Page 102

1    Q.    Have you ever received -- been
2  arrested or received tickets for road rage
3  incidents?
4    A.    No.
5    Q.    Have you ever engaged in road rage?
6    A.    It depends on your definition of road
7  rage.
8    Q.    Okay.
9    A.    But yeah, have I ever been angry that
10 someone cut me off or -- yeah, of course.
11   Q.    Okay.  Do you recall any incidents
12 when you actually physically hit cars?
13   A.    No.
14   Q.    Do you recall the first time that you
15 and Gary Lickovitch rode together on a sales call
16 when he started supervising you, New York, and you
17 got upset with a taxi driver and actually hit the
18 vehicle?
19   A.    With my hand?
20   Q.    Yes.
21   A.    Yes, I recall that.
22   Q.    Okay.
23   A.    He was getting extremely close to my
24 car, so I wanted to stop that and wake that up and
25 say, hey, you're about to hit me.

Page 103

1    Q.    Okay.
2    A.    And he was close enough to reach my
3  hand out the window of my vehicle and touch it, and
4  that's what I did.
5    Q.    Okay.  And what did you say?
6    A.    I don't recall, but I'm sure it
7  wasn't...
8    Q.    Some F bombs here and there?
9    A.    Possibly.
10   Q.    Do you recall what Gary said to you
11 after that incident?
12   A.    I don't.
13   Q.    Do you recall him saying, don't ever
14 do that again?
15   A.    No.
16   Q.    Any other incidents like that where
17 you hit cars?
18   A.    Not that I recall.
19        MR. KNAPP:  All right.  Should we
20 take a quick break?
21        MR. MARTIN:  Yeah.  It's a good time.
22        THE VIDEOGRAPHER:  The time is 11:02
23 a.m.  We are off the record.
24        - - -
25        (A recess occurred from 11:02 a.m. to

Page 104

1  11:14 a.m.)
2        - - -
3        (Deposition Exhibit No. Simons-4,
4  Application for Employment, Bates stamped
5  BSC00000006 through BSC00000015, was
6  marked for identification.)
7        - - -
8        THE VIDEOGRAPHER:  This begins Disk 2
9  of the deposition.  The time is 11:14 a.m.  We are
10 on the record.
11 BY MR. KNAPP:
12   Q.    All right.  Mr. Simons, I'd like to
13 turn the questioning now to your employment at
14 Boston Scientific.
15   A.    Okay.
16   Q.    You started working for Boston
17 Scientific in February 2000.  Right?
18   A.    February or March, yes.  I believe
19 February, though.
20   Q.    Showing you what's been marked as
21 Exhibit 4.  We're not going to spend a lot of time
22 with this, but I just wanted to confirm that
23 this is your application for employment with Boston
24 Scientific, which you signed in February of 2000,
25 and the resume you submitted?

Page 105

1    A.    Yes.
2    Q.    And when you were first hired at
3  Boston Scientific, you were hired to be territory
4  manager for Long Island and the West Peripheral
5  Vascular Territories?
6    A.    That's correct.
7    Q.    And you reported to Tony Ratchford?
8    A.    Yes; for a short time.
9    Q.    He was -- okay.  And Tony was the
10 regional manager for New York?
11   A.    Yes.
12   Q.    Okay.  And that's the job you
13 ultimately ended up with?
14   A.    To start, yes.
15   Q.    And then you were promoted to manager
16 in January of 2009; is that right?
17   A.    That's correct.
18   Q.    And so when you were promoted to
19 manager, can you just describe what that job meant?
20 What did it -- what were your job duties?
21   A.    So regional manager at Boston
22 Scientific is responsible for the development of
23 representatives as well as his region or her region
24 attaining quota set by the company.
25   Q.    And how does the regional manager

Confidential - Subject to Further Confidentiality Review

Page 106

1  help reach quota?
2      A.    Many ways.  You help representatives
3  devise a clear-cut plan and then to execute that
4  plan, as well as -- as well as assisting in
5  contracts and ultimately increasing usage of the
6  devices.
7      Q.    So -- and assisting with contracts
8  meaning -- means, among other things, like closing a
9  deal with a potential new customer?
10     A.    That's correct.
11     Q.    Or a existing customer for a new
12 sale?
13     A.    Right.  For more -- expanding your
14 base of business within a hospital or hospital
15 system.
16     Q.    And it also includes kind of
17 maintaining the customer relationship.  Right?
18     A.    Yes.  You're responsible for strong
19 customer relationships, especially with key opinion
20 leaders.
21     Q.    Especially what?
22     A.    Key opinion leaders.
23     Q.    And what was -- as regional manager,
24 what was the region that you manage?
25     A.    So New York and New Jersey it was

Page 107

1  called.
2      Q.    Okay.
3      A.    So it was basically the five
4  boroughs -- at the beginning of my employment, it
5  was the five boroughs of New York and Northern New
6  Jersey, Central to Northern New Jersey.
7      Q.    Did that region change from 2009 to
8  2015?
9      A.    It did.  Boston Scientific went
10 through a reduction in force.  So I believe then --
11 my numbers may not be exactly accurate, but they had
12 35 managers and they cut that down to 17 or 18
13 managers.  So with that reduction in force, I was
14 given a larger geographic territory.
15     Q.    And when did that RIF or reduction in
16 force occur?
17     A.    Again, I'm really bad with dates, but
18 I believe it was probably two years prior, maybe a
19 year-and-a-half prior to my end of employment.
20     Q.    So sometime in 2013 perhaps?
21     A.    That sounds like it probably is
22 right.
23     Q.    So when your region was expanded, how
24 was it expanded?
25     A.    So I picked up geographic areas of

Page 108

1  Long Island as well as some other accounts in New
2  Jersey and Westchester and more upstate New York
3  areas.  I also had different representatives come
4  onto our team from the other region.
5      Q.    So is it correct that during the
6  entire time that you were a regional manager, you
7  reported to a -- somebody in Gary Lickovitch's
8  position?
9      A.    No.
10     Q.    Okay.
11     A.    That spot was vacant for an extended
12 period of time.  And then at some point during that
13 time, Sam Conaway, amongst his other
14 responsibilities, was tasked with assisting the
15 regional managers in that role.
16     Q.    So let's talk -- what was Gary's job
17 title?
18     A.    So his job titled changed from the
19 director of the Northeast, without changing any
20 responsibilities, to vice president, I think area
21 vice president or regional vice president of the
22 Northeast.
23     Q.    So when you were hired in 20 --
24 excuse me, promoted to manager, regional manager, in
25 2009, was there a director of the Northeast region?

Page 109

1      A.    Yes.  I was promoted by Paul Reilly.
2      Q.    And how long was Paul your direct
3  supervisor?
4      A.    Paul was let go from the company as a
5  restructuring.  And again, I'm not exactly positive
6  the date.  And subsequently there was a director put
7  in place named Guenter Haines.
8      Q.    Guenter?
9      A.    Yeah, G-U-E-N-T-E-R Haines.  And he
10 was subsequently removed from the position and given
11 another role at Boston Scientific.
12     Q.    And then who replaced Guenter?
13     A.    So that's when the open time was.
14 And then so we reported directly to Mark Toland, the
15 senior VP of sales for a time.  And then I believe
16 Sam was tasked with assisting in the territory.
17     Q.    So the regional -- in your situation
18 as a regional manager, you reported to the sales
19 director for your region?
20     A.    That's correct.
21     Q.    The larger region?
22     A.    Yes.
23     Q.    And that was the Northeast region?
24     A.    Yes.
25     Q.    And then that person who either was

Confidential - Subject to Further Confidentiality Review

Page 110

1 called the director of Northeast or the area vice
2 president for the Northeast reported to the director
3 of sales?
4     A.     The senior VP of sales, yes.
5     Q.     And at the time of your separation,
6 that was Sam Conaway?
7     A.     I'm sorry?
8     Q.     At the time that you were fired, the
9 person in that role was Sam Conaway.  Correct?
10     A.     No.  Gary Lickovitch was in my direct
11 supervisor role, and the senior VP of sales was Sam
12 Conaway.
13     Q.     That's what I'm talking about.
14     A.     Okay.
15     Q.     So in 2009 when you were promoted,
16 who was in the senior VP of sales role?
17     A.     Denis Harrington.
18     Q.     Okay.  Did you have other senior vice
19 presidents of sales that was your second level
20 supervisor other than Denis and Sam?
21     A.     Not -- Mark Toland filled that
22 position between Denis and Sam.
23     Q.     How do you spell Mark's last name?
24     A.     T-O-L-A-N-D.
25     Q.     So it was Denis, Mark and Sam?

Page 111

1     A.     Yes.  From when I was a regional
2 manager, yes.
3     Q.     Right.  Okay.  All right.  So
4 that's -- and then the senior VP of sales reports to
5 whom?
6     A.     The president of the division.
7     Q.     The division is the -- what division?
8     A.     Interventional cardiology.
9     Q.     And that person is Kevin Ballinger?
10     A.     Currently.
11     Q.     And Kevin was the president of the
12 international cardiology division in 2015 when you
13 were let go.  Correct?
14     A.     That's correct.
15     Q.     How many times do you think you've
16 spoken to Kevin Ballinger?
17     A.     I would say you can count them
18 probably 10 to 20 over the years, hello at meetings.
19 He was at several meetings that I was at.
20     Q.     Were you personal friends with him?
21     A.     No.  He's ridden with me on sales
22 rides.
23     Q.     And how many times has he ridden --
24 did he ride with you in sales rides?
25     A.     To my recollection, I rode with Kevin

Page 112

1 once in the field for the day.
2     Q.     And when was that?
3     A.     I don't -- I don't recall the date
4 exactly, but it was during my tenure as a regional
5 manager.
6     Q.     Got it.  Sometime between 2009 and
7 2015?
8     A.     Towards later, you know, '13, '14,
9 probably '14.  I just can't recall the date he was
10 in the field with me.
11     Q.     Did you ever have any significant
12 conversations with him the 10 to 20 times that you
13 would run into him at meetings?
14     A.     We had conversations about customers
15 and business, if you consider that significant.
16     Q.     So let's talk then going the other
17 direction and the team that you supervised.
18           In 2015, how many sales reps reported
19 to you?
20     A.     So I believe I had five sales
21 representatives, six sales representatives.
22     Q.     Why don't you name them.  It looks
23 like you're doing it internally.
24     A.     I'm doing it in my head.
25           So Ryan McKeefrey, Pete Dunn, Tom

Page 113

1 Garrett, Joe Peabody, Michele Polk, Tim Martin,
2 Arial -- I can't recall her last name.  She was a
3 clinical specialist.  I believe that's it.
4     Q.     So in your region in 2015, just one
5 clinical specialist?
6     A.     Two.
7     Q.     Who is --
8     A.     Arial and Tim Martin were both
9 clinical specialists.
10     Q.     So in terms of sales reps, I have
11 Ryan, Pete, Tom, Joe and Michele?
12     A.     So Pete and Tom in 2015 had the role
13 of business partner.  And Joe Peabody, Michele Polk,
14 Ryan McKeefrey had the role of territory therapy
15 consultant.
16     Q.     All right.  How about Louis Del
17 Ponte?
18     A.     I don't --
19     Q.     Was he a sales rep?  Okay.
20           Thad Reardon?
21     A.     I've heard the name Thad Reardon.  He
22 didn't work for me.
23     Q.     Okay.  How about Jillian Rothwell?
24     A.     Did I say Jillian Rothwell on there?
25     Q.     No.

Confidential - Subject to Further Confidentiality Review

Page 122

1 performance -- I don't know even know exactly what
2 it stands for. You submit that to your manager or
3 direct reporting boss. Then he or she in turn fills
4 in their own PDC and evaluates you from their
5 perspective.
6    Q.    So part of it is your own -- if it's
7 your evaluation, part of it's your evaluation of
8 yourself, part of it is your manager's evaluation?
9    A.    That's correct.
10    Q.    Okay. And did you engage in that
11 process with your subordinates?
12    A.    I did.
13    Q.    Same process, it's called a PDC, they
14 self-evaluate and you evaluate them?
15    A.    The forms and names have changed over
16 the years, but that's exactly what we do, yeah.
17    Q.    I'm going to go over some of your
18 evaluations.
19        The first document --
20        MR. MARTIN: Can I ask you something?
21        Were these documents all marked?
22        MR. KNAPP: I'm sorry.
23        MR. MARTIN: The standards of
24 conduct, were they marked? I just didn't know if
25 you marked them.

Page 123

1        MR. KNAPP: Yes.
2        MR. MARTIN: That's okay.
3            - - -
4        (Deposition Exhibit No. Simons-11,
5        2011 Performance Achievement and
6        Development Form, 4 pages, was marked for
7        identification.)
8            - - -
9 BY MR. KNAPP:
10    Q.    Exhibit 11 is a 2011 performance
11 achievement development evaluation for you.
12 Correct?
13    A.    Yes.
14    Q.    And if you look at the top, on the
15 first page, it says, "Review Date: March 14, 2012."
16        Do you see that?
17    A.    Yes.
18    Q.    So this is something given to you in
19 March 2012 about your prior year's performance.
20 Correct?
21    A.    Yes.
22    Q.    And at this point, your supervisor is
23 Paul Reilly. Right?
24    A.    Correct.
25    Q.    And he's giving you this feedback; is

Page 124

1 that right?
2    A.    Yes.
3    Q.    Sorry. In this evaluation from 2012,
4 he reports it was probably the worst year ever for
5 you in terms of your numbers. Right?
6    A.    Yes.
7    Q.    Business declined more than 10
8 million from the year prior?
9    A.    Correct.
10    Q.    You fell 11 million short of your
11 goal. Right?
12    A.    That's correct.
13    Q.    And he kind of gives you the benefit
14 of the doubt and says, I think this is an anomaly.
15 It's just a bad year. Right?
16    A.    Yes.
17    Q.    It looks like your overall
18 evaluation, if you go to page 3, is achieves
19 expectations. Right?
20    A.    Yes.
21            - - -
22        (Deposition Exhibit No. Simons-12,
23        Performance-Development-Coaching (PDC),
24        Bates stamped BSC00000215 through
25        BSC00000218, was marked for

Page 125

1        identification.)
2            - - -
3 BY MR. KNAPP:
4    Q.    Exhibit 12 then is your next year's
5 evaluation that was given to you by Guenter Haines.
6 Correct?
7    A.    Yes.
8    Q.    And Haines is H-A-I-N-E-S. Right?
9    A.    Yes.
10    Q.    And this would have been given to you
11 in early 2013. Right?
12    A.    Either early 2013 or mid year. We
13 had two reviews a year, so I'm not sure which one
14 this is.
15    Q.    Then if you turn to page 3, there's a
16 box that's called "Manager Summary."
17        Do you see that?
18    A.    Yes.
19    Q.    It looks like PDC, if you look at the
20 top, stands for performance development coaching.
21 Right?
22    A.    Yes.
23    Q.    If you look in that "Manager Summary"
24 box, the third sentence says, "Mike is one of the
25 most talented/instinctual managers in the

Confidential - Subject to Further Confidentiality Review

Page 126

1 organization. When he's personally involved, good
2 things happen."
3        Do you see that?
4    A.   Yes.
5    Q.   What did you think he meant by that,
6 "when he's personally involved, good things happen"?
7    A.   I assumed he meant when I'm part of
8 the sales process, that my skills help benefit the
9 process.
10   Q.   And if you look at the fourth -- the
11 last page, you again get an achieves expectations
12 rating. Right?
13   A.   Yes.
14   Q.   So that's -- on a scale of 1 to 5,
15 there's five possible evaluations to be given.
16 Right? Outstanding, exceeds expectations, achieves
17 expectations, needs improvement or too new to rate.
18 Right?
19   A.   Correct.
20   Q.   And on that scale you're right in the
21 middle at achieves. Correct?
22   A.   On this evaluation, yes.
23   Q.   And then if you look above where it
24 says "Personnel Performance Management," do you see
25 that, the box?

Page 127

1    A.   Yes.
2    Q.   It says, "Mike got burned in 2012
3 thinking that everyone on his team is doing their
4 job to the best of their ability. When he
5 personally started inspecting, he realized that was
6 not the case."
7        Do you see that?
8    A.   I do.
9    Q.   What was that referring to?
10   A.   Meaning I started focusing more on
11 inspecting their planning and business plans and
12 then having discussions with my representatives on
13 ways that they could more effectively handle their
14 own territories. And that's what we had discussed
15 in management meetings, that I need to be more hands
16 on with their business plans.
17   Q.   And what specifically do you know, if
18 you recall, did he mean by you having got burned in
19 2012?
20   A.   I don't recall what he's referring
21 to.
22   Q.   Did you learn that you can't just let
23 your sales reps work on autopilot?
24   A.   I did. We had an incident with Jack
25 Condon when I let him go, that we lost a large

Page 128

1 account as a result of letting Jack go. And I
2 hadn't developed the relationships that I should
3 have in that account prior to moving forward with
4 the termination.
5    Q.   And do you think that's what he's
6 talking about?
7    A.   I'm not -- again, I don't know what
8 he's talking about, but that could be the cause.
9        - - -
10       (Deposition Exhibit No. Simons-13,
11       E-mail dated 3/4/2014, 7 pages, was marked
12       for identification.)
13       - - -
14 BY MR. KNAPP:
15   Q.   Mr. Simons, I'm showing you
16 Exhibit 13, which the first page is an e-mail from
17 is Sam Conaway to you dated March 4, 2014. Correct?
18   A.   Uh-huh. Yes, sir.
19   Q.   And in it Sam says, "Mike, please
20 sign and send to HR."
21   A.   Yes.
22   Q.   And at this point, Gary Lickovitch
23 had not been made the area --
24   A.   Area vice president. Right.
25   Q.   -- vice president. Correct?

Page 129

1    A.   Correct.
2    Q.   Sam was acting as your direct level
3 supervisor at that point?
4    A.   Yes.
5    Q.   So is it correct that Sam gives you
6 his evaluation of you and asks you to sign it and
7 give it to HR so it's in your file. Right?
8    A.   That's, yes, normal.
9    Q.   Do you recall why you didn't sign it
10 and send it to HR?
11   A.   I don't recall that.
12   Q.   Okay. Let me back up.
13       Do you recall signing this and
14 sending it to HR?
15   A.   I don't recall signing this and
16 sending it to HR.
17   Q.   So therefore you probably could not
18 answer why you didn't if you don't recall that you
19 didn't. Right?
20   A.   Right.
21   Q.   Do you recall how you felt about this
22 evaluation?
23   A.   I felt there was positive parts to
24 it, but I was a little disappointed with his
25 evaluation of me as far as my seen behavior.

Confidential - Subject to Further Confidentiality Review

Page 130

1    Q.    Okay. Did you think it was unfair?
2    A.    I did feel at that time that it was
3  unfair. And I believe the policy at Boston
4  Scientific is not to sign a PDC that you don't agree
5  with. I'm not positive on that, but that's just
6  what I recall people have done to me when I've given
7  PDCs they didn't like.
8    Q.    Okay. I'm sorry, I didn't hear you.
9          Did you say you thought the policy
10 was if you don't agree with it, you don't sign it?
11   A.    Yeah. I'm not sure that was the
12 policy, but I've had that happen to me as a manager
13 before.
14   Q.    Okay. And is it possible perhaps
15 that's why you didn't sign this and send it to --
16   A.    It's possible, yeah.
17   Q.    Do you recall telling Sam, I don't
18 agree with this?
19   A.    Yes.
20   Q.    And I'm not going to sign it?
21   A.    I don't recall saying I'm not going
22 to sign it, but I remember having discussion I don't
23 agree with it and I'm disappointed in it.
24   Q.    So if you go to the third page of --
25 excuse me, fourth page of the evaluation, fifth page

Page 131

1  of the exhibit, there's an overall self-evaluation.
2  So this is the preceding page to the one you're at.
3    A.    Okay.
4    Q.    Right there. And you had given
5  yourself a successful overall self-evaluation.
6  Right?
7    A.    Correct.
8    Q.    And then the next two pages are Sam's
9  evaluation of you. Correct?
10   A.    Yes.
11   Q.    And if you go to the second page, he
12 also gives you a successful overall rating. Right?
13   A.    Correct.
14   Q.    But he gives you some tough feedback.
15 Right?
16   A.    Correct.
17   Q.    He commends you for having been the
18 only regional manager hit the plan in the east?
19   A.    In the company, I believe it was.
20   Q.    Okay. This says, "In 2013, you are
21 the only RM to hit plan for the year in the East and
22 the only regional manager in the East to win
23 P-Club." Right?
24   A.    Yes.
25   Q.    Okay. But you're saying you think

Page 132

1  you also might have been the best in the country?
2    A.    You know, I was the only regional
3  manager to grow their business year over year.
4    Q.    And it says, "In addition, you won
5  the" prestigious, I think it's supposed to say,
6  "Stauberg award for multiple P-Club wins."
7          Do you see that?
8    A.    Yes.
9    Q.    What does that mean?
10   A.    It means you've won five P-Clubs in
11 your career.
12   Q.    Okay. "With all that said," it
13 continues, "it has been a challenging year for you
14 as a sales leader. Your judgment is one of the most
15 important pillars of sales leadership, Mike, in
16 2013, this is the one area that is keeping you from
17 being rated as an outstanding manager. This is a
18 needs improvement area for you as a sales leader.
19 Moving forward, I need to see a 360 degree
20 turnaround in this important leadership metric."
21 Right?
22   A.    Correct.
23   Q.    So it goes on to say, "I look forward
24 to your develop" -- development probably -- "in
25 2014. In order to continue as a manager in good

Page 133

1  standing at BSC, in 2014, you must demonstrate good
2  leadership judgment with no infractions. As I wrote
3  in your corrective action, any future lapse in good
4  judgment could lead to termination."
5          Right? Is that what he said?
6    A.    Not exactly what he said, is it? Am
7  I reading it wrong?
8    Q.    Did I misspeak?
9    A.    Could you repeat the question to me?
10   Q.    Well, he basically said, any future
11 lapses in good judgment could lead to termination.
12 Right? I'm looking at the second paragraph. This
13 is the last sentence.
14          MR. MARTIN: The last line -- you're
15 on the wrong page.
16          THE WITNESS: That's the problem.
17 I'm on the wrong page.
18          MR. KNAPP: Back where you were. You
19 were on the right page. The "Manager Summary."
20          MR. MARTIN: "Manager Summary."
21          MR. KNAPP: Second paragraph.
22          THE WITNESS: Okay. I'm looking at
23 the wrong section. Sorry. Yes.
24          MR. MARTIN: He was quoting the last
25 sentence, "As I wrote in your corrective action, any

Confidential - Subject to Further Confidentiality Review

Page 134

1  future lapse in good judgment could lead to
2  termination."
3          THE WITNESS:  That's correct.
4  BY MR. KNAPP:
5      Q.    So March 2014, you're told any future
6  lapse in judgment, you could be fired?
7      A.    That's correct.
8          MR. MARTIN:  Probably -- I'm going to
9  object.  It said, "per your corrective action."
10         MR. KNAPP:  I'm sorry, what was your
11  objection?
12         MR. MARTIN:  That you didn't
13  paraphrase it correctly.  He said, "As I wrote in
14  the corrective action."  So he's referring to the
15  corrective action.  Then he says the remainder of
16  the sentence.
17  BY MR. KNAPP:
18      Q.    As of March 2014, he's telling you
19  that any future lapse in good judgment could lead to
20  termination.  Correct?
21      A.    Correct.
22      Q.    And he goes on, if you look down at
23  the bottom box, it says, "Mike, during your time
24  reporting to me I've seen behavior that is very
25  detrimental to your leadership role."  Correct?

Page 135

1      A.    Correct.
2      Q.    And you go on, the last sentence of
3  that says, "I will need to see no judgment
4  challenges for the next 2 years to consider you for
5  future career advancement.
6          "Mike, I want to be very clear with
7  you.  Correcting your leadership judgment is
8  critical for you to remain in your current role."
9      A.    Correct.
10         MR. MARTIN:  My objection is you
11  missed an entire sentence there that said, "Based on
12  the recent corrective action, you must comply" with
13  "the metrics outlined in the corrective action."  So
14  you're -- excuse me, you're taking it out of
15  context.
16         MR. KNAPP:  I disagree, but you're
17  free to put that context in there.
18         MR. MARTIN:  Uh-huh.
19  BY MR. KNAPP:
20      Q.    So had you had conversations with Sam
21  about wanting to advance further within the company?
22      A.    Yes.
23      Q.    And what was your hope?
24      A.    Well, my hope is that he would view
25  me as a strong leader and recognize my sales success

Page 136

1  and my ability to develop people and move me to the
2  next level.
3      Q.    Which would be the job that
4  ultimately Gary Lickovitch was put in.  Right?
5      A.    Or a role similar to that.  There are
6  other jobs that are viewed as an advancement in the
7  company.
8      Q.    Did you apply for a promotion to that
9  role?
10      A.    Yes.
11      Q.    Were you hoping to get that before
12  you got this review?
13      A.    I was hoping to be in the running for
14  it.  I've done things at Boston Scientific that
15  they've developed me to move forward in the company.
16      Q.    And by this, when you got this
17  review, you understood that wasn't going to happen.
18  Right?
19      A.    I did.
20      Q.    And that was disappointing?
21      A.    Yes.
22      Q.    Did you -- and March 2014 would have
23  been after your divorce with Lacia.  Correct?
24      A.    Yes.
25      Q.    And after you'd started drinking

Page 137

1  more.  Right?
2      A.    Yes.
3
4          (Deposition Exhibit No. Simons-14,
5          E-mail dated 2/14/2014, Bates stamped
6          BSC00002036 through BSC00002039, was
7          marked for identification.)
8          - - -
9  BY MR. KNAPP:
10      Q.    Showing you what's been marked as
11  Exhibit 18, Mr. Simons, is this a corrective action
12  letter that you received from Sam Conaway in
13  February 2014?
14      A.    It is.
15      Q.    So this was a month prior to this --
16  the evaluation that we just looked at.  Right?
17      A.    That's correct.
18      Q.    And the cover e-mail says, among
19  other things, that as a result of this corrective
20  action letter, he's removing you from the trusted
21  advisor sales -- excuse me, the trusted advisor team
22  for sales force 2014?
23      A.    That's correct.
24      Q.    What is the trusted advisor team?
25      A.    It's a made up review team that Sam

Confidential - Subject to Further Confidentiality Review

Page 138

1  had put together that would help -- you know, I'm
2  not sure exactly what their purpose was, but they
3  would get together and have discussions about the
4  sales force.
5      Q.    So different regional managers?
6      A.    Yes.
7      Q.    And at that point, how many were on
8  the trusted advisor team for sales force?
9      A.    I have no idea.
10     Q.    Did you not really care about that?
11     A.    Not at all.
12     Q.    You didn't think that was important?
13     A.    I actually did not feel that was
14 anything that was important to me, no.
15     Q.    And your reaction is kind of like so
16 what.  Right?
17     A.    Yeah.  At that point I was, you know,
18 disappointed that he made any move like that at all,
19 but I wasn't so upset that I wasn't part of that
20 trusted advisor team, no.
21     Q.    Is it fair to say that you didn't
22 entirely respect Sam Conaway?
23     A.    That's fair to say.
24     Q.    You thought you were smarter than
25 him?

Page 139

1      A.    No.
2      Q.    You thought you were more effective
3  than him?
4      A.    No.
5      Q.    Okay.  If you look at the second
6  page, so the actual -- no.  Sorry, the second page
7  of the exhibit, which is the first page of this
8  written corrective action, what was your reaction
9  when you got this?
10     A.    My initial reaction was I think he
11 was exaggerating in each case.  And while he feels
12 he wasn't completely making it up, I think it was
13 going overboard to what the situation was.
14     Q.    So he identified several situations
15 that he observed?
16     A.    Yes.
17     Q.    That you -- where you were
18 essentially drunk during a work function.  Right?
19     A.    That's his interpretation.
20     Q.    And the first is dinner with Dr.
21 Chiu -- is it Dr. Chiu or Dr. Wong?
22     A.    It's Dr. Chiu Wong.
23     Q.    And that dinner was on October 30,
24 2013.  Right?
25     A.    Yes.

Page 140

1      Q.    Do you recall that dinner?
2      A.    Yes.
3      Q.    And Dr. Chiu Wong is the director of
4  the catheterization lab at Cornell?
5      A.    That's correct.
6      Q.    Is he a significant customer?
7      A.    He is in that region.
8      Q.    And he says, during the dinner you
9  were not able to follow the conversation and had
10 unprompted outbursts of laughter?
11     A.    That's absolutely incorrect.
12     Q.    It didn't happen?
13     A.    I did have laughter through -- Dr.
14 Wong and I have a personal relationship and we're
15 friendly.  What I do remember about the dinner is
16 that Sam Conaway had a confrontation with Dr. Wong
17 about not involving Dr. Wong in his studies because
18 Dr. Wong didn't favor Boston Scientific for their
19 stent business.  In fact, Sam's exact quote was, you
20 know how this works, Chiu.  So what I do remember
21 from this dinner is Sam left angry from it and left
22 before the dinner was over.
23     Q.    Okay.  And was he angry at your
24 behavior?
25     A.    He didn't make any comment about my

Page 141

1  behavior that night.  The first I heard about it was
2  this.
3      Q.    He also says, "You were not focused
4  on the strategy that was to be accomplished during
5  the physician meeting.  In summary your behavior was
6  unprofessional and you exhibited poor judgment."
7      A.    I disagree with that.  I'm not sure
8  what the strategy would have been with getting into
9  a confrontation with a large customer as Sam did.
10     Q.    And to the extent you laughed at the
11 dinner, were you laughing at Sam?
12     A.    No.
13     Q.    What were you laughing about?
14     A.    I don't recall what we were laughing
15 about.  It was a social dinner with someone that I
16 enjoy their company.
17     Q.    It goes on to refer to a kickoff
18 meeting with The Medicines Company in New Jersey on
19 December 18, 2013.  Right?
20     A.    Yes.
21     Q.    He said it was a key strategy for the
22 interventional cardiology sales team.
23           Is that -- do you agree with that?
24     A.    I agree he believed it was.
25     Q.    And he says, during that meeting I

Confidential - Subject to Further Confidentiality Review

Page 142

1 noticed how disruptive your behavior was to the
2 meeting's objectives. You slurred your speech and
3 you repeated comments several times.
4        Do you deny that you were slurring
5 your speech?
6    A.    I deny I was slurring my speech.
7    Q.    And that you repeated your comments?
8    A.    I don't recall repeating my comments.
9 What I recall is making a joke when we were doing
10 introductions. And any time that I was out of
11 character for Sam Conaway, whether it was excitement
12 or happiness, that he perceived it as, you know,
13 there -- he must be under the influence. That was
14 my perception.
15    Q.    Did he feel that way about other
16 people, to your knowledge, that they were under the
17 influence when they were acting happy or out of
18 their normal character?
19    A.    I can't speak for Sam Conaway. I
20 just know that I've been with the company for 15
21 years and never had a corrective action taken
22 against me. So I think Sam's perceptions were Sam's
23 perceptions.
24    Q.    This is also during a period when you
25 began drinking heavily. Correct?

Page 143

1    A.    No, I didn't say heavily. I said
2 drinking more. And clearly at this point I feel
3 like it wasn't affecting my performance, because I
4 just won a President's Club and had a great year.
5    Q.    Right. But he's telling you it's
6 affecting your performance. Correct?
7    A.    That's his perception. I don't feel
8 that it was. And I think this was overblown and
9 unfair.
10    Q.    This is at the same period of time
11 that your ex-wife Lacia is complaining about your
12 drinking. Right?
13    A.    That's correct. But alcohol was
14 served at this function, and I witnessed many people
15 drinking.
16    Q.    Were they drunk?
17    A.    Not to my recollection, no.
18    Q.    It goes on to say, "On December 29...
19 there was a Pre-NSM Managers meeting."
20        Do you see that?
21    A.    Yes.
22    Q.    Do you recall him stressing the
23 importance of each manager leading by example to
24 ensure that we don't exhibit inappropriate conduct?
25    A.    Yes.

Page 144

1    Q.    He says, "During" the "awards
2 ceremony I along with several senior leaders
3 observed your girlfriend in attendance at the awards
4 ceremony which was inappropriate and poor judgment
5 to have your girlfriend attend the National Sales
6 Meeting." Right?
7    A.    I saw that he wrote that.
8    Q.    Was Anna Knighten with you at this
9 meeting?
10    A.    Anna Knighten was with me at the
11 hotel at that meeting. Correct.
12    Q.    Was she in attendance at the awards
13 ceremony?
14    A.    Yes. But Sam would not let me
15 explain why she was in attendance.
16        Anna Knighten was a previous employee
17 of Boston Scientific and was invited in to the
18 meeting by her Memphis team, specifically Rick
19 Hayes.
20    Q.    Okay.
21    A.    She was sitting at that table. When
22 I received the Stauberg award, she came from that
23 table to my table to congratulate me.
24    Q.    And shook your hand and then went
25 back to her table?

Page 145

1    A.    No. She sat with us for a second as
2 the meeting went on.
3    Q.    Did you make out with her at all at
4 that meeting?
5    A.    No. I was surrounded my subordinates
6 and team. And that is what I didn't agree with.
7 Sam Conaway, one, didn't listen to my explanation of
8 what had happened; and two, completely made up and
9 exaggerated, in my opinion, her hands were all over
10 me, grabbing me, making out is what he said. And
11 that just didn't happen.
12    Q.    Okay. Did you understand spouses and
13 significant others were not invited?
14    A.    I absolutely did.
15    Q.    Did you know that she had been
16 invited before she showed up?
17    A.    Invited where?
18    Q.    To this meeting.
19    A.    No, I didn't know she had been
20 invited. In fact, I had no idea that she had any
21 plans to see her team from the Memphis area that
22 night.
23    Q.    Was she staying with you that
24 weekend?
25    A.    She was.

Confidential - Subject to Further Confidentiality Review

Page 146

1    Q.    Did you drive there together?
2    A.    Flew.  I think -- where was the
3  meeting?
4    Q.    I don't --
5    A.    This was a flight, I believe.
6    Q.    Where was the meeting?
7    A.    I think it was Florida, if I recall.
8    Q.    Okay.  Did you stay in the same hotel
9  room with her?
10   A.    We did.
11   Q.    Okay.  Did you walk down to the
12 meeting together?
13   A.    No.
14   Q.    You did not know before the meeting
15 started that she was going to attend?
16   A.    That's absolutely correct.
17   Q.    And at that point, she was a former
18 employee of Boston Scientific?
19   A.    That's correct.
20   Q.    And who paid for her flight?
21   A.    I'm not sure if I did or she did.  We
22 may have used miles.  I'm not positive of how that
23 was paid for.
24   Q.    Okay.  So --
25   A.    Not expensed, if that's --

Page 147

1    Q.    What's that?
2    A.    Not expensed.
3    Q.    So you made it kind of a vacation for
4  the two of you?
5    A.    Absolutely.  She had plans to, you
6  know, relax at a nice resort while I had my business
7  meeting.
8    Q.    And were there other spouses and
9  significant others at the meeting?
10   A.    Absolutely.
11   Q.    Just not in the meetings?
12   A.    Incorrect.
13   Q.    Who else?
14   A.    So Jeanne Donlan was in the meeting,
15 and she's not part of the IC crew.  And --
16   Q.    Is she a Boston Scientific employee?
17   A.    She's a Boston Scientific employee
18 but was not invited to the awards dinner.
19   Q.    Okay.
20   A.    So it has happened in the past that
21 previous and former employees meet with their
22 friends and talk.
23   Q.    So let's talk about this meeting,
24 though.
25         Other than Jeanne Donlan -- is that

Page 148

1  Tom Donlan's wife?
2    A.    It is.
3    Q.    Who else?
4    A.    No one that I recall.  But there were
5  other spouses there, I just don't recall who they
6  were.
7    Q.    At the meeting?
8    A.    Yeah.  There usually are other
9  spouses at the meetings.
10   Q.    Was Jeanne Donlan at the awards
11 ceremony?
12   A.    Yes.
13   Q.    Did you invite her in?
14   A.    No.
15   Q.    How did she get invited?
16   A.    I have -- I have no idea.  She was --
17   Q.    She is married to Tom Donlan, who was
18 your subordinate?
19   A.    Tom Donlan was a manager in Seattle.
20   Q.    Okay.
21   A.    I just know she was there.
22   Q.    At the awards ceremony?
23   A.    That's correct.
24   Q.    All right.  It says, "Many of your
25 colleagues and direct reports were" ordered -- "were

Page 149

1  offended and expressed their concern about your
2  conduct while your girlfriend was in attendance at
3  the awards ceremony."
4         Are you aware of that?
5    A.    I am not.  I know he said it, but he
6  never elaborated on who that was.
7    Q.    "After the awards ceremony, I
8  approached you and shared my disappointment in your
9  lack of judgment and professional" judge -- excuse
10 me, "professional behavior."
11        Do you recall that happening?
12   A.    I do.
13   Q.    And what did you say in response?
14   A.    I said, I would like to discuss that
15 with you, I think something to that effect, being
16 that he didn't understand the entire circumstance.
17   Q.    Okay.  And didn't say anything else?
18   A.    He responded to me.  That was I think
19 something along the lines of that's poor judgment, I
20 wanted to pop some bottles with you.  I would have
21 invited you up to my private party, which he did not
22 at that point.  But his exact quote was, you just
23 won P Club.  I wanted to pop some bottles with you.
24   Q.    So what's the connection between that
25 and your having a girlfriend -- having Anna with you

Confidential - Subject to Further Confidentiality Review

Page 150

1 at the awards ceremony?
2        A.    My connection is that he decided to
3 not invite me to his private room party.
4        Q.    Okay.  And did you explain to him why
5 Anna was there?
6        A.    He didn't give me that opportunity.
7        Q.    Okay.  And then he talks about on
8 February 5, 2014 he received a called from you at
9 5:15 p.m.  He returned your call later at around
10 6:30 and he thought your engagement and thought
11 process was questionable during that call.
12            Do you recall that phone
13 conversation?
14        A.    I don't recall that -- I don't recall
15 that specific conversation.
16        Q.    Do you recall having a conversation
17 with him where you were intoxicated?
18        A.    No.
19        Q.    So did you sign off on this
20 version --
21        A.    I signed off on this.  It was my
22 understanding that when you get a corrective action,
23 when you sign it, it's acknowledgment of the
24 corrective action as opposed to agreement with the
25 corrective action.

Page 151

1        Q.    So then why didn't you sign off on
2 your evaluation?
3        A.    I'm not sure why I did not sign off
4 at that time.
5            - - -
6            (Deposition Exhibit No. Simons-15,
7        Memorandum dated February 14, 2014, Bates
8        stamped BSC00001385 through BSC00001387,
9        was marked for identification.)
10            - - -
11 BY MR. KNAPP:
12        Q.    Showing you what's been marked as
13 Exhibit 15, that's your signed version.  Right?
14        So let me back up.
15            Is that your signature on page 3 of
16 this document?
17        A.    That is.
18        Q.    On the section 2 on page 2 of that
19 document --
20        A.    Yep.
21        Q.    -- second paragraph of section 2
22 says, "As a result of my concern about your
23 professional behavior it is expected that you read
24 and review the Code of Conduct Policy by March 1,
25 2014."  Correct?

Page 152

1        A.    Yes.
2        Q.    "Please send me an e-mail once you've
3 done this and let me know if you have any
4 questions."
5        A.    Yes.
6        Q.    Did you review the code of conduct
7 policy?
8        A.    I believe I glanced through it, yes.
9        Q.    You didn't read it?
10        A.    I read portions of it that would
11 pertain to any of this, I believe.
12        Q.    Did you send him an e-mail saying
13 you'd done so?
14        A.    As I recall, I think I did, but I
15 can't be definitive.
16        Q.    It says, "It is also important that
17 you prepare for meetings, prepare for presentation,
18 and be on time."
19            Do you see that?
20        A.    I do.
21        Q.    "During the discussions with
22 customers, leaderships or your own team members you
23 should be engaged in the conversation, focused on
24 the business strategy and goals of the meeting at
25 hand."  Right?

Page 153

1        A.    Yes.
2        Q.    The third paragraph, he says, "I am
3 available if you have questions or need advice if
4 you're faced with a difficult situation and need to
5 make a judgment decision.  Michele DeCoux, HR
6 Business Partner, is also a resource to you if you
7 have questions or need assistance."  Right?
8        A.    Yes.
9        Q.    Do you recall then following up with
10 Michele DeCoux about this?
11        A.    I believe we spoke about it, yes.
12        Q.    Do you recall -- what do you recall
13 about that conversation?
14        A.    I don't recall the conversation
15 exactly.  I think she had mentioned to me that Sam
16 was concerned about, you know, we had just -- about
17 judgment and drinking possibly.  I don't recall the
18 conversation directly, but I know we spoke at a
19 meeting about this.
20        Q.    Do you recall what you said to her
21 about it?
22        A.    I don't.  I think I said I don't
23 agree with everything in there, because that was my
24 feeling about the document.
25        Q.    This dinner with Dr. Chiu Wong --

Confidential - Subject to Further Confidentiality Review

**Page 158**

1  Q.    Showing you what's been marked as
2  Exhibit 16.
3  A.    Okay.
4  Q.    This is an e-mail chain between you
5  and your wife that looks like it begins on Monday,
6  January 27, 2014.  Right?
7  A.    It does.
8  MR. MARTIN:  The last page the chain
9  starts.
10  THE WITNESS:  Okay.
11  BY MR. KNAPP:
12  Q.    So if you look through this, it looks
13  like there's an e-mail from school about -- an
14  e-mail to kindergarten families.  Right?
15  A.    Okay.  Yes.
16  Q.    And you forwarded it on to Lacia,
17  saying, did you get this, and she says yes.  Right?
18  A.    Okay.  Yes.
19  Q.    You respond say, I'm on the plane, I
20  miss them already.  Correct?
21  A.    Yes.
22  Q.    And then she sends you a long e-mail
23  on the top of page 2 on January 27th.  Right?
24  A.    Yes.
25  Q.    She's upset with you, right, about

**Page 159**

1  what had happened?
2  MR. MARTIN:  You should read the
3  whole e-mail before you answer.  It starts on the
4  first page.
5  BY MR. KNAPP:
6  Q.    Between you and Anna?
7  MR. MARTIN:  I'm sorry, hers is on
8  the second page.  Yours is on the first page.
9  THE WITNESS:  Okay.
10  BY MR. KNAPP:
11  Q.    So Anna expresses to you her anger
12  about you having the children and there's a domestic
13  disturbance, physical violence that takes place at
14  your house and the kids witness it again.  Right?
15  A.    I believe that Lacia --
16  Q.    What did I say?
17  A.    Anna.
18  Q.    So Lacia sends you this e-mail
19  expressing her anger.  Correct?
20  A.    Yes.
21  Q.    And she says, this is the third
22  domestic violence call between you and Anna in the
23  last nine months.  Right?
24  A.    Yes.
25  Q.    You responded and said, well, it's

**Page 160**

1  actually only the second.  Right?
2  A.    It was the second that I recall.
3  Q.    In any event, on the second page,
4  Lacia says, "If there is ONE more incident involving
5  alcohol, fighting OR the police, I will take action
6  to remove the children from that environment
7  indefinitely." Right?
8  A.    Yes.
9  Q.    So you are being told by her in your
10  personal life any more alcohol incidents, you don't
11  get to see the kids anymore?
12  A.    Correct.
13  Q.    At the same time, your employer is
14  telling you, any more alcohol bad judgment issues,
15  you're going to be fired.  Right?
16  A.    Okay.  Yes.
17  Q.    And then she says in this e-mail on
18  the first page, "As you know, I was arrested under
19  false charges on your behalf after you hit me in the
20  face.  You are an abuser.  Period."
21  Do you see that?
22  A.    I see that.
23  Q.    Do you deny that?
24  A.    I deny that.  And the police -- and
25  the police verified.  They arrested her and not me.

**Page 161**

1  Q.    And you respond, "Fuck you Bitch"?
2  A.    That's correct.
3  Q.    Were you drinking when you sent that
4  e-mail?
5  A.    No, not that I recall.
6  Q.    You might have been?
7  A.    I don't think so.
8  No, I was not.  It's 9:27 a.m.
9  - - -
10  (Deposition Exhibit No. Simons-17,
11  Memorandum dated June 13, 2014, Bates
12  stamped BSC00000225 through BSC00000227,
13  was marked for identification.)
14  - - -
15  BY MR. KNAPP:
16  Q.    Showing you what's been marked as
17  Exhibit 17.
18  In June -- on June 13, 2014, you
19  received a final corrective action from Sam Conaway.
20  Correct?
21  A.    Yes.
22  Q.    Where he mentions continued poor
23  judgment and inappropriate interactions.  Correct?
24  A.    Yes.
25  Q.    And he is -- among the things he

Confidential - Subject to Further Confidentiality Review

Page 162

1 identifies is that there was an our evolution
2 regional manager meeting in the first week of June
3 2014.  Right?
4    A.    Correct.
5    Q.    And he said, at the kickoff he
6 specifically said, I want the focus not on fun or
7 drinking or celebrating but on work here.  Right?
8    A.    That's what he says, yes.
9    Q.    Do you recall him saying that?
10   A.    I don't recall that.
11   Q.    Do you deny he said it?
12   A.    No.  I just don't recall it.
13   Q.    Okay.  And then you went on a dinner
14 with Kevin Ballinger with the group; is that
15 correct?
16   A.    Correct.
17   Q.    He says, you left the meeting on
18 Tuesday in the late afternoon and when you returned,
19 you asked your new director an inappropriate
20 question about his age.
21   A.    That's what's written here, yes.
22   Q.    Who's the new director he's referring
23 to here?
24   A.    Gary Lickovitch.
25   Q.    Okay.

Page 163

1    A.    I think I asked him how old he was.
2    Q.    Okay.
3    A.    I don't know why that's
4 inappropriate.  It was just a curiosity question.
5    Q.    And this is a guy that had been hired
6 in the position that you actually wanted.  Right?
7    A.    That's correct.
8    Q.    And you didn't like Gary either, did
9 you?
10   A.    I thought Gary was incompetent.
11   Q.    You thought he was a moron?
12   A.    I don't know that I've used that
13 word, but...
14   Q.    Did you tell other people you thought
15 he was incompetent?
16   A.    We had discussions among our team and
17 managers that they felt the same way.
18   Q.    Did you tell people you thought he
19 was a moron?
20   A.    I don't know that I used that word.
21   Q.    Okay.  Idiot?
22   A.    I'm not sure I used that word either,
23 but I felt he was incompetent for the role that he
24 was -- that he was working in.
25   Q.    And you told people that?

Page 164

1    A.    We had discussions amongst ourselves,
2 yes.
3    Q.    You told people that?
4    A.    Yes, I did.
5    Q.    So is this the first time you met
6 Gary?
7    A.    I don't recall.  No, I believe it
8 wasn't the first time I met.  He was in a different
9 role with Boston Scientific.
10   Q.    This is the first time you were with
11 him in his capacity as your manager?
12   A.    I believe so, yes.
13   Q.    Is it kind of an alpha dog thing to
14 say, hey, how old are you?
15   A.    No.  I was actually curious how old
16 he was.  He had talked about playing football for
17 Ohio State, and I was curious what years he was
18 there.
19   Q.    You didn't ask him what years you
20 were there.  You said, how old are you?
21   A.    Yeah.  I don't know exactly what the
22 terminology was.
23   Q.    Okay.  He says that on the walk to
24 dinner you continued to ask inappropriate questions
25 and exhibit poor judgment.

Page 165

1        Do you recall him --
2    A.    I don't recall doing any of that, and
3 he never specified what the inappropriate questions
4 were.
5    Q.    It says, it was evident that you had
6 multiple alcoholic beverages before dinner despite
7 my instructions not to.
8        Had you drunk --
9    A.    I had had alcohol that night with
10 several managers prior to dinner.  We had free time
11 and we went and met for drinks, which was pretty
12 common at sales meetings.
13   Q.    Did you leave the meeting early to go
14 have drinks?
15   A.    I didn't leave the meeting early at
16 all.  They released us.
17   Q.    And were you drunk that night?
18   A.    Not to my recollection.
19   Q.    He said you were slurring your words
20 and speaking in an incoherent manner.
21        Do you recall that?
22   A.    I don't recall it.
23   Q.    Do you deny it?
24   A.    I don't deny it.  I don't recall.
25   Q.    Okay.  So if he had already given you

Confidential - Subject to Further Confidentiality Review

Page 166

1  a final -- or excuse me, a written corrective action
2  in February saying any more bad judgment, drinking
3  behavior, you could be fired, why are you doing this
4  in June 2014?
5      A.    Well, I didn't believe that drinking
6  with fellow managers and colleagues was
7  demonstrating bad judgment.
8      Q.    How about getting drunk to the point
9  where you're slurring your words and speaking
10 incoherently?
11     A.    I clearly didn't realize that that
12 was the perception of what happened.  I didn't think
13 I was drunk.
14     Q.    So he met with you the next day; is
15 that right?
16     A.    He did.
17     Q.    And what did he say?
18     A.    The next morning.  He was
19 disappointed that he -- that I thought I had had a
20 good meeting with Kevin Ballinger discussing
21 potential, you know, advancement in the company and
22 some contracts and apparently Sam felt that Kevin
23 was upset that I had drank prior to having dinner
24 with him.
25     Q.    Was he upset that you drank or was he

Page 167

1  upset you were drunk?
2      A.    He said he was upset that I was
3  drinking at a business meeting, a meeting that was
4  supposed to be focused on business.  He didn't
5  mention the word "drunk" to my recollection.
6      Q.    So again, in this final corrective
7  action, he says, "Modifying your behavior is
8  critical for your continued employment."  Right?
9      A.    Correct.
10     Q.    What did you understand him to mean
11 by modifying your behavior?
12     A.    We had had the discussion at the
13 point where he would rather that I not drink when we
14 were at national -- when we were at meetings.  I
15 think he was -- he was talking about making better
16 judgment calls.
17     Q.    And you committed to him, I won't
18 drink at any more BSE meetings.  Right?
19     A.    That's correct.
20     Q.    And did you?
21     A.    I did not for an extended period of
22 time.
23     Q.    Okay.
24     A.    I refrained from it.  And what my
25 understanding of the policy was, is that you can't

Page 168

1  be put on an indefinite corrective action.  I
2  thought it was clearly defined that corrective
3  actions have a definitive time frame where there's
4  follow-up and you're either continued on to the next
5  or final stage of your corrective action or the
6  corrective action is canceled and you move forward
7  with your career.
8      Q.    And where does it say that in here?
9      A.    I believe that's outlined somewhere
10 that we had reviewed in the policies that Boston
11 Scientific lays forth on corrective actions.
12     Q.    Does it say that here?
13     A.    It does not say that here.
14     Q.    Did Sam Conaway tell you that was the
15 case?
16     A.    He told me that this -- I said, is
17 this going to be for the rest of my career.  He said
18 yes.
19     Q.    Okay.  Did you think that it would be
20 okay to get drunk and exhibit poor judgment and
21 inappropriate behavior after a period of time?
22     A.    First of all, no, I did not.
23     Q.    Okay.
24     A.    And that was not my intention.
25     Q.    Is there a second?

Page 169

1      A.    No, no, there's no second.
2           MR. MARTIN:  His answer was twofold.
3  BY MR. KNAPP:
4      Q.    So you knew, this is now two strikes.
5  Right?
6      A.    Correct.
7      Q.    According to Sam?
8      A.    According to Sam.
9      Q.    All involving drinking too much and
10 exhibiting poor judgment and poor behavior.  Right?
11     A.    Correct.
12     Q.    Did you think that if something like
13 that happened again, that they would keep you on as
14 an employee?
15     A.    I did.
16     Q.    Why?
17     A.    First, because I had -- I had shown a
18 consistent path that I was not drinking at meetings
19 and my team was doing well and Gary was giving me
20 many accolades at this point saying that I could
21 really bring home the business and that type of
22 thing.  And second, because I've had a successful
23 track record for 15 years at Boston Scientific, that
24 I think they would have taken that into account.
25           Frankly, I didn't expect it to happen

Confidential - Subject to Further Confidentiality Review

Page 170

1 again, but I was not overly concerned about being
2 terminated at this point.
3    Q.    Do you think all those things you
4 just said might explain why he didn't fire you at
5 this point?
6    A.    I think -- yeah. I think that had to
7 weigh into it. Sure.
8    Q.    Right. You were a great performer.
9 Right?
10    A.    Yeah.
11    Q.    And so it would have to take an awful
12 lot to fire you. Right?
13    A.    I would -- I would have, yeah,
14 expected so.
15    Q.    So Gary was promoted to northeast VP
16 in June of 2014. Right?
17    A.    Yes.
18    Q.    Okay. And we recall -- we talked
19 earlier about him riding along with you, and I don't
20 think I put a time to it, but I think it was August
21 2014 where you got in a altercation with a cab
22 driver?
23    A.    Yeah. And as I -- as I recollect, I
24 believe that Gary laughed at that point, thinking it
25 was funny.

Page 171

1    Q.    Okay. Do you recall calling the cab
2 driver a motherfucker?
3    A.    It's possible.
4    Q.    But you don't recall Gary saying,
5 don't do that again?
6    A.    Not at all.
7    Q.    Do you recall telling Gary in
8 September 2014 that you enjoyed working with him,
9 that you had him all wrong and that you had thought
10 he was brought in to fire you?
11    A.    That conversation could have taken
12 place, yes.
13    Q.    So let's break it into chunks.
14         Do you recall telling Gary, I thought
15 you were being brought in to fire me?
16    A.    Yes.
17    Q.    Why do you think that?
18    A.    Because I've had two corrective
19 actions against me against Sam -- from Sam Conaway,
20 and it was clear to people throughout the company
21 that Gary was Sam's, quote/unquote, boy that he put
22 into the spot. And so I felt -- I felt initially
23 threatened to have one of Sam's own there,
24 especially after being with the company for 14 years
25 prior to that without a black mark on my record. I

Page 172

1 felt that, you know, Sam was being overboard with
2 his corrective actions and then Gary was put in
3 place to -- as kind of a watchdog for Sam.
4    Q.    And you had the president of the
5 division saying you were acting inappropriately.
6 Right?
7    A.    That was reported to me by Sam, not
8 by the president of the division.
9    Q.    Okay. Did you ever -- are you aware
10 of any facts to suggest that's not true?
11    A.    No.
12    Q.    And were you concerned about that?
13    A.    Yeah. I was surprised and concerned.
14    Q.    Do you recall telling Gary that I had
15 you all wrong, I actually like working with you?
16    A.    Listen, I believe that people say
17 things. I don't recall saying that specifically,
18 no. It's very possible, though.
19    Q.    Did you feel that way?
20    A.    No. Frankly, it was important to me
21 to build rapport with my boss. And that was
22 important to Gary at that point. And I did want to
23 have a better working relationship with my direct
24 superior.
25    Q.    You still thought he was incompetent?

Page 173

1    A.    And his incompetence was clear to a
2 multitude of people throughout the organization.
3    Q.    Okay. Do you recall telling Gary
4 Lickovitch in September 2014 that you have so much
5 stuff on so many people that a lot of people would
6 fall if you were wronged by the company?
7    A.    I don't recall saying that, no.
8    Q.    Is it possible?
9    A.    It's possible.
10    Q.    You don't deny saying that?
11    A.    I don't know why I would say that. I
12 don't deny it because I don't recall it, but I don't
13 know what would benefit me to say that to a
14 superior.
15    Q.    Well, it's extortion. Right?
16         MR. MARTIN: Objection. That's
17 argumentative.
18 BY MR. KNAPP:
19    Q.    It's telling your supervisor, you
20 know, I know there's two strikes against me. I
21 think I might be -- you were brought in to fire me,
22 but if you do, I've got the goods on some people and
23 I'll make them fall too. Right?
24         MR. MARTIN: It's argumentative.
25 BY MR. KNAPP:

Confidential - Subject to Further Confidentiality Review

Page 174

1    Q.    That would be the purpose of saying
2  it, to protect yourself?
3           MR. MARTIN:  You're saying it is.
4  It's your testimony, it's not anybody else's.
5  BY MR. KNAPP:
6    Q.    That would be the purpose of saying
7  it.  Right?
8    A.    Again, I don't recall saying it.  I
9  think I answered the question.  But I wouldn't know
10  a purpose of saying that to a superior.
11    Q.    That would be the purpose, would it
12  not?
13           MR. MARTIN:  He's already answered
14  the question.  He doesn't know the purpose.  You're
15  arguing.
16           THE WITNESS:  I don't know the
17  purpose of that.
18  BY MR. KNAPP:
19    Q.    You don't -- your testimony is you
20  don't understand what that might mean, if you said
21  that to your boss, if you fire me, I've got the
22  goods on people?
23    A.    I understand the statement that you
24  made, what it may mean.  I don't recall saying it,
25  and I would find it hard to believe that I said that

Page 175

1  to Gary Lickovitch.
2    Q.    Do you recall ever saying that to
3  anybody?
4    A.    No.  No, I don't recall saying that
5  to anybody.
6    Q.    You deny it?
7    A.    I don't recall saying it to anyone,
8  and I don't know what context I would -- I would use
9  those words.
10    Q.    Do you recall telling Lynn Prust that
11  you had text and photos that you were going to use
12  against the company?
13    A.    I -- yeah.  Lynn Prust and I
14  discussed that Sam was inappropriate in text
15  messages.
16    Q.    Right.
17    A.    And I wanted to make her aware that I
18  felt the senior leadership was being inappropriate
19  with their subordinates.
20    Q.    You were threatening to disclose
21  those, weren't you?
22    A.    What I was doing is threatening to
23  give the evidence to Lynn Prust to prove that Sam
24  Conaway was being inappropriate with me.
25    Q.    But you didn't give it to her?

Page 176

1    A.    I couldn't get it.  I had deleted it.
2    Q.    Do you recall -- do you recall
3  telling Michele DeCoux that you had texts and tape
4  recordings that you could use against people?
5    A.    I don't remember saying tape
6  recordings.  I remember in the context of me
7  explaining to compliance that I felt that senior
8  leadership was being inappropriate with me, that I
9  had texts from Sam Conaway asking for girls' phone
10  numbers.
11    Q.    Why not just give that to HR?
12    A.    Because I didn't have the texts
13  anymore, so the only way I thought they could get
14  them is internally because my phone belonged to the
15  company.
16    Q.    So why did you repeatedly threaten
17  that you had this stuff?
18    A.    It wasn't a threat.  We had discussed
19  that I felt Sam was inappropriate with me and had
20  discussed that there was this evidence out there.
21    Q.    Why didn't you give it to them?
22    A.    Because I just explained to you, I
23  didn't have it any longer.  It wasn't on my phone.
24    Q.    If you knew you didn't have it, why
25  did you continue to threaten that you were going

Page 177

1  to --
2    A.    Because I assume that the company
3  could use their own internal phones to go find the
4  records if they were interested in pursuing it.
5    Q.    So -- all right.  Do you recall
6  showing Gary Lickovitch pictures of naked women?
7    A.    No.
8    Q.    Do you deny that you did that?
9    A.    I do.  I don't recall that at all.
10  Who were the naked women that I showed him?
11    Q.    So during this time period, you
12  started looking for other work.  Right?
13    A.    Not at this point, no.
14    Q.    No?
15    A.    I don't believe so.
16    Q.    You started putting your resume
17  together in the fall of 2014?
18    A.    I don't recall when the time frame
19  is.  Again, dates, I'm not positive on.
20           - - -
21           (Deposition Exhibit No. Simons-18,
22           E-mail dated 10/14/2014, Bates stamped
23           BSC00001654 through BSC00001659, was
24           marked for identification.)
25           - - -

Confidential - Subject to Further Confidentiality Review

Page 178

1    THE WITNESS: I do recall this now.
2  BY MR. KNAPP:
3    Q.    Showing you what's been marked as
4  Exhibit 18.
5    This is an e-mail from you to Anna
6  Knighten. Correct?
7    A.    Okay, yes.
8    Q.    Dated October 14, 2014 enclosing
9  your -- a draft resume?
10    A.    Yes.
11    Q.    Why were you preparing a resume in
12  October 2014?
13    A.    I believe I felt it prudent to update
14  my resume. I hadn't done that since I started with
15  Boston Scientific.
16    Q.    And why did you feel it prudent to
17  update your resume?
18    A.    I believe a lot of people continue to
19  have an updated resume when they change jobs and
20  have new jobs. I don't recall my mindset of why I
21  did it. Two corrective actions is concerning.
22    Q.    Did you circulate your resume and
23  start looking for jobs in late 2014?
24    A.    I don't believe ever sending my
25  resume out in that time frame, but I don't remember

Page 179

1  the dates that I did.
2    Q.    Is it possible you did?
3    A.    Yes, it's possible.
4    Q.    Who's Chris Leach?
5    A.    I don't recall.
6    - - -
7    (Deposition Exhibit No. Simons-19,
8    E-mail chain, top one dated 11/29/2014,
9    Bates stamped BSC00001674 through
10    BSC00001679, was marked for
11    identification.)
12    - - -
13  BY MR. KNAPP:
14    Q.    Showing you what's been marked as
15  Exhibit 19.
16    This is an e-mail from you to Chris
17  Leach at trivascular.com?
18    A.    Chris Leach is -- now I recall.
19    MR. MARTIN: Wait until there's a
20  question.
21    THE WITNESS: Yes.
22  BY MR. KNAPP:
23    Q.    You can go ahead. Who is Chris
24  Leach?
25    A.    I believe he's a manager at

Page 180

1  Trivascular.
2    Q.    What is Trivascular?
3    A.    It's a medical device company that
4  sells aortic stent graphs.
5    Q.    And you e-mailed him and said, among
6  other things, "I have attached the resume for you to
7  pass on if you see an opportunity." Right?
8    A.    Yes.
9    Q.    Why did you send him a resume?
10    A.    I had met him in New York City and
11  just wanted to explore other opportunities that may
12  be, you know, within the field.
13    Q.    Why?
14    A.    I think it's wise to always see what
15  else is out there and if there's an interesting new
16  opportunity. I obviously didn't make any move to
17  leave or go to them, but I would always explore
18  opportunities.
19    Q.    So is it because in part you felt
20  that your job was on the line and you're being
21  managed by an incompetent person who you didn't
22  respect and who you didn't think liked you? Is that
23  part of the reason?
24    A.    Yes.
25    Q.    So you have a sister named Kathleen.

Page 181

1  Correct?
2    A.    Yes.
3    Q.    And where does she live?
4    A.    She lives in Cherry Hill, New Jersey.
5    Q.    Okay. And what does she do?
6    A.    She is a sales rep for Marriott.
7    Q.    Okay. And how many siblings do you
8  have?
9    A.    I have three sisters and two
10  brothers.
11    Q.    Okay. And do they all live in --
12    A.    They all live in the South Jersey
13  area: Medford, Cherry Hill, Haddon Heights.
14    Q.    Do you remember that your sister
15  started -- Kathleen started pressing you to go get
16  treatment for alcoholism in the fall of 2014?
17    A.    Yes.
18    Q.    Do you believe that was warranted?
19    A.    Reflecting back, yes.
20    Q.    Why?
21    A.    Because clearly people outside were
22  starting to see changes in me and had concerns about
23  my drinking. While she wasn't around on a daily
24  basis, she had concerns.
25    Q.    And how often do you see her, like

Confidential - Subject to Further Confidentiality Review

Page 182

1 how would she have even known?
2     A.    My sister Kathleen is in -- still in
3 contact with my ex-wife at times.
4     Q.    Lacia?
5     A.    Yes.
6                - - -
7         (Deposition Exhibit No. Simons-20,
8         E-mail chain, top one dated 9/12/2014,
9         Bates stamped BSC00001582 and BSC00001583,
10        was marked for identification.)
11               - - -
12 BY MR. KNAPP:
13    Q.    Showing you what's been marked as
14 Exhibit 20, Mr. Simons, this is an e-mail your
15 sister sent you in mid September 2014.  Right?
16    A.    Yes.
17    Q.    And would you agree that in this
18 she's kind of imploring you to go seek treatment?
19    A.    Yes.
20    Q.    And if you go look at the second
21 paragraph of her e-mail which is on page 1, it
22 begins with "The other component is your job."
23        Do you see that?
24    A.    Yes.
25    Q.    "I strongly think you should skip the

Page 183

1 meeting in DC.  You could check into this place by
2 Monday and I could take care of your company and
3 letting them know where you are et cetera."
4        Do you see that?
5     A.    Yes.
6     Q.    What was the meeting in DC?
7     A.    There was -- I believe it was -- I'm
8 not positive, but I believe it was TCT, which is a
9 cardiology meeting which I did attend.
10    Q.    Okay.  And you didn't go into
11 treatment as she requested at that point.  Right?
12    A.    No, sir.
13    Q.    And she goes on to say, "I would get
14 a note from your doctor and you can get FMLA for 12
15 weeks.  You can't be fired!!"
16        Do you recall that?
17    A.    Yes.
18    Q.    Did you believe that to be the case
19 after she told you, that if you seek FMLA, they
20 can't fire you?
21    A.    I believe that that's what the
22 understanding of the law is, but I felt still at
23 this point concerned about exposing my disease to
24 the company superiors.
25    Q.    She goes on to say, "If you do not go

Page 184

1 into treatment and get caught drinking during work
2 hours, or Joe or Tom tell" anybody "about the
3 incident that happened, you can be fired
4 immediately."  Right?
5     A.    Correct.
6     Q.    Did you agree with her?
7     A.    I did agree with that, yes.
8     Q.    What's the incident she's referring
9 to here with respect to Joe and Tom?
10    A.    I don't recall.  I think, maybe it's
11 possibly when Tom came to my house and, you
12 know, I had been arrested, but I'm not exactly
13 positive what she's speaking of.  Kathleen and I had
14 had many discussions about...
15    Q.    Both Joe and Tom were aware that you
16 had a problem with alcohol.  Right?
17    A.    I believe so.
18    Q.    And they both knew that you went into
19 treatment in March because you told them.  Right?
20    A.    That's correct.
21    Q.    Your sister goes on to say, "If you
22 seek treatment before they find out and go under
23 FMLA, they can't do anything to you."  Right?
24    A.    That was her understanding.
25    Q.    And you agreed with that at the time.

Page 185

1 Right?
2     A.    Yes.  I believe that to be true.
3     Q.    Have you talked to your sister or Joe
4 or Tom about what this incident is that they're
5 referring to here?
6     A.    No.
7     Q.    Or she's referring to?
8     A.    No.
9     Q.    Have you talked to your sister at all
10 about this case?
11    A.    No.  I mean, way back, a long time
12 ago when I had initially been terminated, we had a
13 discussion about it; but no, I haven't talked about
14 specific details in quite a while.
15    Q.    And tell me about the conversation
16 you had with her when you were terminated.
17    A.    I had -- I had visited her home and I
18 think she saw how upset I was.  And I think there
19 was surprise on all of our parts that I had made the
20 effort to voluntarily go into rehabilitation for the
21 disease of alcoholism and the company still let me
22 go after completing that treatment and getting on a
23 program for aftercare.
24    Q.    So do you think -- well, all right.
25        MR. MARTIN:  It's almost quarter to

Confidential - Subject to Further Confidentiality Review

Page 186

1    1:00. Let me know when it's a good time to take a
2    break.
3                MR. KNAPP:  Let's go through this
4    last exhibit and then we'll break for lunch.  Sorry
5    about that.
6                - - -
7                (Deposition Exhibit No. Simons-21,
8          E-mail chain, top one dated 9/15/2014,
9          Bates stamped BSC00001556 and BSC00001557,
10         was marked for identification.)
11               - - -
12   BY MR. KNAPP:
13   Q.    So Mr. Simons, showing you
14   Exhibit 21, this is another e-mail from your sister
15   to you.  And this is dated September 15, 2015 -- 14.
16   Correct?
17   A.    Yes.
18   Q.    Do you remember getting this e-mail?
19   A.    Yes.
20   Q.    And she's -- is it correct that she
21   was unhappy you didn't take her advice to go to
22   treatment and this is like she escalated it up a
23   notch to try to convince you to go?
24   A.    That was my take on it, yes.
25               THE VIDEOGRAPHER:  Sir, you're

Page 187

1    muffling your microphone.
2                THE WITNESS:  Oh, sorry.  Yes.
3    BY MR. KNAPP:
4    Q.    She writes here, "You tell me about
5    how you need help and have the shakes, drink in the
6    morning, have been caught by your subordinate
7    workers et cetera and that you cannot quit this
8    addiction by yourself."  Right?
9    A.    That's what she wrote.
10   Q.    Is it true that you had told her as
11   of September '14 you were drinking in the morning?
12   A.    I don't recall saying that to her.
13   Q.    Do you deny it?
14   A.    I don't recall saying it to her.  I
15   don't deny it.  I think that was her perception of
16   what was happening.
17   Q.    Well, she's not just making it up.
18   Right?
19   A.    I don't know if she's making it up or
20   not.  I don't recall saying that to her.
21   Q.    Is your sister prone to lying?
22   A.    My sister is prone to exaggeration.
23   Q.    Okay.
24   A.    And engages in gossip quite
25   frequently.

Page 188

1    Q.    Exaggeration like Lacia.  Correct?
2    A.    Exaggeration like taking Lacia's side
3    of stories, yes.
4    Q.    And exaggeration like Gary and Sam.
5    Right?
6    A.    Correct.
7    Q.    And your counselor at the treatment
8    center in California.  Correct?
9    A.    I think yes.
10   Q.    And the police officers in Wyckoff,
11   New Jersey.  Correct?
12   A.    Correct.
13   Q.    She says, you told me about how
14   you've been caught by your subordinate workers.
15               What is that referring to?
16   A.    I think -- I'm not exactly sure of
17   the incidence she's referring to, but I think, you
18   know, Tom had come to my house when there was an
19   incident.
20   Q.    How many other -- he didn't catch you
21   drinking that time.  Right?
22   A.    But he knew that was probably
23   involved in the incident.
24   Q.    And that was two years earlier?
25   A.    I believe so, yeah.

Page 189

1    Q.    What other -- on what other occasions
2    were you caught drinking by your subordinates?
3    A.    I don't recall.
4    Q.    She says, you come down here and drop
5    the girls off with me and go out partying.
6                Is that true?  Did you do that?
7    A.    That was going to my 20th high school
8    reunion that we had already planned that she would
9    watch my daughters and I would go to visit with
10   friends that I hadn't seen in years.
11   Q.    That's just referring to one incident
12   when --
13   A.    Yes.
14   Q.    -- that was already understood.
15               She said, "You are crying and sound
16   desperate when I speak to you."
17               Was that true?
18   A.    It happened one time.
19   Q.    And then she goes on to say, "What
20   I'm not okay with is your lying.  Are you even
21   aware" that you told Karen -- who is Karen?
22   A.    My sister.
23   Q.    -- that "Lacia called the cops on you
24   and came to your door with the cops to get the girls
25   on Friday?"

Confidential - Subject to Further Confidentiality Review

Page 190

1        Do you recall telling your sister
2   Karen that?
3        A.    I don't recall telling her that.
4        Q.    Is it possible you did?
5        A.    Yes.
6        Q.    And would that have been something
7   you might have said when you were drunk and it just
8   wasn't true?
9        A.    It's possible.
10       Q.    She goes on, says, "No one comes to
11  see you or calls because you are so lost to
12  addiction, no one wants any parts of it or your dark
13  life."
14            Did you see -- do you remember
15  reading that?
16       A.    I remember reading it.
17       Q.    Is that true?
18       A.    It's her opinion.
19       Q.    And your response was, you wrote,
20  "Wow. You know it all I guess." Right?
21       A.    That is my response.
22       Q.    So you're -- essentially you were
23  rejecting her -- what she was telling you. Right?
24       A.    Yes.
25       Q.    You didn't think you needed treatment

Page 191

1   at that point?
2        A.    I was concerned about seeking out
3   treatment at that point.
4        Q.    Did you ask Tom and Joe not to say
5   anything about what had happened?
6        A.    No.
7        Q.    You just knew they wouldn't?
8        A.    I just didn't expect it to get to the
9   point where they would be asked.
10           MR. KNAPP: Okay. All right. Let's
11  take a break.
12           THE VIDEOGRAPHER: This concludes
13  Disk 2 of the deposition. The time is 12:47 p.m.
14  We are off the record.
15               - - -
16           (A luncheon recess was taken from
17  12:47 p.m. to 1:22 p.m.)
18               - - -
19           THE VIDEOGRAPHER: The time is 1:22
20  p.m. We are on the record.
21  BY MR. KNAPP:
22       Q.    Mr. Simons, we're back from lunch and
23  continuing your deposition.
24           You realize you're still under oath?
25       A.    Yes, sir.

Page 192

1        Q.    Okay. To the extent you've sought
2   employment since your last day of work at Boston
3   Scientific, have you been offered any jobs that you
4   did not accept?
5        A.    No.
6        Q.    And with respect to social media, are
7   you on Facebook, Twitter, any of that stuff?
8        A.    I'm on LinkedIn.
9        Q.    Okay.
10       A.    And recently I joined Facebook, but
11  for no real reason. I don't have -- I have one
12  friend on there. And I don't plan to pursue it.
13       Q.    And as far as e-mails that you've had
14  in the last, let's say, 3 years, what e-mail
15  addresses other than your Boston Scientific e-mail
16  address?
17       A.    Now I have one e-mail,
18  mike.simons516@gmail.com.
19       Q.    And do you have an e-mail address in
20  your new employment that's specifically Control
21  Medical?
22       A.    That is -- no, I don't.
23       Q.    With respect to -- we've talked
24  earlier about Anna Knighten alleging -- telling the
25  police at one point that you dragged her by her hair

Page 193

1   down the hall in that one domestic dispute incident,
2   do you deny that you did that?
3        A.    Yes.
4        Q.    Do you recall telling any of your
5   subordinate employees or co-workers about that
6   incident or allegation?
7        A.    I don't recall talking to them about
8   it.
9                - - -
10           (Deposition Exhibit No. Simons-22,
11           E-mail dated 12/1/2014, Bates stamped
12           BSC00001670 and BSC00001671, was marked
13           for identification.)
14               - - -
15  BY MR. KNAPP:
16       Q.    So we're now in December 2014.
17           Do you recall in late November that
18  you had a call with Gary Lickovitch in which he
19  raised some concerns about your judgment?
20       A.    I do recall.
21       Q.    And that was on a Friday that you had
22  the discussion?
23       A.    I believe so.
24       Q.    And tell me what you recall about the
25  phone conversation. Well, let me back up.

Confidential - Subject to Further Confidentiality Review

Page 194

1    Was it a phone conversation?
2    A.   I don't recall. I remember having a
3  conversation that I'm looking at in front of me.
4    Q.   And he followed up that conversation
5  in writing with this December 1st e-mail?
6    A.   I believe the e-mail came, yes.
7    Q.   Tell me what you recall without
8  looking at this document of that conversation.
9    A.   So what I recall from this document
10 is that again, because Gary Lickovitch would not let
11 me explain my position on any of this, that I was
12 not able to clarify the incorrect assumptions that
13 he made from this.
14   Q.   We'll talk about that in a minute.
15        Do you recall raising any issues with
16 Gary in that conversation?
17   A.   I did. I recall that Gary's behavior
18 was not -- not appropriate for a senior leader at
19 Boston Scientific in regards to other employees.
20   Q.   And did you get specific with him in
21 the call or the conversation?
22   A.   In the call I did not get specific
23 with him.
24   Q.   Okay.
25   A.   Not to my recollection. But I did

Page 195

1  write him a subsequent e-mail.
2    Q.   Okay. So is it correct that he had a
3  meeting with you, he raised what he thought was
4  inappropriate behavior on your part, and you
5  responded saying, look in the mirror basically?
6    A.   Yes. I mean, not exactly that, those
7  words, but yes.
8    Q.   Right.
9    A.   I responded saying, first -- my first
10 response was, can you let me explain the situation.
11 And he said something to the effect of, I don't want
12 to hear it. It doesn't matter what your explanation
13 is.
14   Q.   And then that was the first thing.
15        Then what's the second thing?
16   A.   Second, I explained the situation to
17 Sam Conaway at a meeting at a hotel in New York
18 City. And he agreed that he completely understood,
19 that it was a misunderstanding.
20   Q.   When was that meeting?
21   A.   Sometime after Gary and I had had a
22 discussion.
23   Q.   Was it before or after this e-mail?
24   A.   I don't recall.
25   Q.   Okay.

Page 196

1    A.   I believe it was after, if...
2    Q.   All right. So I take it that after
3  this conversation you had with Gary in late
4  November, you thought that was kind of the end of
5  it, right, and then you were surprised that he sent
6  you an e-mail documenting it?
7    A.   Exactly.
8    Q.   And you were unhappy with him for
9  documenting his concerns. Right?
10   A.   Correct.
11   Q.   And why did that make you mad?
12   A.   Because when you read the e-mail --
13 first of all, e-mails at Boston Scientific are
14 permanent documents. And secondly, I did not once
15 again agree with his perception of what happened in
16 the e-mail, so had little chance to rebut his
17 thoughts.
18   Q.   So, and to be specific then, the two
19 issues that he raised with you in the conversation
20 late November and then documented in this e-mail,
21 the first was with respect to a welcome reception
22 for Arial. Correct?
23   A.   That's correct.
24   Q.   And what is Arial?
25   A.   She was a clinical specialist on my

Page 197

1  team and a new employee that we had just hired.
2    Q.   And Mike -- excuse me, Gary was
3  unhappy that you brought Anna to that welcome
4  reception. Correct?
5    A.   He states that here. He was at the
6  welcome reception and seemed to be having an
7  excellent time and drinking and enjoying himself and
8  did not make any comment to me about it until this
9  e-mail, about the specific Arial situation.
10   Q.   And he says, Mike, "you told me that
11 you spoke to Ebony and had prior approval from her
12 to have significant others at the welcome
13 reception." Right?
14   A.   No. What I told him was I spoke to
15 Ebony Travis about having significant others at just
16 BSC meetings, where there are no customers, and she
17 said that that is allowed according to our code of
18 compliance. Then subsequently Gary said, had you
19 spoken to Ebony. I said yes because I had
20 previously spoken to Ebony Travis about the policy
21 of having spouses or significant others at a welcome
22 party.
23        Then after Gary raised that, I called
24 about this specific incident with Ebony. And she
25 reinforced her position that we were in fact allowed

Golkow Technologies, Inc.                     Page 50 (194 - 197)

Confidential - Subject to Further Confidentiality Review

Page 198

1  to have spouses and significant others.
2      Q.     And when you first talked to Ebony --
3  well, let's back up.
4          In the conversation you had with Gary
5  on Friday, November 21st, did he say, you told me --
6  or did you tell him in that conversation that Ebony
7  said I can?
8      A.     He misunderstood. He asked me had I
9  spoken to Ebony, and I said yes.
10     Q.     And what's Ebony's title again?
11     A.     She is in the compliance
12 department --
13     Q.     Okay.
14     A.     -- at Boston Scientific.
15     Q.     So he out of the blue said, did you
16 speak to Ebony about this?
17     A.     That is correct.
18     Q.     And you said, as a matter of fact, I
19 have?
20     A.     That's correct.
21     Q.     And when had you spoken to Ebony
22 prior to this November --
23     A.     Ebony and I had -- I can't recall the
24 exact date, but Ebony and I had had discussions
25 about when you have BSC functions similar to a

Page 199

1  holiday party, are you allowed to have significant
2  others there. And the answer was -- from her was
3  yes, as long as there's no customers.
4      Q.     And she -- he in this e-mail, Gary,
5  says, "This requires prior written approval from
6  senior leadership in which I should be copied."
7  Right?
8      A.     That's what he says.
9      Q.     "I never received anything."
10         And he didn't because you didn't
11 understand you had to do that. Right?
12     A.     I had never heard that was the
13 policy. And frankly, Gary knew about this
14 get-together long before us going to it and
15 welcomely attended it.
16     Q.     And he says, "I never received" --
17 excuse me.
18         When I spoke to Ebony she told me she
19 didn't speak to you and in fact, she reiterated that
20 there's this senior approval needed. Right?
21     A.     That's what he states in here.
22     Q.     Do you claim that he's making that
23 up?
24     A.     I don't claim he's making that up. I
25 claim that that's not what Ebony had told me.

Page 200

1      Q.     Okay. And then the next issues he
2  raises is you were to meet with somebody named
3  Dmitriy after he finished his case either at his
4  condo or out for a quick dinner on Wednesday.
5          Who is Dmitriy?
6      A.     He is a physician at Columbia
7  Presbyterian.
8      Q.     Okay.
9      A.     And a friend of Gary's.
10     Q.     And you asked if you could skip out
11 of it so you could spend time with your daughters.
12 Correct?
13     A.     Yes.
14     Q.     And that's true?
15     A.     Yes.
16     Q.     And he said, absolutely. Go ahead?
17     A.     Correct. But the misunderstanding
18 here is that I don't believe that a meeting was set
19 with Dmitriy. I think there was a phone call in to
20 Dmitriy and we were waiting to hear back from him.
21 I had spent two days with Gary Lickovitch and felt
22 that I wanted to go see my family as opposed to an
23 impromptu dinner.
24     Q.     Okay. And you asked to be -- to not
25 have to do it?

Page 201

1      A.     That's correct.
2      Q.     And he then says how surprised he was
3  the next morning to see you and Anna on the elevator
4  of the W Hotel at 8:50 a.m. looking as though you
5  had just woken up?
6      A.     That was his claim, yes.
7      Q.     And had you spent the evening with
8  Anna at the W Hotel that evening?
9      A.     I met Anna later in the evening and
10 we stayed at the W because I already had the room
11 reserved.
12     Q.     And is this in downtown New York or
13 where is that?
14     A.     Midtown New York, yes.
15     Q.     And if you're leaving to spend -- did
16 you in fact leave to spend time with your daughters?
17     A.     I took my daughters to dinner that
18 evening.
19     Q.     Where?
20     A.     Outside their house. I don't
21 remember the restaurant, but I picked my daughters
22 up and we went to dinner.
23     Q.     Okay. Did you use a credit card for
24 that dinner?
25     A.     I don't recall.

Confidential - Subject to Further Confidentiality Review

Page 202

1    Q.    Did you pay cash?
2    A.    I don't recall.
3    Q.    Okay.  You don't recall where you
4  took them?
5    A.    I don't.  We've eaten out at
6  countless restaurants.
7    Q.    What's that?
8    A.    We've eaten out at countless
9  restaurants.
10    Q.    How far of a drive is it from Midtown
11  Manhattan to there?
12    A.    I live about 16 miles outside of New
13  York City, so close.
14    Q.    How far of a drive is that?
15    A.    How long a drive is that?
16    Q.    Yeah.
17    A.    It all depends on traffic, but not
18  overwhelmingly long.
19    Q.    How long?
20    A.    40 minutes with traffic.
21    Q.    With traffic?
22    A.    Yeah.  Without traffic you can get
23  there in 20 minutes.
24    Q.    So you left to -- instead of doing
25  dinner, you say take your daughters out to dinner?

Page 203

1    A.    That's correct.
2    Q.    And then instead of staying at
3  home -- were your daughters at your home?
4    A.    They were at their mother's.
5    Q.    And where is --
6    A.    And I dropped them back at their
7  mother's house.
8    Q.    Where does she live?
9    A.    Very close proximity, 3 miles away
10  from me.
11    Q.    So you picked them up that evening,
12  dropped them off, but then went back to Midtown
13  Manhattan?
14    A.    Yes.  Anna was still working in
15  Midtown Manhattan.  She was at a Beeth (ph) meeting,
16  which is a peripheral meeting in New York City.  I
17  still had the room, so I called Anna and said, would
18  you like to just stay in the city.  We have the
19  room.
20    Q.    Why did you keep the room?
21    A.    Because I was unsure if Gary was
22  going to make me stay for a work dinner.  And by the
23  time we figured out I wasn't going, it was 5:00 and
24  past the time you can cancel the hotel room.
25    Q.    Okay.  Did you explain to him when he

Page 204

1  saw you that morning what had happened?
2    A.    I tried to, as I previously stated.
3  He said he didn't want to hear it.
4    Q.    You're talking about the meeting on
5  November 21st.
6         But the morning that he saw you at
7  the Hotel W?
8    A.    No.  I simply said to him, I have
9  another meeting I need to go to this morning, talk
10  to you later.
11    Q.    And he says you weren't really in any
12  shape to be going to a meeting based on how you were
13  dressed.
14         Do you agree?
15    A.    I agree.  I needed to stop home and
16  change into a suit for my meeting, which I was still
17  on time for.
18    Q.    So then you claim that in this
19  November 21st conversation you tried to explain
20  everything, and he said, I didn't want to hear it?
21    A.    That's correct.
22    Q.    Okay.  And you were angry that you
23  got that document --
24    A.    I was angry, yes, he made a formal
25  e-mail about it when not willing to listen to an

Page 205

1  explanation.
2    Q.    Did you send him an e-mail to explain
3  it?
4    A.    I don't believe so.
5    Q.    Why not?
6    A.    Because he stated he didn't want to
7  hear the explanation.
8         - - -
9         (Deposition Exhibit No. Simons-23,
10         E-mail chain, top one dated 12/4/2014,
11         Bates stamped BSC00001665 through
12         BSC00001667, was marked for
13         identification.)
14         - - -
15  BY MR. KNAPP:
16    Q.    So you responded to his e-mail to you
17  on Thursday, December 4th at 9:20 in the morning.
18  Correct?
19    A.    Correct.
20    Q.    In your response you said --
21    A.    I responded to the conversation.
22    Q.    What conversation?
23    A.    The conversation on the 21st.
24    Q.    So this was -- your e-mail is dated
25  Thursday, December 4th --

Confidential - Subject to Further Confidentiality Review

Page 206

1    A.    Or our conversation on Monday, I
2    guess it was.
3    Q.    And Monday would have been December
4    1st?
5    A.    Yes, I believe so.
6    Q.    So did you also have a conversation
7    on December 1st that was followed up by this
8    e-mail --
9    A.    I believe so.
10    Q.    -- that's Exhibit 22?
11        Okay.  All right.  You said, "I
12    wanted to follow up on our conversation on Monday.
13    I think it ended well and we reached an agreement...
14    I will certainly follow through on that."
15        What agreement did you reach that you
16    were going to follow through on?
17    A.    Gary had a discussion about honesty
18    and being more up front about explanations prior to
19    an event happening.  And now I understood, you know,
20    maybe I could have explained better what my plans
21    would have been so he was not shocked to see me that
22    morning.
23    Q.    And he says, "At times our talk
24    became heated but that was fine with me."
25        How did it become heated?

Page 207

1    A.    Because, again, I was trying to
2    explain to him what happened, he was not letting
3    that happen.  And both of us got back and forth
4    where he's telling me to stop trying to explain, and
5    I'm saying, you need to understand what happened.
6    So it got heated.
7    Q.    "I just want" -- you go on in this
8    e-mail and say, "I just want to lay out issues that
9    my team has expressed to me and hopefully we have
10    resolved these," we being you and Gary?
11    A.    Yes.
12    Q.    So why didn't you say, here's my
13    explanation that you wouldn't hear?
14    A.    Because he already had told me that
15    he didn't want an explanation.  He told me he was
16    uninterested in hearing it.
17    Q.    What you said is basically I think
18    you're sexually harassing Jillian Rothwell, you
19    acted inappropriate with Gary, but this e-mail and
20    my concerns will stay between us?
21    A.    I essentially had consulted an
22    ex-senior leader at Boston Scientific on how to
23    handle a situation like this.  And his advice at the
24    time was make sure you document exactly what you're
25    saying.

Page 208

1        You know, my first concern was to
2    stop the behavior.
3    Q.    Sure.  And why did you say, "This
4    e-mail will stay in my files"?
5    A.    Because I wanted to reassure him that
6    if the behavior stopped, then I didn't know exactly
7    how to proceed with it.
8    Q.    You're saying if you make life
9    difficult for me, I'm going to come forward with
10    this information?
11    A.    That's not what I'm saying at all.
12    Q.    It sure sounds like it.
13    A.    I'm saying I had concern about Gary's
14    actions and I wanted to document it and let him know
15    that it's an important enough concern that I wanted
16    it documented.
17    Q.    You never had raised these issues
18    with him previously, had you?
19    A.    Yes, we had.
20    Q.    When?
21    A.    In that discussion that we got heated
22    about.
23    Q.    Oh, you did?
24    A.    Yes.
25    Q.    What did you say?

Page 209

1    A.    I told him that members of the
2    team -- I don't know the exact words, but members of
3    the team were raising concerns about his behavior
4    when he visits New York City.
5    Q.    Okay.  But you didn't get into
6    specifics?
7    A.    I don't recall, but I don't think we
8    got into actual specifics.
9    Q.    So it sure sounds like you're trying
10    to threaten him.  Right?
11        MR. MARTIN:  Objection.
12    BY MR. KNAPP:
13    Q.    You're saying, I'm going to come
14    forward with this and I'll keep this in my files,
15    but as long as we continue to have a strong working
16    relationship, Gary, we'll keep this between us?
17        MR. MARTIN:  You're arguing with the
18    witness.  He's already answered that question.
19        You can answer.
20    BY MR. KNAPP:
21    Q.    That's what you're saying, isn't it?
22        MR. MARTIN:  It's argumentative.
23        You can answer if it's any different
24    than your last answer.
25        THE WITNESS:  No, it's not.  I've

Confidential - Subject to Further Confidentiality Review

### Page 210

1 answered the question.
2 BY MR. KNAPP:
3    Q.    How did you answer it?
4    A.    That I thought it was important to
5 stop Gary Lickovitch from this behavior and
6 important enough to write an e-mail to clearly lay
7 out what the behavior is.  And by my meaning a
8 strong working relationship, that means Gary acts
9 appropriately when he's dealing with my
10 representatives.
11    Q.    Why didn't you go to HR with any of
12 this?
13    A.    I'm not certain that I wouldn't have
14 if -- but momentarily after I sent this e-mail, Gary
15 had elevated it to HR.  So the point became moot.
16    Q.    He kind of called your bluff, didn't
17 he?
18    A.    No.  I think he probably was
19 concerned about it and he went to HR.  And at that
20 point, we're in the HR's hands.
21    Q.    You didn't report it to HR, though.
22 Right?  Gary did?
23    A.    Gary elevated it.
24    Q.    Right.  Gary reported it to HR.
25 Correct?

### Page 211

1    A.    That's correct.
2    Q.    Not you?
3    A.    That's correct.
4    Q.    And if it says to the contrary in
5 your Complaint, that would be wrong.  Correct?
6    A.    I spoke to HR about it, but Gary is
7 the one that elevated the e-mail.
8    Q.    Did you observe personally him acting
9 inappropriately with Jillian?
10    A.    Yes.
11    Q.    Did Jillian ask you to raise
12 concerns?
13    A.    She came to me and said, Gary makes
14 me feel uncomfortable.
15    Q.    Okay.
16    A.    So at that point, I said, how so.  We
17 had a discussion about it.  And it was multiple
18 situations that she felt uncomfortable around Gary,
19 felt she was singled out as a female representative,
20 that Gary was giving her more attention than other
21 people and inappropriately doing things that made
22 her feel uncomfortable.
23    Q.    And when did she have these
24 conversations with you?  When did this start?
25    A.    I don't -- not long before this.  It

### Page 212

1 was all kind of lumped together in one conversation.
2    Q.    How long before?
3    A.    The final straw being, we were at a
4 work dinner, Gary, Jillian and I.  And Gary asked
5 Jillian to come back to the hotel in New York City
6 when she lives in New York, upstate.
7    Q.    Where does she live in upstate New
8 York?
9    A.    I don't exactly remember the town,
10 but I know it was above New York City.  And Gary
11 said, why don't you just stay at the W with me.  And
12 she said that was the final straw that she talked
13 about it.
14    Q.    When was that dinner?
15    A.    I don't recall the date.
16    Q.    Was it in October?
17    A.    It was just prior to this.
18    Q.    Like days?
19    A.    I believe so.  Days or a week, yeah.
20 I mean, it was -- it was shortly before this.
21    Q.    And when did Tom Garrett express
22 concern to you that he was dragging him around to
23 meet girls?
24    A.    In the October time frame.  Gary kept
25 coming to New York and was spending nights out with

### Page 213

1 Tom Garrett.
2    Q.    And why didn't you report that?
3    A.    I did report it right here.
4    Q.    Why didn't you report it earlier?
5    A.    It was all in a short time frame
6 where I was meeting with them, gathering
7 information.
8    Q.    Who was the executive who told you to
9 document?
10    A.    I spoke to a mentor of mine, Paul
11 Reilly.
12    Q.    Who?
13    A.    Paul Reilly.
14    Q.    Your former boss?
15    A.    I didn't explain the situation to
16 him.  I simply explained that I -- that there was a
17 situation with my superior and complaints made
18 against him by my representatives.
19    Q.    When did you have this discussion
20 with Paul?
21    A.    Just prior to this e-mail.
22    Q.    What did Paul tell you, document it?
23    A.    He said it's very important that you
24 document these things.
25    Q.    Did he tell you to confront him?

Confidential - Subject to Further Confidentiality Review

Page 214

1   A.   He did.
2   Q.   Where does Paul work now?
3   A.   He's the CEO of ActiveRx.
4   Q.   And where is that?
5   A.   ActiveRx, I believe -- he's in
6   Massachusetts, but I'm not sure where the
7   headquarters are.
8   Q.   In Boston or --
9   A.   Right outside. A suburb.
10  Q.   So you get a call after Gary reports
11  it to HR from Michele DeCoux?
12  A.   Correct.
13  Q.   And who is Michele DeCoux?
14  A.   She is in charge of HR of
15  interventional cardiology.
16  Q.   And where is she located?
17  A.   Minneapolis or Maple Grove,
18  Minnesota.
19          - - -
20       (Deposition Exhibit No. Simons-24,
21       Handwritten notes dated 12-9-14, Bates
22       stamped BSC00000748 through BSC00000763,
23       was marked for identification.)
24          - - -
25  BY MR. KNAPP:

Page 215

1   Q.   Going back to the e-mail you sent
2   Gary, do you understand how it could have been
3   perceived as you threatening to go public with
4   concerns unless he continues to maintain a strong
5   working relationship with you?
6   A.   That was not my intention when I
7   wrote it. It was to bring to his attention his
8   inappropriate behavior and have it stop.
9   Q.   Can you understand how it could be
10  perceived that way, the way you wrote it?
11       MR. MARTIN: I object. His opinion
12  on that is irrelevant.
13       You can answer it if you can.
14       THE WITNESS: I don't see how that
15  would be the focus of the e-mail. I think his focus
16  should have been I'm doing things wrong and I need
17  to change.
18  BY MR. KNAPP:
19  Q.   You can't possibly understand how it
20  could be perceived as you threatening to go public?
21  A.   I can't speak to how Gary perceived
22  anything.
23  Q.   I'm not asking you to guess how Gary
24  perceived it.
25  A.   I don't think that's --

Page 216

1   Q.   You don't think a reasonable person
2   would perceive it to be that?
3   A.   No. A reasonable person would
4   perceive it that they've done wrong and offended
5   some of the people that work for them.
6   Q.   So you end up talking to Michele
7   DeCoux, it looks like the first time is on December
8   9th.
9       Do you recall that?
10  A.   Again, dates I'm not great with, but
11  I see what you've put in front of me says December
12  9th.
13  Q.   Read the second paragraph here. It
14  says, "Mike heard through the grapevine that Jillian
15  was asked by her," Gary, "to stay at the W. Mike
16  has not had a conversation with her."
17      Do you see that?
18      MR. MARTIN: We have -- I object.
19  First of all, we have Simons-24, which is
20  handwritten notes from someone that's not identified
21  by anyone and not signed by anyone. So to the
22  extent that you're calling these notes from Michele
23  DeCoux, I don't have any idea.
24      MR. KNAPP: Excuse me. I'll
25  represent that these are Michele DeCoux's notes.

Page 217

1       MR. MARTIN: Okay.
2   BY MR. KNAPP:
3   Q.   Have you reviewed these notes before
4   today's deposition?
5   A.   I have not, no.
6   Q.   Did you tell Michele DeCoux that you
7   had not actually had a conversation with Jillian
8   about any of this?
9   A.   No.
10  Q.   Did you tell Michele DeCoux that you
11  heard through the grapevine?
12  A.   No. Because I was standing right
13  next to him when he did it.
14  Q.   So for Michele to have written that
15  is just one more example of somebody miswriting what
16  you told them?
17  A.   I can't speak to why Michele wrote
18  that, but that's not what happened.
19  Q.   The fourth paragraph says, "Mike was
20  fine with the coaching that Gary provided. What
21  Mike didn't like was the follow-up e-mail recapping
22  what he said to Mike."
23      Is that something you told Michele?
24  A.   Yes.
25  Q.   The last -- the second page, it says,

Confidential - Subject to Further Confidentiality Review

Page 218

1  "Gary is a good director and he doesn't want to get
2  him in trouble."
3           Is that what you told Michele?
4  A.    Yes.
5  Q.    Did you believe that?
6  A.    I did not believe it, but what I did
7  believe is that this would get back to Gary and
8  there would be repercussions from that.
9  Q.    You told Michele that Gary has not
10 propositioned anybody.  Right?
11 A.    That was my understanding.  He hasn't
12 gone that far.
13 Q.    Do you recall on December 19, 2014,
14 turning to the third page, that Michele DeCoux
15 followed up with you, said she looked into the
16 concerns, there's follow-up that she can't share
17 with you and it's now closed?
18 A.    Yes.
19 Q.    And you told her, I'm glad it's
20 closed?
21 A.    If I said that, yeah.  I guess I was
22 happy it was closed because obviously I need a good
23 working relationship with my direct superior.
24 Q.    So not only did HR interview you
25 about these allegations, they followed up with you

Page 219

1  and told you they concluded?
2  A.    They left a call and said it was
3  done, yeah.  I didn't recall this, but, you know,
4  obviously if it's here, then we had the discussion.
5  Q.    Do you know whether they talked to
6  Jillian?
7  A.    I don't.
8  Q.    For you, would it be inaccurate for
9  you to say there was no interview of Jillian by HR
10 with respect to this?
11 A.    No.  There was an interview of
12 Jillian, but I didn't talk to her about the content
13 of that interview.
14 Q.    Did Jillian tell you that HR reached
15 out to her?
16 A.    She did.  But again, also said, we're
17 not supposed to discuss what we discussed.
18              - - -
19          (Deposition Exhibit No. Simons-25,
20          Amended Complaint, Certification Pursuant
21          to R.1:38-7(c), Designation of Trial
22          Counsel, Demand for a Jury Trial, 15
23          pages, was marked for identification.)
24              - - -
25 BY MR. KNAPP:

Page 220

1  Q.    This is Simons Exhibit 25.  It's your
2  Amended Complaint in this case.
3           Have you seen this before?
4  A.    I believe I reviewed this yesterday.
5  Q.    So paragraph 6 says, "In October
6  2014, plaintiff followed company procedure and
7  reported to human resources that one of his
8  subordinates, Jillian Rothwell, had been subjected
9  to sexual harassment by a supervisor, Gary
10 Lickovitch."
11          That's not correct, is it?
12 A.    What's not correct is just the order
13 of it.  So I eventually did talk to HR about it
14 after I sent the e-mail to someone.
15 Q.    Well, you didn't report it.  Gary
16 reported it.  We've already established that.
17 Right?
18 A.    Correct.
19 Q.    Paragraph 7 stays, "Although human
20 resources spoke to the offender Lickovitch, and
21 Lickovitch's supervisor Samuel Conaway, human
22 resources did not contact or report to either Ms.
23 Rothwell or to plaintiff regarding any
24 investigation."
25          That's not true either, is it?

Page 221

1  A.    That was my recollection at the time,
2  but now we've established that they have reported
3  back to us.
4  Q.    You just kind of made that up?
5  A.    I didn't make it up.  That was my
6  recollection at the time.
7  Q.    It was untrue.  Right?
8  A.    Nope.  It was my recollection at the
9  time.
10 Q.    Your recollection is not correct?
11 A.    That's correct.
12 Q.    Do you remember calling Gary after
13 this episode and apologizing for the e-mail you
14 sent?
15 A.    I remember having a discussion
16 talking to him about hopefully we could still have a
17 productive work relationship.
18 Q.    Do you recall apologizing for having
19 sent that e-mail?
20 A.    Yes, I believe I did.
21 Q.    Did you recall telling him, I don't
22 want to lose my job?
23 A.    Yes.
24 Q.    Why did you -- what were you
25 apologizing for?  Why did you apologize?

Confidential - Subject to Further Confidentiality Review

Page 222

1    A.    Because when situations like this
2  occur in the workplace, it puts a negative mark on
3  the person that you've come to -- the accused.  And
4  we've had -- we had arguments that were heated about
5  it.  So since it was the first time I've ever had to
6  turn a superior in for doing anything
7  inappropriate.
8    Q.    You didn't turn a superior in, did
9  you?
10        MR. MARTIN:  Yes, he did.  He
11 reported it directly to the person who did it, who
12 was his supervisor.  So that's argumentative.
13        MR. KNAPP:  You're not testifying,
14 Counsel, and that's directly in contravention of the
15 court's order.
16        MR. MARTIN:  I'm not -- I'm not
17 testifying.  It's -- your question is inappropriate.
18        THE WITNESS:  I did report it.
19 BY MR. KNAPP:
20   Q.    You didn't report it to HR?
21   A.    I already established I didn't report
22 it to HR, but I did bring it to Gary's attention to
23 make the behavior stop.
24   Q.    Do you recall attending the national
25 sales meeting in early February 2015?

Page 223

1    A.    I do.
2    Q.    Were you drinking there?
3    A.    I did drink there.
4    Q.    Even though you had been told not to
5  drink at company functions?
6    A.    That's correct.  But that was long,
7  months before.
8    Q.    So it didn't matter?
9    A.    Clearly it did.
10   Q.    Do you recall an interaction with
11 Jeannette Bankes?
12   A.    I do.
13   Q.    Where you hugged her and tried to
14 kiss her?
15   A.    I do.  Kissed her hello.
16   Q.    Do you remember --
17   A.    Which we've done multiple times
18 before.
19   Q.    Do you remember putting your arm
20 around her and saying, you look great?
21   A.    Yes.
22   Q.    Okay.  Do you remember telling her,
23 hey, I'm safe?
24   A.    No.
25   Q.    Do you remember grabbing her like you

Page 224

1  were going to kiss her and her turning her head,
2  pushing you away?
3    A.    No, I don't recall that exactly, that
4  it went -- that it happened that way.
5    Q.    Are you aware that concerns were
6  raised with HR about that?
7    A.    I am.
8    Q.    And it's your belief that that was
9  Gary Lickovitch that raised those concerns.  Right?
10   A.    I don't know who it was.
11   Q.    You alleged that Gary Lickovitch did
12 that.  Right?
13   A.    It was my assumption that that was --
14 that there was a possibility that it was Gary.
15   Q.    Or Sam?
16   A.    Or Michele DeCoux or Sam.
17   Q.    Okay.  You thought they were
18 retaliating against you by kind of contriving a
19 sexual harassment complaint.  Right?
20   A.    At first I absolutely believed that.
21   Q.    Kind of like what happened with you
22 and Gary in December.  Right?
23   A.    That's what you think it was, but
24 that wasn't the situation.
25   Q.    Okay.  Do you recall Lynn Prust

Page 225

1  calling you?
2    A.    I do.
3    Q.    You know what I just realized?  I
4  think I told you that my understanding was that
5  these notes that are Exhibit 24 were Michele
6  DeCoux's.  I think they're actually Lynn Prust's.
7    Do you recall --
8        MR. MARTIN:  That's why I objected to
9  the questions.
10       MR. KNAPP:  You should have said
11 something.
12       MR. MARTIN:  They're in your hands.
13 You know, you got them and produced them, so our
14 understanding was they were Lynn Prust's notes.  And
15 you were representing they were Michele DeCoux's,
16 so...
17 BY MR. KNAPP:
18   Q.    Yeah.  Do you recall talking to Lynn
19 Prust in December?
20   A.    I do.
21   Q.    And having the conversation that's
22 outlined in Exhibit 24?
23   A.    Yes.  When I reviewed Lynn Prust's
24 notes, I recognized that there were inconsistencies
25 with what I felt that I had said and what was

Confidential - Subject to Further Confidentiality Review

Page 226

1 written.
2    Q.    And those inconsistencies we've
3 already discussed. Right?
4    A.    For this document, yes.
5    Q.    And then do you recall Lynn Prust
6 calling you about the concerns that were raised
7 about Jeannette Bankes?
8    A.    Yes.
9    Q.    Okay. And did you ever consider that
10 perhaps it was Jeannette that had made the
11 complaint?
12    A.    I found that hard to believe with the
13 relationship that Jeannette and I had, that it was
14 very normal for us to give a kiss hello and say how
15 are you.
16    Q.    Did you later come to learn that it
17 was in fact Jeannette that made the complaint?
18    A.    I did.
19    Q.    Did you talk to Jeannette directly
20 about it?
21    A.    No.
22    Q.    When did you come to learn that?
23    A.    I can't remember exactly when. But
24 when Lynn Prust started to ask me about did you kiss
25 someone at the national sales meeting, I recalled

Page 227

1 the incident of walking in to a table full of Boston
2 Scientific employees and giving Jeannette a kiss.
3    Q.    So if you look at paragraph 9 of your
4 Complaint that's in front of you, it says, "Conaway
5 and Lickovitch wrongly accused plaintiff of sexual
6 harassment of female co-employees. None of the
7 female employees involved in the purported event
8 considered any conduct by plaintiff inappropriate
9 and verified that no sexual harassment had taken
10 place."
11    A.    Yes.
12    Q.    Do you now understand that not to be
13 accurate?
14    A.    I don't. What I understand and what
15 I think I was speaking about here is when Lynn Prust
16 said that Gary and Sam had made accusations against
17 me.
18    Q.    About sexual harassment?
19    A.    About kissing a girl. So whether
20 that's classified as sexual harassment or not, I
21 have no idea.
22    Q.    Okay. So that's that one female
23 employee?
24    A.    Yes.
25    Q.    Singular?

Page 228

1    A.    That's correct.
2    Q.    And you say, "None of the female
3 employees involved...considered any conduct by
4 plaintiff inappropriate."
5         Who were the female employees
6 involved?
7    A.    I don't remember their names, but I
8 remember Lynn Prust saying that she had spoke to
9 three females that were at the table and all of them
10 said my behavior was appropriate.
11    Q.    And so what sexual harassment was
12 alleged to have occurred at a table?
13    A.    At a table?
14    Q.    Yeah. You said none of the -- Lynn
15 Prust told you none of the employees at your table
16 reported inappropriate conduct?
17    A.    I had heard from one of the girls at
18 the table that Lynn Prust was calling around to
19 girls that were sitting at that table asking if I
20 was inappropriate.
21    Q.    So Lynn didn't tell you that. One of
22 the girls at your table told --
23    A.    One of the girls that was at the
24 table let me know that that was the case.
25    Q.    And by girls, are you referring to

Page 229

1 adult women?
2    A.    Adult women, correct.
3    Q.    Who is Jason Gentile?
4    A.    He is a manager in Philadelphia.
5    Q.    Do you recall calling him on or about
6 February 25th to talk about Gary and Sam?
7    A.    No. I don't remember that specific
8 date. I know that Jason and I have talked about
9 Gary and Sam many times.
10    Q.    Do you recall calling him drunk in
11 late February?
12    A.    No.
13    Q.    Do you recall calling him and saying,
14 Gary and Sam won't be here very long because they've
15 done some things and that someone has some
16 incriminating evidence?
17    A.    I don't remember saying that.
18    Q.    Okay. Do you recall ever telling
19 anybody that you were aware of incriminating
20 evidence against Gary and Sam?
21    A.    I believe I've had discussions with
22 people about that.
23    Q.    Where you've threatened that you can
24 bring them down?
25    A.    Not me.

Confidential - Subject to Further Confidentiality Review

Page 230

1    Q.    Who?
2    A.    So Tom Donlan had apparently evidence
3  that he and Sam had shared inappropriate naked
4  pictures of females.
5    Q.    Who took the pictures?
6    A.    I believe Tom Donlan did.
7    Q.    So Tom Donlan took naked pictures of
8  females?
9    A.    He did.  And Sam asked him to see
10 them.
11   Q.    Did you see this happen?
12   A.    No.  I wasn't --
13   Q.    Did you see these pictures?
14   A.    I did not.  I was not involved at all
15 in that case.
16   Q.    Who told you about this?
17   A.    Tom Donlan.
18   Q.    So you're aware that Tom had naked
19 pictures of a female?
20   A.    He made me aware of it, yes.
21   Q.    Is this a female he'd had sex with?
22   A.    I don't know if he had sex with her
23 or not.
24   Q.    Was she passed out?
25   A.    Was she --

Page 231

1    Q.    Passed out?
2    A.    No.
3    Q.    Okay.  How did he get pictures of a
4  naked female?
5    A.    Believe it or not, there are naked
6  females that allow you to take pictures of them.
7    Q.    I'm not familiar with that
8  personally.
9          You are?
10   A.    I am because he made me aware of it.
11   Q.    Was this a Boston Scientific
12 employee?
13   A.    No.
14   Q.    Is it somebody he had had sex with?
15   A.    I believe so, yes.
16   Q.    What did he say?
17   A.    About?
18   Q.    About it to you.
19   A.    That Sam was asking him for these
20 pictures.
21   Q.    What did he say about having taken
22 the pictures?
23   A.    He didn't say anything about it.
24   Q.    How did you know that the pictures
25 existed then if he didn't say anything about it?

Page 232

1    A.    Because he had spoken to Lynn Prust
2  and explained to her that Sam was asking him for
3  these pictures.
4    Q.    Okay.  And did you know that it was
5  alleged that Tom showed you these pictures?
6    A.    No, I did not know that it was
7  alleged that he showed me these pictures.
8    Q.    Did you report that to anybody, that
9  a manager at Boston Scientific had naked -- pictures
10 of a naked woman that he was sharing?
11   A.    No, I did not.
12   Q.    Did he in fact share the pictures?
13   A.    No.  I believe -- I don't know if he
14 shared the pictures with Sam or not, but he never
15 shared them with me.
16   Q.    And you don't know if he shared them
17 with anybody else?
18   A.    I have no idea.
19   Q.    What do you think of Tom Donlan?
20   A.    I think he's a good guy.
21   Q.    A standup guy?
22   A.    Yeah.
23   Q.    High integrity?
24   A.    I do.
25   Q.    Do you recall the next day you called

Page 233

1  Jason Gentile and apologized for having called him
2  and said, I had too many cocktails and I probably
3  said too much?
4    A.    I don't recall saying that, but it
5  wouldn't surprise me if I did.
6    Q.    Why wouldn't it surprise you?
7    A.    Because if I had done something to
8  Jason who I considered a friend, then I would have
9  apologized, but I don't recall the incident.
10         -  -  -
11         (Deposition Exhibit No. Simons-26,
12         Mike Simons PDC 2014, Bates stamped
13         BSC00001344 and BSC00001345, was marked
14         for identification.)
15         -  -  -
16 BY MR. KNAPP:
17   Q.    I'm showing you what's been marked as
18 Exhibit 26.
19         Do you recognize this document?
20   A.    I just saw this document yesterday
21 for the first time.
22   Q.    Do you know what it is?
23   A.    It's apparently, although not in the
24 normal format that we used to have, a PDC written by
25 Gary.

Confidential - Subject to Further Confidentiality Review

Page 234

1    Q.    But you do not recall ever receiving
2  this?
3    A.    I don't recall receiving it, because
4  I'm not sure whether he gave it to me before I went
5  away for treatment or not.
6    Q.    Were you aware of anybody at Boston
7  Scientific sharing naked pictures of women that
8  they've slept with, with anybody?
9    A.    I'm aware that just the interaction
10  happened between Sam and Tom Donlan.
11    Q.    And that you're aware of that because
12  Tom told you?
13    A.    Yes.
14    Q.    Are you aware of that ever happening
15  before with anybody, somebody having naked pictures
16  of a woman they slept with and offering to show it
17  to somebody else?
18    A.    I'm not aware of that happening.
19          - - -
20          (Deposition Exhibit No. Simons-27,
21          E-mail chain, top one dated 2/20/2015,
22          Bates stamped BSC00001737, BSC00001737 and
23          BSC00001736, was marked for
24          identification.)
25          - - -

Page 235

1  BY MR. KNAPP:
2    Q.    Showing you what's been marked as
3  Exhibit 27, Mr. Simons. There's a February 27th Q1
4  sales call.
5          Do you recall that?
6    A.    I do.
7    Q.    Scheduled for 5:30 to 6:00 p.m.
8  Eastern Time?
9    A.    I do.
10    Q.    And what is a Q1 sales call?
11    A.    Essentially it's senior leadership
12  and regional managers getting onto a sales call to
13  discuss forecast and sales for the end of the
14  quarter.
15    Q.    Can I back up because this is
16  bothering me.
17          Did the woman who Tom Donlan took
18  naked pictures of consent to the pictures being
19  taken?
20    A.    I've never spoken to her and I have
21  no idea. She seemed to consent.
22    Q.    Why?
23    A.    Because I've never heard otherwise.
24  I wouldn't know if she consented. I believe she
25  sent them to him.

Page 236

1    Q.    Okay. Why? Did he tell you that?
2    A.    Which is my understanding. I think I
3  recall him telling me that. She sent them to him.
4  He wasn't in the pictures.
5    Q.    When you said she seemed to consent,
6  it sounds like maybe you saw them perhaps and --
7    A.    I don't know. No. I don't know the
8  situation. I remember having a discussion with Tom
9  Donlan when he was involved with HR and explaining
10  that Sam was being inappropriate with him.
11    Q.    Do you know if she consented to his
12  sharing those naked pictures of her with others?
13    A.    I don't know that at all.
14    Q.    Did you ask him?
15    A.    No.
16    Q.    Did you tell him, hey, it could be a
17  violation of criminal law for you to be showing
18  pictures of somebody naked --
19    A.    Never had that discussion with him.
20    Q.    Okay. All right. So the Q1 sales
21  call, you accepted that you were going to
22  participate in that call. Right?
23    A.    Yes.
24    Q.    You had been drinking that evening.
25  Right?

Page 237

1    A.    No.
2    Q.    Did you drink at all that evening?
3    A.    No.
4    Q.    Not at all?
5    A.    I did not drink at all before the
6  conference call.
7    Q.    How about afterwards?
8    A.    No.
9    Q.    You deny that you were drunk at all
10  or intoxicated at all on February 27th. Correct?
11    A.    That's correct.
12    Q.    And you're aware now that others
13  complained that you were slurring your speech when
14  you spoke on this call. Right?
15    A.    I'm aware that people have made that
16  accusation.
17    Q.    And you deny it?
18    A.    That's correct.
19    Q.    You weren't drunk?
20    A.    No.
21    Q.    Do you recall where you were that
22  evening?
23    A.    I was at home.
24    Q.    And what were you doing at home?
25    A.    I had just finished up a call with a

Confidential - Subject to Further Confidentiality Review

Page 238

1  customer where we had won a contract.
2      Q.    With St. Francis Hospital?
3      A.    With Catholic Health System, yes.
4      Q.    And did you celebrate that evening?
5      A.    I had made a few calls to family and
6  friends saying I was excited about the deal, because
7  they knew that I was working on it.
8      Q.    Did you celebrate by drinking that
9  evening?
10     A.    I already stated no.
11     Q.    What's that?
12     A.    I already stated no.
13     Q.    Okay.  And you -- do you know what
14  you did after the call?
15     A.    I don't recall.
16     Q.    Nothing stands out to you, though?
17     A.    No.  I saw a document where my
18  ex-wife had claimed that I went out to a work dinner
19  and took a car service home.  I believe she was
20  incorrect about the date, because it would be very
21  rare that I would do a Friday night work dinner and
22  never take a car service or have a neighbor being
23  babysitting my children unless it was an extreme
24  emergency.
25     Q.    And in fact, if you had, if you had

Page 239

1  your children that evening and were drinking, she
2  could pull the plug on you.  Right?
3      A.    She had no legal basis to pull the
4  plug on me.  She would do things on her own accord,
5  but there was no court order that said that.
6      Q.    She threatened that if you got drunk
7  again when your kids were at home --
8      A.    She made --
9      Q.    -- she was going to prevent you from
10  being with them again.  Right?
11     A.    She made a great deal of threats over
12  the course of the six years that we were in
13  conflict.
14     Q.    So have you talked to anybody who
15  heard you on the call that said you weren't drunk?
16     A.    Yeah.
17     Q.    Who is that?
18     A.    I spoke to Tom Donlan.  I spoke to
19  Jim Toto.  And I forgot, I think I had spoken to
20  someone in marketing, Craig Brandli, who said, you
21  were fine.
22     Q.    Of those three guys, Jim Toto was
23  fired.  Right?
24     A.    He was.
25     Q.    How about Tom Donlan?

Page 240

1      A.    He was fired.
2      Q.    What?
3      A.    He was fired.
4      Q.    How about Craig Brandli?
5      A.    He still works for the company.
6  That's my recollection.
7                  - - -
8              (Deposition Exhibit No. Simons-28,
9          E-mail chain, top one dated 3/12/2015,
10         Bates stamped BSC00001910 and BSC00001911,
11         was marked for identification.)
12                 - - -
13  BY MR. KNAPP:
14     Q.    So this Friday in March -- I'm sorry,
15  the date that you were alleged to have been drunk on
16  the call, February 27th, was just three weeks before
17  you went into treatment.  Right?
18     A.    That's correct.
19     Q.    And you were in the darkest stages of
20  your alcoholism at that point.  Correct?
21     A.    No.
22     Q.    When were the darkest stages?
23     A.    I finally had hit rock bottom when I
24  got my DUI.
25     Q.    So the dark -- it's limited to one

Page 241

1  day?
2      A.    No.  It's -- it progressively got
3  worse.  There was not drinking every single day.
4      Q.    And it's a Friday evening.  You're
5  happy because you just landed a big deal.  Right?
6      A.    Correct.
7      Q.    And you deny drinking that evening?
8      A.    I do.
9      Q.    And showing you what's been marked as
10  Exhibit 28, this is the e-mail that you referenced
11  between you and Lacia where she is upset that you,
12  among other things, had a car service that brought
13  you home that evening.  Right?
14     A.    Yes.
15     Q.    So if you look at the first page of
16  this Exhibit 28, there's an e-mail from her to you
17  dated March 12th at 9:43.  She says, "The fact that
18  you took a car service home from a work dinner
19  because 'you had a few drinks' on the 27th during
20  parenting time clearly indicates that you are not."
21              Do you see that?
22     A.    I do.
23     Q.    Do you recall telling her you had a
24  few drinks on the 27th?
25     A.    I don't.  And the fact of the matter

Confidential - Subject to Further Confidentiality Review

## Page 250

1  Bates stamped BSC00001346 and BSC00001347,
2  was marked for identification.)
3  - - -
4  BY MR. KNAPP:
5  Q.  Showing you what's been marked as
6  Exhibit 30, do you recall getting this e-mail from
7  Gary Lickovitch on March 6th?
8  A.  I do not recall that.  It's clear
9  that he sent it.
10  Q.  And he said earlier in the first
11  e-mail, which is the first and second page, bottom
12  of the first and top of the second, he's concerned
13  that you missed a Northeast med ed conference call
14  the day before.  Right?
15  A.  Correct.
16  Q.  I hope everything is okay.  We spoke
17  yesterday.  I went over the expectations of the
18  call.  And when I called your name to take your
19  team's roll, you weren't present.
20  Do you see that?
21  A.  Yes.
22  Q.  Was that true?
23  A.  I'm sure it was.
24  Q.  Do you know why you didn't --
25  A.  I don't recall --

## Page 251

1  Q.  Go ahead.
2  A.  -- if I was working or doing -- in an
3  appointment where I was customer facing, that would
4  be a reason for missing a conference call, but I
5  can't specifically say.
6  Q.  And could it be because you were
7  drink -- intoxicated?
8  A.  No.  I mean, I -- it's possible but I
9  don't think likely that I would have missed a call
10  for that reason.
11  Q.  And he says, "We have a number of
12  conference calls today, my expectation as it always
13  is, is that you and your teams are on the...calls as
14  requested and...on time!"  Right?
15  A.  Yes.  And I assume I made all those
16  calls if there was not a subsequent e-mail sent to
17  me.
18  Q.  And then the first page, there's an
19  e-mail that Friday later in the day where he said,
20  we're on this Watchman call, they just called your
21  name and you're not on.  What's going on?
22  Do you recall missing that call too?
23  A.  I don't recall missing that call, but
24  this is 3/6, both of these messages.
25  Q.  Uh-huh.

## Page 252

1  A.  Yeah.  So I don't recall missing that
2  and -- I don't recall what the reason would have
3  been, but I think just assuming that I was drinking
4  is probably incorrect.
5  Q.  Why would that be an incorrect
6  assumption giving what was going on?
7  A.  Because there are many reasons why
8  you would miss a conference call, whether it's not
9  in your calendar or you're customer facing with
10  business.  Just to make that leap would be too much
11  for me to do because I don't remember March 6th
12  specifically.
13  Q.  Do you recall after the car service
14  e-mail from your wife, that your wife said, you're
15  not picking up the kids from school anymore until
16  further notice?
17  A.  In March?
18  Q.  Yeah.
19  A.  Yeah, I remember her saying that.
20  Q.  And did you comply with that?
21  A.  No.
22  Q.  Why not?
23  A.  Because I didn't feel that she had a
24  basis to do that.
25  Q.  What caused that consent order to be

## Page 253

1  entered in January 2015 when you had divorced back a
2  year or two earlier?  Was there some event that
3  occurred?
4  A.  There was.  She had filed a
5  restraining order against me, which we have
6  previously discussed.  She extended that restraining
7  order, threatening to do a permanent restraining
8  order, until I changed the consent order to agree to
9  her wishes.
10  Q.  Was the domestic disturbance with
11  Anna Knighten one of the reasons?
12  A.  I don't think so, no.  This had
13  everything to do with Lacia and her expectations of
14  me parenting time.  But again, I can't speak for her
15  reasons.
16  Q.  When did you learn that there had
17  been an accusation that you were drunk on the
18  February 27th call?
19  A.  The first time I had heard that ever
20  was the day that I met in the hotel lobby and they
21  stated that as a reason for my termination.
22  Q.  You had not -- okay.  So that was
23  after you came back from your leave?
24  A.  That's correct.
25  Q.  And you don't recall talking to Lynn

Confidential - Subject to Further Confidentiality Review

Page 254

1 Prust about that at all?
2    A.    I don't recall what time -- what
3 date -- maybe I did talk to her before. I don't
4 recall that. But I remember denying that to Lynn
5 Prust. If she had brought it up, I would have
6 denied it because it wasn't true.
7    Q.    So March 2015, that's the time by
8 then you should have your evaluations of your team
9 completed. Right?
10    A.    I don't remember the exact date. I
11 believe March 31st you have to have everything done.
12    Q.    Okay. Did you tell Gary you had
13 completed those?
14    A.    I told Gary I was in the process of
15 completing them.
16    Q.    And had you even started them yet
17 before you went out on your leave?
18    A.    I'm not positive. I mean, I make
19 notes about what I'm going to put in them on a
20 regular basis, if there are specific incidents, but
21 I don't know whether I started writing them out yet.
22    Q.    Do you recall in early March before
23 your DWI that Lynn Prust reached out to you to
24 schedule a call and you were concerned that she was
25 calling you?

Page 255

1    A.    Of course. Everyone is concerned
2 when compliance calls and when your bosses are
3 making accusations against you. I think it would be
4 very normal.
5    Q.    Do you recall that that call was
6 supposed to be the -- early in the week of the week
7 that you got your DWI?
8    A.    I don't recall the time. Lynn Prust
9 called me so many times, I couldn't pinpoint the
10 exact date and time that she wanted to talk that
11 specific time.
12    Q.    Do you recall the preceding Friday,
13 so March 6th, that you called Gary and said, I'm
14 concerned she's calling me?
15    A.    I think I expressed concern to Gary
16 that compliance was calling. That would be a normal
17 thing to express to your supervisor.
18    Q.    Did you recall telling Gary that
19 there was somebody -- a woman staying in the room
20 next to you at the national sales meeting that you
21 made out with?
22    A.    I never said that to Gary.
23    Q.    Did you say it to anybody?
24    A.    No. Because it never happened.
25    Q.    Did you tell Sam the same thing?

Page 256

1    A.    I never told him that. In fact, I'd
2 like to go on the record and say why would I ever
3 tell one of my supervisors who I knew were trying to
4 come after me something about that personal life.
5    Q.    Did you say you kissed a clinical
6 from Jason's region?
7    A.    I did not. And Jason's region has
8 two male clinicals in it.
9    Q.    Did you call Jim Toto and tell him
10 that Gary and Sam got me?
11    A.    Jim Toto and I discussed that Gary
12 and Sam were making accusations. And that call was
13 after Lynn Prust had made it clear that Gary and Sam
14 were making false accusations against me.
15    Q.    Did you call Jim Toto and say that
16 Gary and Sam got me?
17    A.    I don't know the exact terminology
18 that I used, but I wouldn't say got me. I mean -- I
19 meant they're coming after me.
20    Q.    Did the fact that Lynn called -- was
21 scheduling this meeting with you create anxiety for
22 you?
23    A.    It was a great deal of anxiety when
24 Lynn Prust called on a regular basis, yes.
25    Q.    How many times do you think you spoke

Page 257

1 to her? You said she called on a regular basis?
2    A.    Well, I couldn't pinpoint the number
3 of times.
4    Q.    Like four maybe?
5    A.    Probably more, before and after my
6 treatment.
7    Q.    How about before --
8    A.    As soon as I got back from treatment,
9 she started calling me again.
10    Q.    How about before your treatment, how
11 many times did you talk to Lynn?
12    A.    I couldn't -- I couldn't answer that.
13 I don't know.
14    Q.    Three?
15    A.    I don't recall. It was over a year
16 ago. I don't recall.
17    Q.    Well, you said it was regularly?
18    A.    When compliance calls more than once,
19 that's regularly.
20    Q.    Okay.
21    A.    And she called on several different
22 issues.
23    Q.    Do you remember when she spoke to you
24 on March 11th, you told her you were recording the
25 call?

Confidential - Subject to Further Confidentiality Review

Page 258

1    A.    I did.  And I explained to her after
2 recording the call, meaning I'm taking notes on the
3 call.  And yes, I do recall that.
4    Q.    You said you were recording the call.
5 Right?
6    A.    Yes.  And by recording I meant taking
7 notes.
8    Q.    You said you were recording the call.
9 Right?
10   A.    Correct.
11   Q.    You didn't say, and by the way, what
12 I mean is I'm writing notes when you first said it,
13 did you?
14   A.    Not when I first said it.
15   Q.    She said, you can't record the call.
16 Right?
17   A.    She did say that.
18   Q.    You said, it's legal in New Jersey?
19   A.    I did say that.
20   Q.    And she said it's not legal in
21 Minnesota where she was.  Right?
22   A.    Correct.
23   Q.    She didn't consent?
24   A.    She said that.
25   Q.    Yeah.  And it wasn't until the end of

Page 259

1 the conversation you said, well, actually, I meant
2 I'm just taking the notes?
3    A.    It wasn't the end of the
4 conversation.  It was right after she said it's not
5 legal in Minnesota and I clarified I'm not recording
6 this physically, I'm taking notes.
7    Q.    So you meant to say it's legal in New
8 Jersey to take notes of a conversation?
9    A.    I believe it's --
10   Q.    Is that what you intended to
11 communicate to her?
12   A.    I believe it's legal in New Jersey to
13 take notes in a conversation, yes.
14   Q.    That's what you were saying?
15   A.    I did.
16   Q.    Do you think there's any state in the
17 country where it's illegal to take notes of a
18 conversation?
19   A.    No, I don't.
20   Q.    When did you state, it's legal in New
21 Jersey?
22   A.    Because I'm allowed to takes notes
23 during a call.
24   Q.    You were making stuff up, weren't
25 you?

Page 260

1    A.    No.
2    Q.    Do you recall telling her, you have
3 photos and text messages that would bring people
4 down?
5    A.    I had text messages.
6    Q.    Do you recall telling her that you
7 had photos and text messages that --.
8    A.    No, I don't recall saying I have
9 photos.
10   Q.    -- would bring people down?
11   A.    What photos would I have?
12   Q.    Let me ask the question.  Don't
13 interrupt me.
14         Do you recall telling her that you
15 had photos and text messages that would bring people
16 down?
17   A.    I don't recall telling her that.
18   Q.    You told her you had text messages
19 that would bring people down?
20   A.    We did mention text messages,
21 correct.
22   Q.    Why are you threatening to bring
23 anybody down?
24   A.    Because I felt like Sam and Gary at
25 this point were on a witch hunt after me, and I felt

Page 261

1 like Lynn Prust was not only investigating the one
2 case of sexual harassment, that this turned into an
3 investigation of Mike Simons as opposed to an
4 incident.
5    Q.    Because you didn't realize Jeannette
6 Bankes had come forward?
7    A.    I had no idea Jeannette Bankes at
8 that point had come forward.
9    Q.    You thought it was about you having
10 kissed somebody else?
11   A.    That's what Lynn Prust had relayed to
12 me.
13   Q.    Okay.  You don't recall bringing that
14 up with Lynn yourself as opposed to Lynn bringing it
15 up with you?
16   A.    I don't recall bringing that up
17 myself, no.
18   Q.    Okay.  And she asked you for the
19 photo and text messages, and you then responded, I
20 don't have them?
21   A.    Yes.  I also responded to her that
22 she could get them because Boston Scientific
23 controlled our text messages if she wanted to do a
24 thorough investigation.
25   Q.    What happened on the day of March

Confidential - Subject to Further Confidentiality Review

Page 262

1 12th -- so I know the DWI was on March 12th, but
2 take me through your day.
3          What happened in the morning and...
4     A.   So in the morning, got up, regular
5 day.
6          The night -- the day before was my
7 day to pick up the children, so I went to their
8 school to pick them up at regular time.
9     Q.   The day before?
10    A.   The day before, the 11th. The
11 principal had informed me that their mother had
12 picked them up early from school, which she wasn't
13 supposed to do. That was upsetting to me. Yet when
14 I called her cell phone, there was nothing. She
15 wouldn't answer. There was nothing I could do. The
16 kids were with their mother.
17    Q.   So can I just interrupt you? I'm
18 sorry. I want to make sure I understand.
19         So this all was the day before?
20    A.   This is the 11th.
21    Q.   Okay. Who's the principal at that
22 school?
23    A.   I don't know her name. They don't go
24 there any longer.
25    Q.   What school is it?

Page 263

1     A.   St. Elizabeth.
2     Q.   Okay. I'm sorry, go ahead.
3     A.   So then the following morning I just
4 did regular things. You know, I don't recall
5 exactly what regular things, but...
6     Q.   What do you mean, regular things?
7     A.   Checked e-mails, you know,
8 whatever -- whatever normal work that I had.
9     Q.   Okay.
10    A.   I went to pick the kids up midday,
11 thinking I'll go even earlier than she went the day
12 before, to get my children. The principal then
13 informed me that their mother had told the school
14 that they were not supposed to release the children
15 to me. And then I went home stressed, frustrated.
16 I told the principal, I'll come back with the
17 consent order that shows that this is my day and I
18 have every right to pick my own children up.
19         I did drink that day from the time
20 between when I went the original time till I went
21 back the second time, made an extremely poor
22 judgment call. Attempted to pick my kids up. I
23 still had felt fine. And at that point I was met by
24 the Wyckoff Police.
25    Q.   So what time did you go to pick them

Page 264

1 up?
2     A.   I don't remember the exact time.
3 It's on the police report. I think it's 3:30 or
4 2:30.
5     Q.   It was 2:30 when they arrested you?
6     A.   Yeah.
7     Q.   But you said you went there earlier?
8     A.   I had gone there around noon --
9     Q.   You went there at noon to pick them
10 up?
11    A.   -- to pick them up.
12         Yeah. I was going to take them out
13 because I didn't know if she was going to pick them
14 up early again.
15         MR. MARTIN: Is that the first or
16 second time you took them?
17         THE WITNESS: The first time I went
18 was noon.
19 BY MR. KNAPP:
20    Q.   So is it your testimony that you
21 hadn't been drinking at all prior to noon?
22    A.   Right. That's correct.
23    Q.   Not at all, not a drop?
24    A.   No. I drank the night before, you
25 know, and then at that point, like you described it,

Page 265

1 it was -- you know, I was suffering from the disease
2 of alcoholism, so I drank quite a bit, I believe,
3 the night before.
4     Q.   So -- but you were sober by the
5 morning. Right?
6     A.   I don't know that you're always --
7 that you're ever really sober depending on how much
8 you drink the night before, but I did not drink that
9 morning before I went to pick them up.
10    Q.   Were you drunk when you went at noon
11 to pick them up?
12    A.   No, I was not.
13    Q.   So how long does it take to get from
14 your house to the school?
15    A.   I'll estimate 10 minutes.
16    Q.   Okay. So how long were you there
17 when you went at noon, when you had this
18 interaction, they said you can't pick them up?
19    A.   2 minutes. I walked in the front
20 door, tried to sign them out, the principal came out
21 of her office, told me about their mother. I said
22 I'll come back with the consent order.
23    Q.   That all occurred in 2 minutes?
24    A.   It occurred very quickly, you know, 2
25 to 5 minutes. I was there not a long time.

Confidential - Subject to Further Confidentiality Review

Page 266

1    Q.    Okay.  So in the roughly two hours
2  between that and coming back, you got drunk?
3    A.    That's correct.
4    Q.    And the blood alcohol content was
5  like what, that you were tested at?
6    A.    The blood alcohol content was shown
7  to be -- shown to be taken on a faulty breathalyzer.
8    Q.    Sure.
9    A.    And the breathalyzer was subsequently
10  not used anymore by Wyckoff Police.  So I don't know
11  that the blood alcohol content was accurate.
12    Q.    .25 percent.  Right?
13    A.    That's what they recorded.  But
14  again, it was proven that that was an ineffective
15  blood alcohol breathalyzer.
16    Q.    By who?
17    A.    My attorney had figured that out and
18  spoken to the prosecutor, and they agreed that the
19  blood alcohol breathalyzer was infective and
20  inaccurate.
21    Q.    Is that in a court filing anywhere?
22    A.    I'm not sure whether my lawyer filed
23  it, but he did make a motion and send it to the
24  prosecutor, I believe.
25    Q.    Uh-huh.

Page 267

1    A.    So, you know, essentially why it was
2  proved that the blood alcohol breathalyzer was
3  ineffective and had issues, there's still New Jersey
4  law which says a police field sobriety test is
5  enough to be convicted of a DUI.  So, you know,
6  that's why we went forward with the case the way we
7  did.
8    Q.    But there was never any finding that
9  this was an inaccurate blood alcohol reading.
10  Correct?
11    A.    I would have to check with my
12  attorney that did the DUI, but he relayed to me that
13  he proved that it was an inaccurate -- that it
14  was -- that there was problems with the
15  breathalyzer.
16    Q.    What else did you talk to your
17  attorney about with respect to that?
18        MR. MARTIN:  I object.  It's
19  attorney-client privilege.
20  BY MR. KNAPP:
21    Q.    He's waived it.
22    A.    How did I waive it?
23    Q.    By telling me what he told you.
24    A.    Okay.
25        MR. MARTIN:  He asked you about the

Page 268

1  breathalyzer with your defense attorney.
2        THE WITNESS:  Right.
3        MR. MARTIN:  He said it was ruled
4  out.
5        So what else did he tell you about
6  the breathalyzer is the question?
7        MR. KNAPP:  No.  About any of this.
8        THE WITNESS:  Well, obviously we
9  talked about potential penalties for a DUI.
10  BY MR. KNAPP:
11    Q.    Did you admit that you had been
12  drinking that morning with him?
13    A.    I don't recall if he ever asked me
14  that question.
15    Q.    We'll follow that up separately.
16        So you get drunk in the period of two
17  hours to the point where a breathalyzer test, which
18  you claim is inaccurate, reported you as having
19  a .25 percent blood alcohol content.  Right?
20    A.    Correct.
21    Q.    And do you realize what .25 percent
22  means?
23    A.    I do.
24    Q.    That's like you're almost dead.
25  Right?

Page 269

1    A.    No, that's not what it means.
2    Q.    Okay.  Do you know how many drinks
3  you'd have to have --
4    A.    So your information --
5    Q.    -- over a two-hour period to get to
6  that level?
7    A.    I don't know.
8    Q.    Do you recall telling the police that
9  you actually had been drinking from 8:00 to noon?
10    A.    I don't recall telling the police
11  that.  I don't know whether that was reported
12  accurately.
13    Q.    Yeah.  The blood alcohol content is
14  wrong, the police are wrong, your wife is wrong, the
15  principal is wrong, Boston Scientific is wrong.
16  Right?
17        MR. MARTIN:  I object.  It's
18  argumentative and complex, your question.  You can
19  break it down if you want, but you're arguing with
20  the witness.
21  BY MR. KNAPP:
22    Q.    Are you -- have you been criticized
23  as being unwilling to take responsibility for your
24  conduct?
25    A.    I have.

Confidential - Subject to Further Confidentiality Review

Page 270

1    Q.    Is that happening now?
2    A.    As we sit here, no. I've taken
3  accountability for my actions.
4    Q.    Do you remember telling them you had
5  prosecco that day?
6    A.    I don't remember telling them that,
7  but that's a possibility.
8    Q.    Could you have told them you had
9  three to four drinks of prosecco?
10   A.    I think I may have said that to them.
11   Q.    What's that?
12   A.    I think I may have said that to them.
13   Q.    Okay. Where did you go to eat for
14 lunch? Anywhere?
15   A.    No. I realized that that was an
16 inaccurate statement to my attorney, that it wasn't
17 lunch, that I drank at home.
18   Q.    So the interrogatory responses that
19 you signed as being truthful were not correct, that
20 you didn't go out for lunch and have drinks?
21   A.    Not that day.
22   Q.    Okay. And you told your attorney
23 something that wasn't true?
24   A.    This happened a year ago, so at times
25 the total recall of what -- exactly what happened is

Page 271

1  not accurate.
2    Q.    It's a pretty important event,
3  though, right, in this case?
4    A.    Pretty important event.
5    Q.    And you were intoxicated and went to
6  pick up your children to care for them when the
7  consent order that the court had issued said you
8  can't do that. Right?
9    A.    That's correct.
10   Q.    So you were violating the court
11 order?
12   A.    I did not violate the court order. I
13 was not allowed to get to that point, but yes.
14   Q.    You were intending to?
15   A.    That's correct.
16   Q.    Do you think had you had the
17 children -- let me back up.
18         Have you ever been held in contempt
19 of court?
20   A.    No.
21   Q.    No?
22   A.    Not that I can recall. In contempt
23 of court?
24   Q.    For violating a court order.
25   A.    We have never gone back to court and

Page 272

1  had it addressed that way by a judge that you're in
2  contempt. I have been in contempt of court I
3  believe when I violated a restraining order and went
4  to prison, which we covered, or went to jail, which
5  we covered.
6    Q.    Got it. The police report indicates
7  you were swaying, staggering, had slurred speech and
8  smelled of alcohol that day.
9    A.    Correct.
10   Q.    Is that -- do you deny any of that?
11   A.    When you -- when you are drunk, you
12 don't see yourself as others see yourself. So if
13 that's what they said, I'm sure that that's correct.
14   Q.    So that would apply to the February
15 27th call too. Right?
16   A.    I wasn't drunk on the February 7th
17 (sic) call. I've already stated that.
18   Q.    But you don't see yourself as others
19 see you. Right?
20   A.    I wasn't drinking so I couldn't have
21 been drunk.
22             - - -
23         (Deposition Exhibit No. Simons-31,
24         Documents from Wyckoff Police Department,
25         11 pages, was marked for identification.)

Page 273

1             - - -
2  BY MR. KNAPP:
3    Q.    So these are -- Exhibit 31 are some
4  of the court or arrest records relating to your DWI
5  arrest.
6         If you look at page 2, under the
7  narrative, it says, "Lacia further stated that St.
8  Elizabeth's school has an e-mail regarding the civil
9  order, which states that Michael is not permitted to
10 have custody of their children; as he has failed to
11 attend his ETG appointments for his alcoholism."
12         Do you know what that's referring to?
13   A.    I believe Lacia wrote an e-mail
14 saying she's withholding parenting time. But that
15 never went to the court, it went to St. Elizabeth
16 School.
17   Q.    Understood. Okay. And when did you
18 in fact fail to go to an ETG appointment after
19 having the kids?
20   A.    I don't recall. We had a
21 disagreement about what the code for the ETG test
22 is. So when you go to LabCorp, there's an 80-hour
23 test and then there's an acute alcohol test. And my
24 physician who gave me the script to get this had put
25 the wrong code down. And there was a discrepancy

Confidential - Subject to Further Confidentiality Review

Page 274

1  between Lacia and I if I was taking the correct
2  test.
3      Q.    So you were charged with not just a
4  DWI but some other things too. Right?
5      A.    I believe charged with reckless
6  driving, which is common in these cases and was
7  since dismissed.
8      Q.    Do you remember getting ticketed or
9  arrested for obstructing passage of another vehicle?
10     A.    I don't remember that.
11     Q.    Back in September 2012?
12     A.    I don't recall that. I don't even
13 know what that means.
14     Q.    How about following too closely?
15     A.    I do remember that and should have
16 fought it.
17     Q.    What was that about?
18     A.    I pulled onto a highway from an off
19 ramp. And everyone on Route 208 was on their way to
20 work going at a high rate of speed. And the officer
21 said that I was too close to the car as I tried to
22 move in between two cars and enter the highway.
23     Q.    Were you mad at somebody?
24     A.    No. I was trying to get on, on an
25 extremely busy road in the morning during rush hour,

Page 275

1  and I happened to pass a police officer as I was
2  entering the ramp.
3      Q.    So my apologies if I've asked you
4  this already, but you're brought in on the 12th for
5  this DWI. Right?
6      A.    I believe so, yes.
7      Q.    And you're released when?
8      A.    That evening. Later that day.
9      Q.    Okay. If you look at the last page
10 of this exhibit, it says, "Do not release until 1930
11 hours on 3/13/2015 due to elevated" --
12     A.    That's the vehicle.
13          MR. MARTIN: That's the vehicle
14 release authorization.
15          MR. KNAPP: Got it.
16 BY MR. KNAPP:
17     Q.    All right. So did you tell anybody
18 at Boston Scientific that you had been arrested for
19 DWI on that Friday?
20     A.    I don't believe so. I don't recall.
21     Q.    And why did you choose not to do
22 that?
23     A.    A host of reasons probably.
24 Embarrassment.
25     Q.    You could get fired probably. Right?

Page 276

1      A.    I have no clue what their policy is
2  on that.
3      Q.    After all the corrective counseling,
4  you didn't have any clue that maybe you could be
5  fired for getting a DWI during a workday?
6      A.    At that point I wasn't thinking of
7  getting fired, not getting fired; I just knew things
8  were contentious between my senior leaders, and I
9  knew that finally I was ready for treatment and
10 suffering from alcoholism and it was time to get
11 help. So my first thought was not about my job, it
12 was about me getting better.
13     Q.    Because at that point you knew you'd
14 violated the consent order. You wouldn't be able to
15 see your kids again probably, right, unless you did
16 something to fix it?
17     A.    Listen, I knew I was in a lot of
18 trouble with my ex. I got a DUI trying to pick them
19 up at school. I was making no bones about it that I
20 was troubled.
21     Q.    And it was also trouble at work?
22     A.    And once --
23     Q.    Correct?
24     A.    Once the reality -- I had no conflict
25 at work at that point. My first thought were my

Page 277

1  children, not my job.
2      Q.    So the following day you called HR
3  and said, I want to take FMLA leave. Right?
4      A.    I believe I called Camille Chang
5  Gilmore. I believe I spoke to her and said, I have
6  a drinking problem or I'm an alcoholic. Her
7  response to me was, admitting you have a problem is
8  the first step, and we want you to go get help.
9      Q.    Okay. Did you ask for FMLA leave or
10 did she say, hey, there's -- you can apply for FMLA
11 and it's a covered leave?
12     A.    I didn't know that that was what they
13 called it, but she had guided me in the direction of
14 what to go -- what to go do when you're going to go
15 try to get help.
16     Q.    So I think I just -- for the record,
17 the day that you were arrested for the DWI was a
18 Thursday. Right?
19     A.    I'm trying to remember exactly. I
20 believe it was a Thursday.
21     Q.    Okay. So then the next day where you
22 would have called Gail would have been a Friday?
23     A.    If I called her the next day, yeah,
24 Friday's usually right after Thursday.
25     Q.    And Gail -- I'm sorry.

Confidential - Subject to Further Confidentiality Review

Page 290

1 not have participated in those calls if you were
2 gone for an extended period of time because of a
3 leave. Right?
4    A.    I don't know whether she did or she
5 didn't.
6    Q.    And you don't know what custom is.
7 Right?
8    A.    What's customary is that the
9 senior -- or the vice president of the area is the
10 one that steps in, because he's supposed to be in
11 command of that business.
12    Q.    And if somebody is out for an
13 extended leave?
14    A.    I don't know for an extended leave.
15 I don't know the process of what they've done and I
16 wasn't on any of the calls, so I don't know what
17 they did.
18    Q.    Do you know of any regional managers
19 that took time off in excess of a month?
20    A.    I don't.
21    Q.    Okay. Do you know of any other
22 Boston Scientific employees that took leave to go to
23 treatment?
24    A.    I personally don't, no.
25    Q.    Are you aware of any?

Page 291

1    A.    I am not aware of any.
2    Q.    Are you aware of any Boston
3 Scientific employees who were arrested for a DWI
4 during the workday?
5    A.    I don't have any knowledge of that.
6    Q.    Are you aware of any Boston
7 Scientific employees who received repeated
8 counseling for inappropriate behavior and poor
9 judgment as a result of drinking?
10    A.    Those are confidential, so no, I
11 don't have any knowledge of that.
12    Q.    Did you ever hear of any other Boston
13 Scientific employees who were intoxicated on a work
14 call?
15    A.    Again, I wouldn't have any knowledge
16 of that. They're privileged documents, so they're
17 not shared with everyone.
18    Q.    You have personally not been involved
19 in a call where somebody was drunk?
20    A.    I personally have not been involved
21 in a call where somebody was reprimanded.
22    Q.    Where somebody was what?
23    A.    Reprimanded.
24    Q.    Did you personally participate in a
25 call where somebody was intoxicated?

Page 292

1    A.    Are you saying one of my subordinates
2 was intoxicated?
3    Q.    Anybody. A conference call, a sales
4 call where somebody is talking and they're clearly
5 drunk?
6    A.    Not -- not that I can recall.
7    Q.    So you returned to work from your
8 treatment, your leave of absence on April 13th or
9 so?
10    A.    Can I get a calendar out and take a
11 look?
12    Q.    Sure.
13    A.    So we're in '15. So April '15. I
14 believe I came home on a Friday, which probably
15 would have been the 10th. And I think I returned --
16 I'm sure you have this information. I think I
17 returned the 14th or 15th of April.
18    Q.    Okay.
19    A.    Again, I'm not exactly sure of the
20 day.
21    Q.    But you do recall you didn't come to
22 work immediately the following Monday. You took
23 some time?
24    A.    I did not. I took some time to get
25 settled, and I had some personal things I needed to

Page 293

1 deal with.
2    Q.    What personal things did you have to
3 deal with?
4    A.    Like I said, my kids were my
5 priority, and I wanted to find out what the
6 situation was going to be with them when I got home.
7    Q.    While you were in treatment, did you
8 have any communication with the outside world?
9    A.    I did.
10    Q.    What's that?
11    A.    I did.
12    Q.    Okay. Did you communicate with
13 anybody at Boston Scientific?
14    A.    Tom Donlan was still at Boston
15 Scientific at that point.
16    Q.    Okay.
17    A.    And I communicated with Ebony Travis.
18    Q.    Anybody else?
19    A.    I think I might have communicated
20 with Joe Peabody and Tom Donlan -- or Tom Garrett on
21 my team, just giving them an update that things were
22 okay. And I believe Ed Rush, who was -- who worked
23 for me as a subordinate. There was an e-mail that I
24 responded to. It was a simple response. I forget
25 the nature of the e-mail, but it was just kind of an

Confidential - Subject to Further Confidentiality Review

Page 294

1 approval e-mail. And quickly got an e-mail from
2 Michele DeCoux, we'd rather you not be involved in
3 e-mails, get better. Something like that.
4    Q.    Yeah. Okay. So the communication
5 with Joe and Tom was just kind of hey, things are
6 going well, I'm hanging in there?
7    A.    We had a personal relationship.
8 Yeah. They wanted to know how it was going, you
9 know, what it was like, that type of thing, are you
10 okay.
11    Q.    How about Ebony, why were you
12 communicating with her?
13    A.    So Ebony Travis was a compliance
14 officer at Boston Scientific. She shared with me
15 her feelings about a lot of the things that were
16 going on at Boston Scientific at that point, things
17 like investigation of the white party that Sam
18 threw, things like investigations about Sam Conaway
19 in his room having parties. And I think her direct
20 quote to me was, they're really coming after you
21 hard. So I think she was in contact with people
22 like Lynn Prust and Michele DeCoux, but I'm not
23 positive about that.
24    Q.    Did you call her or did she reach out
25 to you?

Page 295

1    A.    She ended up reaching out to me, and
2 I think back and forth we had talked a little bit.
3    Q.    And was it e-mail or --
4    A.    No. Phone calls.
5    Q.    Phone calls?
6    A.    Yes.
7    Q.    Got it. Is she still at Boston
8 Scientific?
9    A.    She is.
10    Q.    Okay. What did she say about -- what
11 were her feelings about things going on?
12    A.    Her feelings were she was -- she had
13 worked with Sam in the past at his previous
14 companies. She was well aware of his inappropriate
15 behavior and that it was very frequent. And she
16 made me aware of the fact, because she had
17 conversations with people, that Sam and Gary were
18 making accusations against me that were going to be
19 investigated or had been investigated, one or the
20 other.
21    Q.    And did she tell you who was being
22 talked to and what people were saying?
23    A.    She gave me -- she mostly discussed
24 Sam and Gary. I can't recall exactly who she talked
25 to, but she also gave me information that Gary was

Page 296

1 going after Tom Garrett really hard because Tom was
2 named in that sexual harassment suit.
3    Q.    She told you the reason he's going
4 after Tom is because Tom was named?
5    A.    I don't know whether she specifically
6 said about the suit, but she's like, I don't know
7 what's going on, but they're really going after Tom
8 Garrett hard.
9    Q.    Okay. Did she give you her opinion
10 as to why any of this was happening?
11    A.    I don't recall if it was so much her
12 opinion as it was she didn't understand why all this
13 was -- was happening.
14    Q.    Where is she located?
15    A.    I believe she lives in Dallas. I'm
16 not positive of that.
17    Q.    Did you tell her, well, your side of
18 things as far as what you told Lynn and what Lynn
19 had asked you?
20    A.    No. I don't I think went into
21 specifics about that. My assumption is she probably
22 knew it because Lynn was sharing everything else
23 with her.
24    Q.    Did you tell her about your DWI?
25    A.    I did not.

Page 297

1    Q.    Why not?
2    A.    Again, you know, not something I'm
3 proud to talk about, so I didn't share it with
4 anyone.
5    Q.    Because you knew if you told her,
6 she'd be obliged to communicate it?
7    A.    I don't know whether she would have
8 communicated that or not, because clearly there's
9 many things that we discussed that she didn't
10 communicate with Boston Scientific --
11    Q.    What else?
12    A.    -- human resources.
13    Well, exactly what I'm telling you.
14 I don't think she believed -- I don't believe she
15 told them that she was having regular conversations
16 with myself and Tom Donlan.
17    Q.    What did you tell her that you don't
18 think communicated?
19    A.    I don't think she communicated that
20 she was having discussions about, you know, what's
21 going on behind the scenes at Boston Scientific
22 human resources about me. I don't think she would
23 have readily shared that with anyone.
24    Q.    Well, she's not communicating
25 information they didn't already know of. She's

Confidential - Subject to Further Confidentiality Review

Page 298

1  telling you just what she heard from them.  Right?
2      A.    She's telling me, right, her
3  discussions with Lynn Prust and Michele DeCoux.
4      Q.    Okay.
5      A.    Right.  And so she was sharing the
6  information that, you know, I was not always privy
7  to.  Right?  In Lynn's question she doesn't clearly
8  come out and say how she found things out.
9      Q.    So you are in -- was Ebony telling
10 you how things were discovered?
11     A.    At times, yes.
12     Q.    What did she tell you?
13     A.    I don't recall exactly.  She had told
14 me -- and the one specific thing I do remember is
15 that Sam and Gary were making a lot of accusations
16 about me.
17     Q.    Did she tell you that Sam and Gary
18 raised the complaint about Jeannette Bankes?
19     A.    No, she didn't tell me that.
20     Q.    Did she tell you Jeannette --
21     A.    I never heard Jeannette from her.
22 She did tell me specifically when and where that
23 claim generated from and what night.  And so I went
24 back and retraced where it would have come from.
25     Q.    And that's something you didn't know

Page 299

1  before?
2      A.    I did not know before.
3      Q.    Had you been asked about -- oh, yeah,
4  you were asked the week of your DWI about this.
5  Right?
6      A.    I think so, yeah.  And I don't think
7  she specified a name.  She just was vague about did
8  I hug and kiss anyone at the national sales meeting.
9      Q.    So she didn't disclose to you
10 anything that Lynn Prust or Michele DeCoux didn't
11 already know, to your knowledge?
12     A.    That they already knew?
13     Q.    Yeah.
14     A.    I don't know what they already knew.
15 My guess is they knew.
16     Q.    Everything she was telling you is
17 what she learned from Lynn and Michele.  Right?
18     A.    I believe so, yes.  I don't know
19 whether she had specific discussions with Sam
20 Conaway, because they were friends as well.
21     Q.    Okay.
22          THE VIDEOGRAPHER:  Excuse me,
23 Counsel.
24          THE WITNESS:  She also offered her
25 opinion on Gary Lickovitch and the type of person

Page 300

1  that he was.
2  BY MR. KNAPP:
3      Q.    What -- tell me about your
4  conversation with Tom Donlan.
5      A.    Tom Donlan ended up, you know, being
6  a very good friend, checking in, finding out how I
7  was each day, supporting me.
8      Q.    So let me go back to Ebony.
9          All of this communication with her
10 was on the phone?
11     A.    Oh, yeah.
12     Q.    None of it was text or e-mail?
13     A.    No.
14     Q.    And the same with the others?
15     A.    Yeah, yeah.  You know, at that point,
16 that's what I recall, that most of it was a quick
17 phone call.
18     Q.    So when you got back to work on the
19 14th or 15th, Lynn reached out to you again to
20 continue her investigation.  Right?
21     A.    Yes.
22     Q.    Do you recall telling Lynn that you
23 had called Kevin Ballinger and told him what Sam
24 Conaway had said at a manager/director meeting about
25 you, we hope he gets better and he was shocked?

Page 301

1      A.    I read through that, and Lynn Prust
2  recorded that incorrectly.  I had left Kevin a
3  message about that.  And no, obviously I didn't say
4  that I spoke to Kevin Ballinger directly.  That
5  would have been extremely easy for her to find out.
6  Kevin never called me back.  But I remember the end
7  of my message pleading with Kevin to be the standup
8  guy, I thought he was a standup guy, and please be
9  the standup guy that you are and realize that these
10 managers are doing the wrong thing.
11     Q.    So if Lynn recalled or her
12 contemporaneous notes say that not only did you call
13 Kevin but Kevin was shocked, that Michele did not
14 record it -- that would — you're claiming you
15 didn't say that?
16     A.    Kevin will be shocked.  I don't know
17 what exactly I said there, but I found a lot of
18 inconsistencies in Lynn Prust's notes, frankly.
19     Q.    Right.  It seems to be a theme with
20 that today.
21          You also told Lynn that you talked to
22 Kevin about Gary Lickovitch.  Right?
23     A.    I don't recall that.
24     Q.    And that not only did you tell him,
25 but that Kevin responded and said, I'll take care of

Confidential - Subject to Further Confidentiality Review

Page 302

1 that?
2   A.   I didn't say that, and I've already
3 answered the question that I never spoke directly to
4 Kevin Ballinger.
5   Q.   So if you had told Lynn that you
6 spoke to Kevin and Kevin said certain things to you,
7 that would have been not true. Correct?
8   A.   That would have been not true if I
9 had told her that.
10   Q.   Do you remember telling her that Sam
11 Conaway is a scumbag?
12   A.   I don't remember if I used those
13 words, but at this point I was so frustrated with
14 compliance.
15   Q.   Do you recall telling her that Gary
16 should be fired?
17   A.   I don't recall telling her that, no.
18   Q.   Do you recall saying that you have
19 information on your phone in which Sam asked you for
20 a girl's number and texted you five times?
21   A.   I did tell her that.
22   Q.   Okay. And you'd forward that to her?
23   A.   I did. And we've already covered
24 this, that I didn't have it in my phone anymore, so
25 I assume that she could have gone to the company

Page 303

1 that runs Boston Scientific's phones and pull it if
2 she was interested.
3   Q.   And she called you a second time that
4 week. Right?
5   A.   I don't recall.
6   Q.   Do you remember her calling you and
7 asking you about your DWI?
8   A.   Yes.
9   Q.   Because she heard about it?
10   A.   She had.
11   Q.   And up to that point, you had not
12 told anybody at Boston Scientific about it. Right?
13   A.   That's correct.
14   Q.   And your first response is to tell
15 her that you were on a plane that day. Right?
16   A.   I don't know what I originally told
17 her. I think I got it incorrect, because she
18 reiterated and went back to the day and started
19 talking about what personally happened to you. And
20 I got the plane mixed up. I went the next day to
21 the treatment facility or the day after. I got the
22 dates mixed up that she was talking about when I
23 said I was on a plane.
24   Q.   To the extent you would have told her
25 nothing happened that day because I was on a plane,

Page 304

1 that would have been untrue. Right?
2   A.   I got the dates mixed up that she was
3 asking about. But when she asked about specific
4 events, she never said DUI. She asked about what
5 specific event happened that day. I was the one
6 that came out and said DUI.
7   Q.   Oh, do you remember actually telling
8 her you don't remember what you were doing that day?
9   A.   Immediately that's exactly what I
10 told her.
11   Q.   First you said you were on a plane.
12 Right?
13   A.   Right.
14   Q.   Then you said you don't know what you
15 were doing that day. Right?
16   A.   I thought she meant work wise, and
17 then she said personal to you and then I recalled.
18        As we've gone through, I'm not
19 excellent on dates, so I wasn't sure what dates she
20 was talking about.
21   Q.   So because she did say what were you
22 personally doing that day, you didn't tell her about
23 the DWI?
24   A.   Again, it didn't occur to me that
25 that was the date, but once we got down to it, I

Page 305

1 remembered that was the date of the DUI. And I
2 admitted it to her.
3   Q.   That's a pretty significant date,
4 isn't it?
5   A.   I didn't remember the -- the event
6 was pretty significant. The date is irrelevant.
7   Q.   Do you remember the date you started
8 treatment?
9   A.   I believe I started it the 13th.
10   Q.   Did you -- you told her you were --
11 you had been home working that day. Right?
12   A.   In the morning, yes.
13   Q.   Okay. And you wouldn't tell her how
14 much you had been drinking. Right?
15   A.   At that point, I was instructed not
16 to talk about it.
17   Q.   By whom?
18   A.   By my attorney for the DUI.
19   Q.   And who was that?
20   A.   His name is Evan Levow.
21   Q.   And where is he located?
22   A.   I believe he's out of Haddonfield,
23 New Jersey.
24   Q.   Do you recall after you got back from
25 treatment in April, your wife accused you of being

Confidential - Subject to Further Confidentiality Review

Page 306

1  at a softball practice of your kids drunk?
2    A.    Yeah.  My wife accused me of a lot of
3  things when I got back from treatment.
4    Q.    Was that not true?
5    A.    It was not true at all.
6    Q.    Okay.  On Friday of that week that
7  you came back, you were told that you were going to
8  have to be at a meeting the next Monday morning with
9  Sam and Michele.  Right?
10   A.    That's correct.
11   Q.    And you had a pretty good idea that
12 you were going to be fired.  Right?
13   A.    I had a concern, yes.
14   Q.    And you thought it was because of
15 your -- they found out about your DWI.  Right?
16   A.    I knew they had found out at that
17 point.  I had spoken to Lynn Prust about it.
18   Q.    What's that?
19   A.    I had spoken to Lynn about it.  I was
20 unsure whether they would fire me because I was not
21 found guilty of anything at that point.
22   Q.    Well --
23   A.    And I also felt that I had completed
24 a rehabilitation program, so maybe they just wanted
25 to discuss with me going forward what their

Page 307

1  expectations were.
2          MR. KNAPP:  Let's take a break.
3          THE VIDEOGRAPHER:  This concludes
4  this video of the deposition.  The time is 3:26 p.m.
5  We are off the record.
6               - - -
7          (A recess was taken from 3:26 p.m.
8  to 3:40 p.m.)
9               - - -
10         (Deposition Exhibit No. Simons-34,
11         E-mail chain, top one dated March 10,
12         2015, Bates stamped BSC00001064 and
13         BSC00001065 and BSC00000812 and
14         BSC00000813, was marked for
15         identification.)
16              - - -
17         THE VIDEOGRAPHER:  This begins Disk 4
18 of the deposition.  The time is 3:40 p.m.  We are on
19 the record.
20 BY MR. KNAPP:
21   Q.    Mr. Simons, going back to these --
22 your testimony about Ebony Travis, how many times
23 did you talk to her while you were on --
24   A.    I don't recall.  I can guess in a
25 range of three.  Could have been plus or minus.

Page 308

1    Q.    And did you have your cell phone with
2  you --
3    A.    The whole time.
4    Q.    -- at treatment?
5          So she called you on your cell phone?
6    A.    Yes.  We spoke on the cell phone.
7    Q.    I'm sorry?
8    A.    Yes.  We spoke on my cell phone.
9    Q.    And you said she initiated the first
10 call?
11   A.    I believe the first call was
12 initiated by her.  Tom Donlan had asked her to reach
13 out to me.
14   Q.    Okay.  Because she talked to Tom
15 about this?
16   A.    She had talked to Tom about his case.
17 They were friends.
18   Q.    Okay.  And then after that first
19 call, did you call her after that or did she
20 initiate every call?
21   A.    I'm not sure whether I called her or
22 I called Tom and asked her to call me.
23   Q.    Okay.
24   A.    But I could have called her at -- you
25 know, at one of those times.

Page 309

1    Q.    All right.
2    A.    I remember we talked on her private
3  cell phone, not Boston Scientific's cell phone.
4    Q.    Okay.  Do you remember what time of
5  day?
6    A.    I don't.
7    Q.    Going back to Exhibit 34 -- or going
8  to Exhibit 34, these are notes that Lynn Prust took
9  of a call with you on March 11th about, or among
10 other things, she you claims you said you're
11 recording it.
12   A.    Uh-huh.
13   Q.    And the first two pages is an e-mail
14 exchange between you and Lynn on March 10th.
15         Do you remember that, where she said,
16 give me the photo and text messages?
17   A.    Yes.
18   Q.    And your response was, "I will not."
19 Correct?
20   A.    I cannot.
21   Q.    It says, "I will not," does it not?
22   A.    Okay.  It says, "I will not."
23 Meaning -- I don't know what I meant.  Meaning I
24 will not be able to.
25   Q.    That's not what you said, though.

Confidential - Subject to Further Confidentiality Review

Page 310

1  Right?
2      A.    Possibly. No. It's clearly written
3  what I said.
4      Q.    So on Friday the 17th, you know that
5  there's going to be this meeting with Sam and
6  Michele on Monday.
7          Do you recall that weekend that you
8  and Anna broke up?
9      A.    It's very possible.
10          - - -
11          (Deposition Exhibit No. Simons-35,
12      E-mail chain, top one dated 4/19/2015, 1
13      page, was marked for identification.)
14          - - -
15  BY MR. KNAPP:
16      Q.    It's an e-mail exchange between you
17  and Anna on April 18th and 19th. You write on the
18  top, "You are what you are and I loved you for that.
19  I'm sorry for what I'm about to do to you, but it is
20  just and right. I will see you in court Anna.
21  Nothing left to lose."
22          What's that all about?
23      A.    I'm not positive if it's about
24  getting the ring back that I had engaged her. If
25  she had broken it off, I think I'm entitled to get

Page 311

1  the engagement ring back.
2      Q.    Okay.
3      A.    But Anna and I had an on again/off
4  again relationship at this point, because obviously
5  my life had been a little tumultuous at that time,
6  as hers was as well.
7      Q.    You say, "You do what you do to
8  protect your family...I need to do the same."
9          Is that reference to what you were
10  going to see her in court about?
11      A.    I don't know whether it's reference
12  to telling my girls about -- I don't recall what
13  it's in reference to. We clearly were having
14  offline conversations from the e-mails.
15      Q.    "I just won't live my life knowing
16  how many lives you and your buddy have destroyed and
17  never paid a consequence."
18          Who are you referring to there --
19      A.    I don't recall.
20      Q.    -- when you say you and your buddy?
21      A.    I don't recall.
22          - - -
23          (Deposition Exhibit No. Simons-36,
24      E-mail chain, top one dated 4/19/2015,
25      Bates stamped BSC00001104, was marked for

Page 312

1      identification.)
2          - - -
3  BY MR. KNAPP:
4      Q.    This is -- Exhibit 36, Mr. Simons, is
5  an e-mail from you to Michele DeCoux on April 19th
6  saying, "I will file tomorrow but I feel stress and
7  I'm going to go out for FMLA...tomorrow."
8      A.    Yeah. At this point I was feeling a
9  great deal of stress from the concern of being
10  dismissed from Boston Scientific and really was
11  unsure what to do.
12      Q.    Were you trying to invoke the FMLA to
13  protect you from adverse consequences for things
14  that you did?
15      A.    I was trying to invoke the FMLA so I
16  could sort things out in my head and figure out what
17  I was doing. I think FMLA, one of the benefits of
18  it is if you're having stress in the workplace, that
19  you can take a break and get your life back in
20  order.
21      Q.    You were hoping by doing that it
22  could delay your termination. Right?
23      A.    Well, it could -- that's one benefit
24  of it, but it could also give me time to reorganize
25  with my family and get my kids' visitation back in

Page 313

1  order.
2          - - -
3          (Deposition Exhibit No. Simons-37,
4      E-mail chain, top one dated 4/17/2015,
5      Bates stamped BSC00001968 through
6      BSC00001971, was marked for
7      identification.)
8          - - -
9  BY MR. KNAPP:
10      Q.    37 is an e-mail exchange between you
11  and Lacia on April 16th and 17th. This is when
12  she's accusing you of drinking again. Right?
13      A.    Yes. It's a common occurrence.
14      Q.    On April 17th at 12:06, the first
15  e-mail on page 1, your -- you say, "I'm also about
16  to lose my job so no money is no money."
17          Are you referring to the upcoming
18  meeting with Sam and Michele?
19      A.    That was my concern, from the
20  information I've got, if they're trying to make a
21  case against me, it was my concern that their goal
22  was to terminate me.
23      Q.    They didn't have to make a case
24  against you, did they? Didn't you make a case for
25  yourself?

Confidential - Subject to Further Confidentiality Review

Page 314

1    MR. MARTIN: Objection,
2  argumentative.
3    THE WITNESS: I believe they did
4  their best to make a case against me.
5  BY MR. KNAPP:
6    Q.   Didn't you make a case for yourself?
7    MR. MARTIN: Same objection. You're
8  still arguing with the witness. It's not an
9  appropriate question.
10    THE WITNESS: I don't believe I made
11  a case for myself.
12        - - -
13    (Deposition Exhibit No. Simons-38,
14    E-mail chain, top one dated 4/19/2015,
15    Bates stamped BSC00001963 through
16    BSC00001965, was marked for
17    identification.)
18        - - -
19  BY MR. KNAPP:
20    Q.   Still that weekend there's more
21  e-mails between you and Lacia.
22    So on Sunday, April 19th, on the
23  second page bottom, you -- argument back and forth.
24  You say, "You think you know it all. When I lose my
25  job Monday. Support is based on income. Mine will

Page 315

1  be zero."
2    So again, telling her you're going to
3  be losing your job. Right?
4    A.   I had a concern about that.
5    Q.   And she replies and says, "I thought
6  Kevin" Ballinger "called you to tell you you weren't
7  getting fired."
8    Did you tell her that?
9    A.   I did not tell her that, to my
10  recollection.
11    Q.   Why would she say you did?
12    A.   You can see with the multiple amount
13  of e-mails, I don't recall everything that we had a
14  discussion about.
15    Q.   So you're telling your wife that
16  you're talking to Kevin Ballinger, and you're
17  telling Lynn Prust you're talking to Kevin
18  Ballinger. Correct?
19    A.   I did not tell Lynn Prust I talked to
20  Kevin Ballinger.
21    Q.   Did you tell your wife that?
22    A.   No. Not that I recall.
23    Q.   They're both making that up?
24    A.   Not that I recall.
25    Q.   Did you have any conversations at all

Page 316

1  with Kevin Ballinger in 2015?
2    A.   Yes.
3    Q.   How many?
4    A.   Not in 2015, no.
5    Q.   Okay.
6    A.   I believe in '14 was the last time I
7  spoke to him.
8    Q.   And then 10:07 a.m. on April 19th you
9  say, "Someone called BSC and told them about the
10  DUI. I am done at this company. They're coming to
11  fire me Monday."
12    Who told them about the DUI? You?
13    A.   I still don't know who told them
14  about the DUI, because Lynn Prust posed the question
15  to me, so clearly she knew about the DUI from
16  someone. I still to this day don't know who told
17  BSC about the DUI.
18    Q.   So on April 19th you're blaming your
19  wife for losing your job. Right?
20    A.   On April 19th I'm blaming my wife for
21  a lot of stress in my life, yes.
22    Q.   It's her fault for telling them about
23  the DUI, because if you kept it separate -- secret,
24  they couldn't have fired you for it. Right?
25    A.   You know, I didn't know where the DUI

Page 317

1  was going, whether I was going to be convicted of it
2  or not. So I don't put it past my ex-wife to do
3  something to make my life worse.
4    Q.   The first page of your e-mail to her
5  at 1:54, "And Lacia, it really happened. Someone
6  gave the info to BSC and said on March 12th I was
7  charged with a DUI. Apparently if you use company
8  equipment while intoxicated it's a violation."
9    Did you not know that?
10    A.   I did not know that. But the car is
11  my own, not a BSC equipment.
12    Q.   And then later you say, "Maybe my
13  girls will benefit from me passing," so were you
14  contemplating suicide at this point?
15    A.   I was in a deep depression when I got
16  back and wasn't allowed to see my girls, and the
17  stress that had been caused by compliance being
18  called on such a regular basis, yes, put me into a
19  deep depression.
20    Q.   So it's not your fault, it's Boston
21  Scientific's fault?
22    A.   The actions were my fault; the stress
23  was caused by Boston Scientific in their relentless
24  effort to -- find out information and make things
25  up about me.

Confidential - Subject to Further Confidentiality Review

Page 318

1  Q.    Was the DWI made up?
2  A.    No.
3         - - -
4         (Deposition Exhibit No. Simons-39,
5         Text Messages, Bates stamped BSC00000961
6         through BSC00000964, was marked for
7         identification.)
8         - - -
9  BY MR. KNAPP:
10  Q.    So the morning of your meeting with
11  Sam and Michele, you start texting Sam and telling
12  him you're not going to go.  Right?
13  A.    Yes.  Again, just the result of
14  extreme amount of stress.  And I did end up going.
15  Q.    And initially you say, "Unless I know
16  who will be in ascendence," I think you mean
17  attendance, "I'm not coming." Right?
18  A.    Initially I said that.
19  Q.    And then you say, "I feel stressed
20  from this investigation.  I have to leave on FMLA
21  again." Right?
22  A.    That was my thought, to get myself
23  together, from whether it's personal or business,
24  that I would be more productive as an employee of
25  Boston Scientific if I handled the stress things in

Page 319

1  my life.
2  Q.    Did you tell anybody at that time, I
3  have depression?
4  A.    No.
5  Q.    Okay.  Did you -- why didn't you
6  proceed with your FMLA leave request?
7  A.    Because, frankly, I realized it was a
8  knee jerk reaction and I really needed to face the
9  company and see what they thought the result was
10  going to be.  I wasn't positive I was being fired.
11  In fact, I held out hope that because I had gone to
12  get treatment, that they would stand behind me.
13  Q.    Then the third page you say, "Have a
14  good breakfast I am not coming.  So unless you
15  can be honest once" and for all and "tell me whose
16  there.  You're acting like the laundry guy than the
17  boss.  Grow up and Man up." Right?
18  A.    He wouldn't respond to my text
19  messages, and I thought they were simple requests,
20  when you're going to a Boston Scientific meeting to
21  find out who was going to be there.
22  Q.    So you're telling -- sorry.  Go
23  ahead.
24  A.    Right.  And again, to explain my
25  frame of mind, I was extremely, you know, upset.

Page 320

1  Q.    You're telling the director of sales
2  for that division of Boston Scientific to grow up
3  and man up?
4  A.    I did.
5  Q.    Do you think that was a wise thing to
6  do?
7  A.    No.
8  Q.    Would you tolerate that from a
9  subordinate of yours?
10  A.    I would not tolerate that from a
11  subordinate of mine, no.
12  Q.    So you go to the meeting.
13         And who is at this meeting?
14  A.    To my knowledge, were Camille Chang
15  Gilmore and Sam Conaway.
16  Q.    Was Michele there?
17  A.    No.
18  Q.    Okay.  And who -- where was the
19  meeting?
20  A.    It was at a hotel downtown in
21  Manhattan.
22  Q.    And where in the hotel?
23  A.    In the hotel lobby or bar off the
24  lobby.
25         And tell me what you can recall in

Page 321

1  that meeting.
2  A.    So I remember walking in.  I was
3  surprised that Camille was there, I think.  Sam sat
4  down.  We sat down across from each other.  He
5  brought up the two performance actions or corrective
6  actions that were given to me.  And then he followed
7  up with, we observed or heard that you were drunk on
8  a conference call on February 27th.  And then I
9  think he finished with, at this time we're going to
10  terminate your employment with Boston Scientific.
11         And I believe after that, Camille
12  handed me a few pieces of paper and said, here's the
13  information you need for separation.  And then I
14  believe Sam patted me on the shoulder.
15         I immediately got up to leave, was
16  still a little shocked to hear the words.  I got up
17  to leave, Sam patted me on the back and said, this
18  is going to be really hard on you.  And I went and
19  got in my car and drove home.
20  Q.    Did he -- he also mentioned the DWI.
21  Right?
22  A.    No, he did not mention the DWI in the
23  firing process.
24  Q.    He didn't say on March 12, 2015 you
25  consumed alcohol during work hours?

Confidential - Subject to Further Confidentiality Review

Page 322

1   A.    I don't believe he said that, no.
2   Q.    Is it possible that he did?
3   A.    No. Because I remember specifically
4  that DUI was not one of the things that he
5  referenced in my firing.
6   Q.    Did he read from a script?
7   A.    No. He had no paper with him to my
8  recollection.
9   Q.    He may have. You don't recall?
10  A.    I don't recall.
11  Q.    Did he tell you that you told Lynn
12 that you spoke to Kevin Ballinger when you didn't?
13  A.    I didn't tell him that. I never
14 heard -- we never mentioned Kevin Ballinger at that
15 meeting at all. In fact, the first time I heard
16 that Lynn Prust had looked at Kevin Ballinger was
17 yesterday when I looked at notes that we were going
18 over.
19  Q.    Do you recall that he said that you'd
20 violated certain policies?
21  A.    I don't recall.
22  Q.    Did he tell you, I realize this is
23 difficult news for you?
24  A.    I believe he may have said something
25 along those lines.

Page 323

1   Q.    Do you recall that February 27th
2  conference call that Gary had to text you because
3  you weren't there when the call started?
4   A.    I do recall getting a text from Gary.
5   Q.    To remind you to come join in on the
6  call?
7   A.    Yes. And that was immediately after
8  it started.
9   Q.    Do you recall in June 2015 you got an
10 e-mail from Bob McKeefrey saying, I need a player
11 coach for $275,000 in five regions in the country,
12 and you forwarded it on to Jim Toto and Thomas
13 Donlan and said, "This is an opportunity, boys"?
14  A.    I believe so, yes.
15  Q.    What came of that?
16  A.    Nothing. I interviewed for the job
17 down in DC and subsequently didn't get it.
18  Q.    And Bob McKeefrey went to work for
19 Medcruiters, Inc.?
20  A.    He's the owner and president of
21 Medcruiters, Inc.
22  Q.    Okay. He left Boston Scientific and
23 started that company?
24  A.    I don't know if Bob ever worked for
25 Boston Scientific.

Page 324

1   Q.    Oh, I'm sorry. Okay. I'm getting
2  him confused with somebody else.
3   A.    Bob McKeefrey is Ryan McKeefrey's
4  father.
5   Q.    Got it.
6          - - -
7          (Deposition Exhibit No. Simons-40,
8          E-mail chain, top one dated 6/29/2015,
9          Bates stamped BSC00001349 through
10         BSC00001355, was marked for
11         identification.)
12         - - -
13 BY MR. KNAPP:
14  Q.    Showing you what's been marked as
15 Exhibit 40. This is an e-mail from Tom Garrett to
16 you on June 29, 2015.
17         Do you recall receiving this?
18  A.    I don't.
19  Q.    Do you recall why -- first of all,
20 what does Rivermine mean, looking at the first page?
21  A.    Rivermine help desk. That is --
22 Rivermine is the cell phone carrier for Boston
23 Scientific, the cell phone administrator for Boston
24 Scientific. I don't know what they call themselves.
25  Q.    Why were you looking for the phone

Page 325

1  number for the Rivermine help desk?
2   A.    Because I needed to call Rivermine so
3  Boston Scientific wasn't in control of my cell phone
4  number any longer.
5   Q.    Okay.
6   A.    And stop their service.
7   Q.    And had you asked them for
8  information on NYU Medical Center?
9   A.    I'm not sure why I would have done
10 that, because I wasn't working at that point, so I
11 don't recall asking them for this.
12  Q.    Did you wonder why -- I mean, did you
13 ask him, why did you send me this?
14  A.    Again, I don't recall the
15 conversation or the context in which I asked for it.
16  Q.    Were you working at that point?
17  A.    No, I was not working at that point.
18 I can speculate that --
19         MR. MARTIN: Don't speculate.
20         THE WITNESS: Yeah. I don't know
21 why -- I don't know why I would have asked him for
22 that.
23 BY MR. KNAPP:
24  Q.    If you look at pages 2 through 4,
25 there's a document entitled "NYU Medical Center."

Confidential - Subject to Further Confidentiality Review

Page 330

1        · identification.)
2                 - - -
3  BY MR. KNAPP:
4        Q.    Before we get to Exhibit 41, Jillian,
5  as you recall, never told you that Gary asked her to
6  sleep with him.  Right?
7        A.    Not to my recollection.
8        Q.    Asked -- yeah.
9              Showing you what's been marked as
10 Exhibit 41.  Danielle Farbanec replaced you,
11 correct, after you were let go?
12       A.    Not immediately.
13       Q.    Ultimately?
14       A.    Ultimately.
15       Q.    And after you were let go, you sent
16 her a text message.  Right?
17       A.    Yes.
18       Q.    And among other things, you say,
19 "Sweety your two faced behavior is going to haunt
20 you.  MY team hates you.  The other managers
21 HATE" -- in capital letters -- "you.  You better
22 watch your mouth because it will soon bury you."
23             Why did you send her that text?
24       MR. MARTIN: I object.  That's not
25 the whole text.  You only took the second paragraph.

Page 331

1  The first sentence -- two sentences you didn't read,
2  which say, "Just got more info.  You bad mouthing
3  Gary to your 'friends'" and then what you read to
4  him was in there.  So you didn't read the whole
5  text.
6        MR. KNAPP:  That's absolutely true,
7  and there's more to it that we can cover in a
8  minute.
9  BY MR. KNAPP:
10       Q.    Why did you send that to her?
11       A.    Because I was informed from other
12 managers at Boston Scientific that at a region
13 manager meeting that she had badmouthed me and the
14 job that I had done before she took over the region.
15 And I just brought it to her attention that she made
16 common practice of badmouthing Gary Lickovitch and
17 his competency in the role.  And I was angry and
18 frustrated that someone who I considered a strong
19 colleague would have to resort to badmouthing me in
20 front of a group of people after I was terminated.
21       Q.    Who told you she was badmouthing
22 Gary?
23       A.    Jim Toto.  And he was at the meeting.
24       Q.    And he was fired for doing that.
25 Right?

Page 332

1        A.    He wasn't he was fired for doing
2  that.  He was fired for performance was my
3  understanding.
4        Q.    Okay.  What did you mean, it will
5  soon bury you?
6        A.    Meaning if Gary continues to find out
7  that you're saying bad things about him, it comes
8  back to haunt you.  When you gossip about people,
9  oftentimes that comes back to bite you.
10       Q.    No.  The only people that are buried
11 are dead people.  Correct?
12       A.    That wasn't my intention to threaten
13 her in any way.
14       Q.    Is that true?
15       A.    Is it what true?
16       Q.    The only people that get buried are
17 dead people?
18       A.    There's another connotation of
19 buried, meaning, you know, bad things happen in your
20 career.
21       Q.    Can you understand how Danielle would
22 have found this to be physically threatening to her,
23 for you to send her a text saying this is going to
24 bury you?
25       A.    I don't agree with why she would have

Page 333

1  thought that.  There's another context, that you've
2  been buried by gossip and rumors.
3        Q.    You also referred to her as a stupid
4  girl.  Right?
5        A.    I clearly did.
6        Q.    Did you think she was a stupid girl?
7        A.    Yes.  Not because she's a girl,
8  because again, she was talking about people in a
9  company setting.
10       Q.    She's not a girl, she's a woman.
11 Right?
12       A.    Correct.
13       Q.    Do you refer to women as girls
14 regularly?
15       A.    At times.  At times I have, yes.
16       Q.    Were you drinking when you sent this?
17       A.    No, not to my recollection.
18       Q.    Is it possible?
19       A.    No.
20             - - -
21             (Deposition Exhibit No. Simons-42,
22       Text Messages, Bates stamped BSC00001099,
23       was marked for identification.)
24             - - -
25 BY MR. KNAPP:

Confidential - Subject to Further Confidentiality Review

Page 346

1  will it be killed for you?
2      A.    I will kill it for you is what I
3  meant to say.  That's a term that we use in sales.
4      Q.    Did Kev respond?
5      A.    No.
6      Q.    And again, you're telling him, I know
7  you're letting go of Sam.
8            What was your basis for that?
9      A.    I just heard it through the
10 grapevine.  And I'm not positive of the source, but
11 I had heard it rumored.
12     Q.    So you kept your BSC laptop for a
13 period of time before you returned it.  Correct?
14     A.    Correct.
15     Q.    Why didn't you return it immediately?
16     A.    Because it wasn't my obligation to
17 collect the equipment from Boston Scientific.
18 Protocol is when you're terminated from Boston
19 Scientific, that your direct supervisor comes and
20 collects all your -- all your Boston Scientific
21 equipment.  That never happened to me.
22     Q.    So you kept it and continued to use
23 it.  Right?
24     A.    Yes.
25     Q.    Did you delete any files on it before

Page 347

1  you returned it?
2      A.    I don't recall.
3      Q.    You may have?
4      A.    I don't recall.
5      Q.    Did you try to wipe things?
6      A.    I don't recall.
7      Q.    Did you view porn on your BSC laptop?
8      A.    Yes.
9      Q.    You understood that was a terminable
10 offense?
11     A.    I've already been terminated.
12     Q.    Did you understand that was a
13 terminable offense?
14     A.    I did not understand that it was a
15 terminable offense.
16     Q.    Did you view porn on your laptop
17 while you were at BSC?
18     A.    I believe I did.
19     Q.    What's flirtlocal.com?
20     A.    No idea.  But I probably looked at
21 it.  It's a website to meet local people.
22     Q.    Did you actually register with it?
23     A.    I believe I may have.  I don't know.
24     Q.    Did you get introduced to --
25     A.    I never met anyone on there, no.

Page 348

1      Q.    How about loversee.com?
2      A.    I don't know that all of those
3  websites that I visited there.  They kind of link
4  into each other and they spam, some of them, but
5  maybe I did look at --
6      Q.    You may have registered at loversee
7  as well?
8      A.    I -- no, I don't believe I did.  I
9  think when you register at one, they have your
10 information at others.
11     Q.    Did you have an account with
12 xmeeting.com?
13     A.    Not that I recall, but it's possible.
14     Q.    Did you use internet websites on your
15 BSC laptop computer to have hookups with women?
16     A.    I never -- I never hooked up with any
17 women from there.
18     Q.    Did you seek that?
19     A.    I looked at what the website was
20 about but never had any physical meeting with
21 anyone.
22     Q.    You actually registered, though,
23 where you put your e-mail in and you could get --
24     A.    You put your e-mail in, you get
25 entrance into the website and you see what's it

Page 349

1  about.
2      Q.    How about what -- seemygf.com?
3      A.    I don't recall.
4      Q.    How about OkCupid?
5      A.    Yes.
6      Q.    What's that?
7      A.    It's a dating site, similar to
8  match.com.
9      Q.    Did you use that?
10     A.    I signed up for it, yes.
11     Q.    Karen Karpusias (ph), who is she?
12     A.    I have no idea.
13     Q.    Why were you looking for real estate
14 in Little Rock, Arkansas?
15     A.    I don't recall looking for Little
16 Rock, Arkansas real estate.
17     Q.    Okay.  What's AdultFriendFinder.com?
18     A.    It's a website.
19     Q.    And did you register with Adult
20 Friend Finder as well?
21     A.    Possibly.
22     Q.    And you'd get e-mails to your Boston
23 Scientific e-mail account from --
24     A.    It was the only e-mail I had.
25     Q.    What's that?

Confidential - Subject to Further Confidentiality Review

Page 358

1 Lacia but not the exact reason why I was terminated.
2       Q.      Actually, we looked at e-mails
3 earlier where you were telling her, I'm going to be
4 fired for the DWI.  Right?
5       A.      Well, I was making an assumption
6 because I was concerned about it.
7       Q.      And you had e-mails back and forth
8 where you were critical of her spreading that around
9 to others on the softball fields, with the other
10 parents and things like that.  Right?
11      A.      Yeah.  I think I'm critical of
12 everything that Lacia does that's a negative towards
13 me.
14      Q.      But she -- you actually believe she
15 was spreading that.  Right?
16      A.      Well, quite frankly, yes.  I know for
17 a fact that she was talking to people, and I don't
18 think there was any reason to reveal my personal
19 business to neighborhood people at a softball field.
20      Q.      Any of those people work in the
21 industry?
22      A.      No, not that I know of, but they're
23 softball coaches and they're neighbors.  But not
24 that I know of that work in the industry.
25      Q.      So you have a disability

Page 359

1 discrimination claim in this case.  Right?
2       A.      Correct.
3       Q.      And you are claiming that you were
4 fired because of your alcoholism?
5       A.      That's correct.
6       Q.      Okay.  And why do you believe you
7 were fired for your alcoholism versus any of the
8 other things that we've talked about today?
9               MR. MARTIN:  I object.  First of all,
10 it's a legal conclusion you're asking from him.  But
11 to the best of his abilities that he can answer the
12 question from facts that he knows as opposed to
13 facts we discovered during the case, you can do
14 that.
15              THE WITNESS:  So the facts that I
16 know is Sam had concerns and voiced them in two
17 corrective actions about my drinking.  And I had
18 stepped forward and spoken to Camille Chang Gilmore
19 stating that I had a drinking problem and I did
20 suffer from the disease of alcoholism.  I entered a
21 treatment center for 30 days.  And when I came back,
22 I was subsequently fired.  I believe that's one of
23 the reasons that they effectively said that they
24 were terminating me.
25 BY MR. KNAPP:

Page 360

1       Q.      And why do you think it's because you
2 were an alcoholic versus because you engaged in the
3 behaviors that you did?
4       A.      Because I firmly believe that I
5 engaged in the behaviors I did because I, you know,
6 developed a drinking problem.  And frankly, I feel
7 like I didn't acknowledge it or didn't recognize it
8 at the time, that I finally did stand up and raise
9 my hand and say, I need some help.  And I did that
10 as soon as I felt like things had gotten to the
11 point where I was ready to get help.
12              MR. KNAPP:  I'm not -- can you read
13 back the question, please.
14              - - -
15              (The court reporter read the
16              pertinent part of the record.)
17              - - -
18              THE WITNESS:  Because I don't think
19 some of those behaviors would have happened if I was
20 not an alcoholic and didn't have control of my
21 drinking.
22 BY MR. KNAPP:
23      Q.      So do you think its disability
24 discrimination to fire somebody because they engage
25 in a terminable offense due to alcoholism?

Page 361

1       A.      I think once a person raises his hand
2 and says, I want to do everything possible to get
3 help, that the company, especially after 15 years of
4 successful service, should stand behind them and not
5 penalize me because I didn't raise it early enough
6 for them, but at least stand behind me and support
7 me, saying I did raise my hand and say I want help
8 and not fire me days after I returned from
9 treatment.
10      Q.      Would it have been better if they
11 fired you before you went out on treatment?
12      A.      No.  It would have better is if --
13 no, it wouldn't have.
14      Q.      Okay.  So your basis -- and I
15 appreciate counsel's point that there might be other
16 things that he'll think of, but your basis, the
17 facts that you base it on, are the facts that you
18 were fired for behavior that's directly linked to
19 your alcoholism, and you were fired after you told
20 people you were an alcoholic and needed treatment?
21      A.      Well, I believe it's much deeper than
22 that.  I think there was a retaliation against me.
23      Q.      I'm asking about disability
24 discrimination.
25              MR. MARTIN:  He's answering the

Confidential - Subject to Further Confidentiality Review

Page 362

1 question. He's answering the question. Go ahead.
2       THE WITNESS:  So I believe that there
3 was more to it than that.  I think there was
4 retaliation from Gary and plotted by Sam.  I think
5 that was evident in conversations I had with Lynn
6 Prust, that they're making -- they're making false
7 accusations against me.  So I think there was a plot
8 not to investigate incidents that happened but to
9 investigate Mike Simons as a whole.
10 BY MR. KNAPP:
11      Q.      Including the Jeannette Bankes issue.
12 Right?
13      A.      You know, after she had asked me the
14 questions about Jeannette Bankes and I answered them
15 honestly, I never heard follow-up on that and didn't
16 see it in any notes of why I was fired that that was
17 an issue.
18      Q.      You believe that was retaliation by
19 Gary and Sam?
20      A.      I don't know if that was retaliation
21 or not.
22      Q.      You believed at the time it was?
23      A.      I believed, because that was the
24 first time I had ever gotten written up for
25 anything, and it seemed that the time frame of after

Page 363

1 Gary and I had gotten into the argument and I had
2 turned him in that Sam and Gary -- you know, that
3 these claims started coming from Lynn Prust.
4       Q.      So I understand you're claiming that
5 Gary and Sam retaliated against you because you
6 reported Gary, I think.
7               Is that one of the things you're
8 claiming?
9       A.      That's correct.
10      Q.      Okay.  Are you claiming they
11 retaliated against you because you're an alcoholic
12 in reporting things to HR?
13      A.      No.  I think using drinking was a
14 vehicle for them to put their retaliation into
15 effect.
16      Q.      What are the facts upon which you
17 base your claim -- and we'll get to the retaliation
18 for having complained about Gary later.  But right
19 now I'm talking about your disability discrimination
20 claim, that you were fired because you're an
21 alcoholic.
22      A.      Yes.
23      Q.      What facts are you aware of to
24 suggest that Gary and Sam were motivated to fire you
25 because of your alcoholism as opposed to some other

Page 364

1 reason?
2       MR. MARTIN:  Give the same objection
3 I gave earlier to the same question that he
4 partially answered, but you can go ahead.
5       THE WITNESS:  First of all, I don't
6 know all the statutes about disability, firing, just
7 speaking from a layman's term.  I feel like the two
8 corrective actions that I received were exaggerated,
9 whether it's in phraseology or extent of the
10 problem.  I feel like I raised my hand and said, I
11 have the disease of alcoholism and I want to get
12 help.  And I had never heard about this February
13 27th incident, even though they had several weeks to
14 address this, whether that day, the next day or two
15 weeks post.  I feel like there was nothing sticking
16 from compliance, so they pulled this out of the mix,
17 and I was fired for essentially a drinking offense
18 after I've acknowledged that I have a disease and
19 went to get help.
20 BY MR. KNAPP:
21      Q.      So other than your -- the perceived
22 unfairness of the criticism, why do you believe
23 they were -- what facts do you have to suggest that
24 they were motivated by your having alcoholism?
25      A.      So I was motivated -- they were

Page 365

1 motivated by the fact of me having alcoholism,
2 because clearly they continued down that path of
3 false accusations of drinking and inappropriate
4 behavior for a leader.  So I think that's
5 discriminating against someone who has alcoholism,
6 who's raising their hand to say, can you understand
7 why some of these behaviors were displayed.
8       Q.      They didn't even know you were an
9 alcoholic until you told them in March?
10      A.      That's not true.  Sam Conaway had
11 asked me back in June, do you have a drinking
12 problem.
13      Q.      And what did you tell him?
14      A.      I told him I didn't feel I had one at
15 that point.
16      Q.      All right.
17      A.      And he had offered to get me help.
18 So at that point I feel like because I didn't go on
19 Sam's time frame, that when I finally felt ready to
20 go get help, that he said, well, too late.  I've
21 already asked you if you wanted help almost a year
22 ago and you said no, so now you're done was my
23 feeling about Sam's thought.
24      Q.      Okay.  Did anybody ever say anything
25 to you to suggest they were motivated by alcohol

Confidential - Subject to Further Confidentiality Review

Page 366

1 discrimination -- you know, discrimination against
2 you because you had alcoholism?
3      A.     I recently found out after reviewing
4 some documents in my attorney's office that Sam
5 called me the company drunk on March 10th prior to
6 me going out for alcoholism. And I think that's a
7 derogatory term from someone who steps up and says
8 they're a recovering alcoholic.
9      Q.     You hadn't stepped up on March 10th,
10 had you?
11      A.     No, not yet, I hadn't stepped up; but
12 calling an employee a drunk to a compliance person I
13 think would show that you have a bias against people
14 who may or may not have a drinking problem, which
15 Sam already had asked me.
16      Q.     Did you -- and you deny you were a
17 drunk at that point. Right?
18      A.     I didn't deny anything. He didn't
19 say it to me. He said it to a compliance officer.
20      Q.     Are you denying here today that you
21 were not a drunk at that point in time?
22      A.     I'm not denying that I was and I had
23 a problem.
24      Q.     Okay. Did he -- what exactly is
25 written in that document you're referring to?

Page 367

1      A.     I didn't actually read the document.
2 It was something that we discussed but --
3           MR. MARTIN: Don't talk about your
4 discussions with --
5 BY MR. KNAPP:
6      Q.     You didn't read anything that said
7 that; somebody told you that was in a document?
8      A.     Correct.
9      Q.     Okay. So you don't know if that's
10 true or not?
11      A.     I trust the person that told me.
12      Q.     Okay. And that was your counsel?
13           MR. MARTIN: Objection. Don't
14 answer.
15           MR. KNAPP: I think he has to, but...
16           We'll mark that.
17 BY MR. KNAPP:
18      Q.     So other than that, your reference to
19 this document you didn't read, any facts upon
20 which -- excuse me.
21           Is there anything that you heard
22 anybody say that makes you believe they were
23 motivated to fire you because of a disability?
24      A.     I believe that Sam has a bias against
25 alcoholism. He's mentioned to me while he was doing

Page 368

1 field rides that he believed other people were
2 alcoholics, in reference to Scott Heuler.
3      Q.     Okay.
4      A.     And he said it to me in a negative
5 connotation. Not he's an alcoholic, you know, we
6 want him to get better, it's I think he's an
7 alcoholic, he smells and looks like he's drunk in
8 the morning after a sales meeting. So it was my
9 feeling that Sam had a bias or negative -- negative
10 opinion of the disease of alcohol.
11      Q.     Did you ever make comments like that
12 about anybody at Boston Scientific?
13      A.     I did not make comments like that.
14      Q.     Never? Okay.
15           Did -- is Scott still employed?
16      A.     Scott is still employed.
17      Q.     What is his position?
18      A.     He's area VP of the Southeast.
19      Q.     To whom does he report?
20      A.     Sam Conaway.
21      Q.     Sam hasn't fired him?
22      A.     I think they made a good friendship
23 from what I can view.
24      Q.     Despite Sam's perception that he's an
25 alcoholic?

Page 369

1      A.     I don't know what changed Sam's
2 perception, you'll have to ask him that, but this is
3 something that Sam said to me early on before he and
4 Scott -- before he was Scott's boss.
5      Q.     Any other facts upon which you base
6 your disability discrimination claim?
7      A.     Not that I...
8      Q.     All right. Now we're going to turn
9 to -- you have a claim that you were retaliated
10 against for raising concerns internally. Right?
11      A.     Yes.
12      Q.     And just -- is that based upon you
13 coming forward in December to Gary and saying, I
14 think there's these issues?
15      A.     I believe so, yes.
16      Q.     And that's the e-mail that we talked
17 about earlier?
18      A.     Correct.
19      Q.     And your belief is that as a result
20 of doing that, Sam and Gary both were out to get
21 you?
22      A.     I believe that Sam and Gary are very
23 close friends, which would be a safe assumption,
24 knowing that Sam brought Gary over from Abbott
25 Corporation. And I believe the fact that Sam

Confidential - Subject to Further Confidentiality Review

Page 370

1 interjected himself into the harassment charge and
2 essentially said there are no -- they're not
3 breaking compliance rules here, that would show that
4 Sam was affecting the outcome of that investigation.
5 And the fact that Sam and Gary made similar but not
6 exactly the same accusation against me that was
7 proven to be nonfactual after the national sales
8 meeting would show that yes, both Sam and Gary had
9 interest in retaliating against me.
10         I also feel like Gary Lickovitch
11 speaking to customers and employees while I was in
12 rehab is the direct result of retaliation.
13    Q.    And what did he say to customers?
14    A.    So a customer had addressed Pete Dunn
15 and essentially said, I heard Mike Simons is in
16 rehab and going to be fired when he gets back.
17    Q.    And what was that customer?
18    A.    Dmitriy Karpakoulous (ph). He's
19 mentioned in another e-mail by Gary.
20    Q.    And where is he?
21    A.    He's at Columbia University. He used
22 to work at Emory down in Atlanta near Gary and Sam.
23    Q.    So Pete called you to say Dmitriy
24 told me that Gary told Dmitriy this?
25    A.    No. It's my understanding -- well,

Page 371

1 Pete and I spoke about it, but it's my understanding
2 that Pete actually called HR as well.
3    Q.    Okay.
4    A.    Then I further found out that -- I
5 didn't find out the nature of the conversations, but
6 two of the reps that work for Steve Bromm were
7 approached by Gary trying to find out information
8 about me. Steve subsequently, after talking to his
9 reps, called HR thinking it was inappropriate while
10 I was in treatment that Gary was talking to reps
11 about me, doing his own investigation. So Pete
12 called HR but never told me what the nature of the
13 conversation was, just that Gary was attempting to
14 find out any information he could about me while I
15 was away.
16    Q.    Why would it be inappropriate for
17 your boss to look into inappropriate behavior on
18 your part?
19    A.    It's my understanding that it's
20 inappropriate for anyone to discuss why I went out
21 on FMLA leave and other than HR once it's turned
22 over to them to do their own investigation and be
23 digging into a situation to try to find out any
24 information that they could.
25    Q.    You're not claiming that Gary told

Page 372

1 these two reps of Steve Bromm's that you were out
2 getting treatment. Right? You're claiming that he
3 asked them questions?
4    A.    I don't know what he told them. I've
5 still never found out exactly what they were told.
6 I still don't know what they were told. I just knew
7 that it warranted Steve Bromm calling HR that he
8 felt uncomfortable enough with Gary's investigation.
9    Q.    So what's the basis for your thinking
10 it's inappropriate?
11    A.    Steve Bromm calling HR that --
12    Q.    That's it?
13    A.    It raised to the level that Steve
14 Bromm felt necessary to speak to human resources
15 about it, so I found that to be inappropriate.
16    Q.    Okay. You don't know what Gary said
17 to them?
18    A.    I don't know the exact details, no.
19    Q.    Do you know any details?
20    A.    No. No details further than I heard
21 it was about me.
22    Q.    Okay. Any other customers to whom
23 Gary spoke about you that you are aware of?
24    A.    Not that I'm aware of.
25    Q.    And any other employees that you

Page 373

1 claim Gary spoke to while you were out on leave?
2    A.    He spoke to Ryan McKeefrey.
3    Q.    Okay.
4    A.    Essentially saying that he thought I
5 was an ineffective manager, he was disappointed that
6 I hadn't had discussions with Ryan about career
7 development. And he believed -- I believe he said
8 that Mike was isolating his team.
9    Q.    And why do you think that's
10 inappropriate?
11    A.    Well, I think it's inappropriate,
12 first of all, because it's not true. My team --
13 I've never, ever made an attempt to isolate my team.
14 In fact, most members of my team didn't want to
15 interact with Gary Lickovitch in their accounts.
16    Q.    You told people on your team you
17 thought Gary was incompetent. Right?
18    A.    I didn't specifically say that to
19 them that I recall. I think I got feedback from
20 them that Gary was not good in front of their
21 customers, that he was woefully underqualified
22 because of lack of product knowledge and lack of
23 accounts and lack of customers.
24    Q.    So I'm trying to understand why it's
25 okay for you to go around telling people at Boston

Confidential - Subject to Further Confidentiality Review

Page 378

1  taken an FMLA claim — FMLA leave?
2       MR. MARTIN: Same objection I made
3  before.
4       You can answer if you know.
5       THE WITNESS: I don't specifically
6  know for taking an FMLA leave. I just know that it
7  was very shortly after I got back from a FMLA leave.
8  BY MR. KNAPP:
9       Q.   Other than the timing, are there any
10 other facts upon which you base your claim that you
11 were fired in retaliation for taking FMLA leave?
12      A.   I don't know any of that.
13      Q.   Did you believe that Sam or Gary had
14 violated any law or regulation in their behavior?
15      MR. MARTIN: At what point?
16      MR. KNAPP: Let me be more precise.
17 BY MR. KNAPP:
18      Q.   To the extent you reported bad
19 behavior by Gary or Sam to either them or Lynn
20 Prust, did you understand that you were reporting
21 behavior that was unlawful or just inappropriate?
22      A.   I don't know the answer to that
23 question. I don't know the laws on sexual
24 harassment.
25      Q.   Okay.

Page 379

1       A.   I believe that I was reporting
2  inappropriate behavior, but I don't know the laws.
3       Q.   Okay. And to the extent you're
4  reporting any unlawful behavior would be sexual
5  harassment, is that what you're saying?
6       A.   So yeah, I reported sexual harassment
7  or inappropriate behavior.
8       Q.   And what specifically did you report
9  as to Sam in your conversations with Lynn?
10      A.   So I reported Sam's inappropriateness
11 to me about asking for females' numbers when he's
12 married.
13      Q.   Because that would be --
14      A.   I thought that's a character flaw and
15 basically out of bounds, to ask a subordinate to be
16 in that position.
17      Q.   Had you ever done that?
18      A.   No.
19      Q.   Okay. What else?
20      A.   That was the crux of -- you know, and
21 then the rest of it was kind of rumors and innuendos
22 that I had posed to Lynn to see if she was willing
23 to investigate.
24      Q.   So you didn't report anything you
25 knew of; you just said there might be some other

Page 380

1  stuff I don't know but you might want to look into
2  it?
3       A.   That's exactly right. I think these
4  are things that I've heard that are troubling.
5       Q.   What things did you say --
6       A.   I've heard Sam Conaway has slept with
7  subordinates. I'm not in the room with a camera, so
8  I don't know if that's a fact or not.
9       Q.   Okay. Anything else?
10      A.   No.
11      Q.   Did you ever sleep with a
12 subordinate?
13      A.   No.
14      Q.   How about a trainee that you were
15 responsible for training?
16      A.   No.
17      Q.   So other than I think he's -- there's
18 rumors he might have slept with subordinates and he
19 asked me for the phone numbers for females when he's
20 married, anything else?
21      A.   No.
22      Q.   Why is asking you for female numbers
23 sexual harassment?
24      A.   I didn't say that was sexual
25 harassment by him. I said it was inappropriate

Page 381

1  behavior.
2       Q.   Okay. But you're not claiming that's
3  unlawful or constitutes sexual harassment?
4       A.   No, no.
5       MR. KNAPP: Take a quick break. I
6  think I'm done.
7       THE VIDEOGRAPHER: The time is 5:00
8  p.m. We are off the record.
9           - - -
10      (A recess was taken from 5:00 p.m.
11      to 5:09 p.m.)
12          - - -
13      THE VIDEOGRAPHER: The time is 5:09
14 p.m. We are on the record.
15 BY MR. KNAPP:
16      Q.   Mr. Simons, I appreciate that you
17 believe that Gary and Sam made up this allegation
18 about you making out with somebody at a national
19 sales meeting. Right?
20      A.   Uh-huh.
21      Q.   But would you agree that if that
22 claim was made to HR, to Lynn Prust, that Lynn and
23 HR had an obligation to look into it?
24      A.   Yeah. I believe they would.
25      Q.   Okay. And they did. Right?

Confidential - Subject to Further Confidentiality Review

Page 382

1    A.    Uh-huh.
2    Q.    And they concluded they couldn't find
3  any corroborating evidence that that even occurred.
4  Right?
5    A.    Correct.
6    Q.    So you were not disciplined for that.
7  Right?
8    A.    No.
9    Q.    Okay. With respect to Jeannette
10  Bankes, you weren't written up for that. Right?
11    A.    I was not disciplined at all for
12  that.
13    Q.    Do you recall Lynn or Michele talking
14  to you about probably shouldn't be kissing or
15  touching women?
16    A.    I don't -- I don't recall having that
17  conversation with them. And I would find that odd,
18  because it's very common practice for people to kiss
19  hello to someone that they were friendly with and
20  felt comfortable with.
21    Q.    Okay. And you thought that was the
22  case with Jeannette. Right?
23    A.    Uh-huh.
24    Q.    But it turns out it wasn't welcome.
25  Right?

Page 383

1    A.    That's what you're telling me.
2    Q.    Okay.
3    A.    I never -- I never was disciplined
4  for any of that.
5    Q.    And -- okay. And I'm not saying you
6  were disciplined, but are you -- do you recall
7  anybody talking to you about being careful about
8  when you chose to engage in physical contact?
9    A.    I don't recall that conversation.
10    Q.    Okay. All right. So I'm trying to
11  remember if there were any other allegations you
12  claim Gary and Sam made to HR other than those two
13  things?
14    A.    I don't recall what the conversations
15  were with Michele DeCoux and Lynn Prust.
16    Q.    Regardless, it sounds like you
17  weren't disciplined or even terminated, for that
18  matter, for any alleged sexual harassment. Correct?
19    A.    Correct.
20         MR. KNAPP: I have nothing further at
21  this point.
22         MR. MARTIN: Mike, I have just a few
23  follow-up questions. I won't belabor it.
24         - - -
25         EXAMINATION

Page 384

1         - - -
2  BY MR. MARTIN:
3    Q.    This February 27, 2015 phone call --
4    A.    Uh-huh.
5    Q.    -- was Gary Conaway on that?
6    A.    Yes.
7    Q.    Excuse me, Sam Conaway?
8    A.    Sam Conaway, yes.
9    Q.    Was Gary Lickovitch on it?
10    A.    Yes.
11    Q.    Now, in your corrective action the
12  prior year, there was an event that Gary discussed
13  with you about excessive drinking. Right?
14    A.    Sam discussed it with me.
15    Q.    Sam. Okay. Keep my names right.
16         The very next day Sam spoke to you
17  about it, didn't he?
18    A.    He did. That's when I received it.
19    Q.    Did Sam speak to you the very next
20  day or even before that about you drinking on the
21  telephone call on February 27th?
22    A.    No.
23    Q.    Did Sam Conaway ever speak to you
24  from February 27th to the day you left, on March
25  13th, about him believing that you had ever had any

Page 385

1  alcohol on that telephone conferences of February
2  27th?
3    A.    No.
4    Q.    Gary was on the call as well.
5  Correct?
6    A.    Correct.
7    Q.    Did Gary speak to you at any time
8  after the call about him believing that you were
9  drinking on -- prior to or during that telephone
10  call on the 27th of February?
11    A.    No.
12    Q.    The first time you learned about that
13  was -- that that was an issue with the company was
14  after you returned from your leave of absence.
15  Correct?
16    A.    That's correct.
17    Q.    Do those facts something you consider
18  part of your disability discrimination case?
19         MR. KNAPP: Objection, leading.
20  BY MR. MARTIN:
21    Q.    You can answer.
22    A.    Yes.
23    Q.    You were asked about this. I'm going
24  to mark this whatever our next exhibit is. I'll
25  have to get copies before we go. It's my only copy.

Confidential - Subject to Further Confidentiality Review

Page 386

1 Just for the record, it's been Bates stamped BSC
2 795, 796 and 797.
3          MR. KNAPP:  What's the date of that?
4 Sorry.
5          MR. MARTIN:  3/10/2015.  For the
6 record, it appears to be Lynn Prust's notes -- I
7 think we're going on that assumption during the
8 deposition -- regarding a scheduled call with Sam
9 Conaway.
10                    - - -
11          (Deposition Exhibit No. Simons-46,
12          Handwritten notes dated 3-10-15, Bates
13          stamped BSC00000795 through BSC00000797,
14          was marked for identification.)
15                    - - -
16 BY MR. MARTIN:
17     Q.     You had testified earlier that you
18 had seen some notes from Lynn Prust before your
19 deposition?
20     A.     Yes.
21     Q.     Let me show you the last page, see if
22 this refreshes your memory.
23          Do you recall ever seeing this before
24 the deposition, the third page of that document?
25     A.     I don't think I actually read that.

Page 387

1     Q.     Okay.  You don't have any
2 recollection of reading that?
3     A.     No.
4                    - - -
5          (Deposition Exhibit No. Simons-47,
6          E-mail chain, top one dated 3/13/2015,
7          Bates stamped BSC00001066, was marked for
8          identification.)
9                    - - -
10 BY MR. MARTIN:
11     Q.     Just for the record, Simons-46 is a
12 March 10, 2015 handwritten notes from Ms. Prust.
13 Scheduled called with Sam Conaway.
14          Did I read that right?
15     A.     Uh-huh.
16     Q.     Is that a yes?
17     A.     Yes.
18     Q.     On the third page, and I'll quote it
19 for the record and you can tell me if I'm wrong.
20          Quote, "People know him as the drunk.
21 He thinks he has great relationships.  His self
22 awareness is not there."
23          Apparently Ms. Prust is attributing
24 that comment to Sam; is that right?
25     A.     Correct.

Page 388

1     Q.     Is that one of the things that you
2 believe supports your disability claim?
3     A.     Yes.
4     Q.     Let me show you what's been marked
5 Simons-47 for identification.  Again, it's
6 information provided by the defendants in discovery,
7 and it's actually Bates stamped BSC 1066.
8          Can you take a look at that for me.
9     A.     Yes.
10     Q.     What's depicted there?
11     A.     This is my --
12     Q.     Well, first, it's an e-mail.  Right?
13     A.     It's my e-mail to Camille Chang
14 Gilmore.  It's from Camille Chang Gilmore basically
15 relaying what I told her on a call.
16     Q.     Now, you did speak to Camille on
17 March 13, 2015.  Am I correct?
18     A.     Yes.
19     Q.     And that's the date of this e-mail.
20 Correct?
21     A.     Yes.
22     Q.     Who is this e-mail -- it's written by
23 Camille.  Correct?
24     A.     Yes.
25     Q.     Who is it addressed to?

Page 389

1     A.     To Gary Lickovitch and Michele
2 DeCoux.
3     Q.     Is it copied to Sam as well?
4     A.     It's also copied to Sam.
5     Q.     Now, did you speak to her that day?
6     A.     I did.
7     Q.     Did you report to her that you
8 suffered -- that you were an alcoholic?
9     A.     I did state that.
10     Q.     Did you tell her that you wanted
11 treatment?
12     A.     I did.
13     Q.     And did you tell her that you wanted
14 to undergo FMLA leave?
15     A.     I did.
16     Q.     Did she offer to send you the
17 information from the ESP, which is the employee
18 assistance plan?
19     A.     Yeah.
20     Q.     EAP.
21     A.     EAP.
22     Q.     That deals with -- what is the EAP?
23     A.     I think the EAP covers several
24 things, but under that falls alcohol abuse and
25 treatment for that.

Confidential - Subject to Further Confidentiality Review

Page 390

```
1      Q.    So she's offering to give you
2   information about the company-sponsored plan for
3   assisting its employees who have alcoholism?
4             MR. KNAPP:  Objection, leading, lack
5   of foundation.
6   BY MR. MARTIN:
7      Q.    Is that what she's offering?
8      A.    Yes.
9      Q.    Now, did you authorize her to tell
10  Gary Lickovitch that you admitted to being an
11  alcoholic?
12     A.    No.
13     Q.    Did you authorize her to tell Sam
14  that you were an alcoholic?
15     A.    No.
16     Q.    Is this the first time when you
17  reviewed this e-mail that it was -- that you learned
18  that she revealed that to Sam and Gary?
19     A.    Yes.
20     Q.    And this e-mail is dated the 13th of
21  March.  Right?
22     A.    Correct.
23     Q.    And after that -- well, first of all,
24  do you believe this is information that supports
25  your disability claim?
```

Page 391

```
1      A.    Yes.
2      Q.    After that -- you discussed on the
3   retaliation issue some of the conduct that Gary took
4   after you went out on leave.  Correct?
5      A.    Correct.
6      Q.    Again, this is leave for your
7   alcoholism inpatient treatment for 30 days?
8      A.    Correct.
9      Q.    Did Gary do to your -- what was
10  reported to you by your colleagues, did Gary do any
11  sort of investigation about your alcohol use?
12     A.    What was reported to me is that he
13  did do an investigation, trying to find out
14  information about me and alcohol use.
15            MR. KNAPP:  Objection.  That's
16  totally contradictory to what he said earlier, and
17  it's a leading question.
18            MR. MARTIN:  I don't think it is.  I
19  think it's consistent.
20  BY MR. MARTIN:
21     Q.    What was reported to you?
22            MR. KNAPP:  Objection, asked and
23  answered.
24  BY MR. MARTIN:
25     Q.    You can answer.
```

Page 392

```
1      A.    So it was reported to me that Gary
2   had been speaking to several clinicals on Steve
3   Bromm's team, asking for information about alcohol
4   abuse, you know, with -- with those reps.  It was
5   also reported to me from Pete Dunn that Gary had
6   spoken with a physician about me going into
7   treatment as well as potentially being fired.  And
8   then it was reported to me that he had been making
9   disparaging comments about my leadership ability to
10  other members of my team.
11     Q.    Are these additional facts that you
12  believe support your disability claim?
13     A.    Yes.
14            MR. MARTIN:  I have nothing further.
15            -  -  -
16            EXAMINATION
17            -  -  -
18  BY MR. KNAPP:
19     Q.    So turning back to page --
20  Exhibit 46, the -- is this the document that you
21  were referring to earlier where you said Sam Conaway
22  referred to you as the company drunk?
23     A.    Yes.
24     Q.    It doesn't say that, though.  Right?
25     A.    "People know him as the drunk."
```

Page 393

```
1      Q.    Okay.  Not even Sam thinks you're a
2   drunk but that people know you as the drunk.  Right?
3      A.    That's what it says here.
4      Q.    Right.  And do you think it's
5   accurate that you didn't have very good
6   self-awareness at this time?
7      A.    I think I gained self-awareness.
8   This was after I had gone -- is this -- this is
9   before I had gone to rehab.  But I was gaining
10  self-awareness at that point that I had an issue,
11  and that's why I stepped up.
12     Q.    This is two days before you had your
13  DWI.  Right?
14     A.    Yeah.  Clearly I knew that there was
15  an issue two days before I had a DWI.
16     Q.    But not enough of an issue to go and
17  seek treatment?
18     A.    Correct.
19     Q.    Okay.  Do you think people did think
20  of you as a drunk?
21     A.    I certainly wouldn't know what people
22  think.  And I had a good sampling of people who
23  would not think that way.
24     Q.    Now, this March 10, 2015 document
25  refers to last Friday, the 27th people were texting
```