5055-J/wjm&mdd
MARTIN, GUNN & MARTIN, P.A.
William J. Martin, Esquire
Attorney ID No. 047941988
Sentry Office Plaza, Suite 420
216 Haddon Avenue
Westmont, New Jersey 08108
(856) 858-0900
(856) 858-1278 (fax)
Attorneys for Plaintiff, Michael Simons

| | |
|---|---|
| MICHAEL SIMONS,<br><br>              Plaintiff<br><br>vs.<br><br>BOSTON SCIENTIFIC, GARY LICKOVITCH, SAMUEL CONAWAY and JOHN DOES 1-30,<br><br>              Defendant(s) | UNITED STATES DISTRICT COURT<br>FOR THE DISTRICT OF NEW JERSEY<br><br>No. 2:15-CV-7519 (MCA/LDW)<br><br>CIVIL ACTION<br><br>**PLAINTIFF, MICHAEL SIMONS' RESPONSES TO DEFENDANTS' STATEMENT OF MATERIAL FACTS** |

<u>Plaintiff's Objection to Defendants' Statement of Material Fact</u>

(1)	Defendants' Statement of material facts should be disregarded and their motion for summary judgment should be denied due to defendants' blatant disregard of Local Rule 56.1, which requires that each fact be set out separately in a paragraph. Defendant has egregiously violated the Rule and has bunched hundreds of facts together in their statement.

Plaintiff, Michael Simons hereby responds to defendants' statement of material facts as follows:

1. Denied as stated. The transcript citation to which defendants refer reflects that when plaintiff was questioned as to his termination date being April 20, 2015 he responded, "[t]hat sounds correct." **(Exhibit A, p. 36:15-17, Simons Dep).**

2. Admitted only that Boston Scientific claims this to be so.

3. Denied as stated. Lickovitch testified that when he was first hired by BSC, he was "the area manager for CTOs," and sometime after was promoted to Area Vice President in BSC's Interventional Cardiology division. This is when he became plaintiff's supervisor. **(Exhibit B, p. 12:24-13:15, Lickovitch dep).**

4. Admitted.

5. Admitted.

6. Admitted.

7. Admitted in part; denied as stated. Admitted that Kevin Ballinger testified that there are 20 regional managers in BSC's Interventional Cardiology division; Denied that Kevin Ballinger testified that "it is a critical and demanding leadership position." More accurately Kevin Ballinger testified they are "important jobs, jobs that we expect a lot from." **(Exhibit C, p. 17:12-14, Ballinger dep)**.

   With respect to the statements attributed to Michelle DeCoux, it is admitted only that she makes such statements in her Declaration; plaintiff believes DeCoux's Declaration to be a sham.

8. Admitted in part; denied; denied as stated. Denied that "Regional Managers are expected to be engaged and capable of handling issues from morning to night." Mr. Conaway testified that they are expected to be engaged from the morning until "when their day finishes." **(Exhibit D, p. 143:12-15). Conaway dep.** Lickovitch testified that "Our space is unique," and the time worked Monday through Friday varies. **(Exhibit B, p. 147:2-148:4). Lickovitch dep.** Stephen Bromm testified that as a regional manager for the past five years, he has not had any set hours. "It's what you need to do to get the job done." **(Exhibit E, p. 9:25-10:7; p. 42:15-18m, Bromm Dep)**. Plaintiff testified, "there's an assumption at [BSC] that people work flexible hours." **(Exhibit A, p. 72:5-12, Simons Dep)**.

   Admitted only that Conaway testified, "We often get calls throughout the evening," from physicians asking about problems with a patient or a device. **(Exhibit D, p. 143:20-22, Conaway Dep)**.

   Denied as stated; admitted only that Conaway and Lickovitch reported that they would notify their supervisor, but did not say that they were expected to do so. **(Exhibit D, p. 144:20-22, Conaway Dep); (Exhibit B, p. 146:5-11); Lickovitch Dep)**. Lynn Prust testified "the way a regional manager's hours were structured was between the employee and their manager." **(Exhibit F, p. 218:11-17); Prust Dep.** Steve Bromm testified "it's fairly common for regional managers to leave work early to leave work for a bit and pick children up at school, and has done so without reporting this to his manager and has never had a problem as a result. **(Exhibit E, p. 40:14-41:8, Bromm Dep)**.

9. Admitted. Admitted that regional managers are highly compensated and that in plaintiff's last full year of employment, his gross pay exceeded $500,000. When plaintiff was fired in April of 2015, he was on track to earn $1,000,000 in 2015.

10. Denied as stated. When plaintiff was first hired by BSC, his region included the five Boroughs of New York and Central to Northern New Jersey. **(Exhibit A, p. 106:23-107, Simons Dep)**.

It is admitted that at the time of his discharge, plaintiff supervised a team of six sales representatives and six clinical specialists.

11. Admitted in part; denied as stated. It is admitted that Regional Managers at BSC report to an Area Vice President. Area Vice Presidents report to the Senior Vice President of Sales, and the Senior Vice President of Sales reports to the President of the Interventional Cardiology Division. **(Exhibit A, p. 109:17-111-10, Simons Dep.)**

Admitted that Kevin Ballinger has been the President of BSC's I.C. Division since July of 2011.

12. Admitted in part; denied as stated. It is admitted that divisions within BSC are supported by Human Resources ("HR") Business Partners and that HR Business Partners assists leadership with talent reviews, development and employee relation issues. It is admitted that the HR Business Partners help interpret company policy, but Ms. Gilmore did not testify that a business partner assesses compliance. She testified that Human Resources Business Partners are responsible to ensure that employees adhere to company policy. **(Exhibit G, p. 20:1-19, Gilmore Dep.)**

13. Denied as stated. It is admitted only that Michelle DeCoux was the HR Business Partner for Interventional Cardiology in 2014 and 2015. **(Exhibit H, p. 9:17-10:8, DeCoux Dep).**

Denied as stated; it is admitted only that DeCoux reported to Camille Chang Gilmore, who became the Vice President of HR for IC and BSC's Global Chief Diversity Officer in approximately 2013. **(Exhibit G, p. 10:22-11:11, Gilmore Dep).**

14. Admitted.

15. Admitted.

16. Admitted.

17. Denied; BSC created a culture of drinking when working. **(Exhibit A, p. 143:13-15; p. 165:9-12; p. 166:5-7, Simons Dep.; Exhibit I, p. 9:8-10-17, Dunn Dep). (Exhibit K, p. 21:8-22; p. 26:9-27:5, Simmerson Dep); (Exhibit F, p. 101; 11-14; p. 128:5-17, Prust Dep; Exhibit B, p. 161:6-16; p. 163:6-17; p. 164:18-165:7; Lickovitch Dep; Exhibit D, p. 59:4-6; Conaway Dep; Exhibit J, p. 52:22-53:7, Rothwell Dep).**

18. Denied as stated. It is admitted only that BSC's Drug & Alcohol Policies states, "Employees are required to abide by this policy as a condition of employment. Violations of this policy may result in corrective action, up to and including unpaid suspension and/or termination of employment." **(BSC Drug & Alcohol Policy, Exhibit P).**

Denied as stated.  It is admitted only that the last sentence of this paragraph is quoted out of context and the correct quote should be, "[S]uch prohibited activity would include going back to the workplace after consuming alcohol at a lunch or dinner or at a Company Sponsored Event or after any such event, sending e-mail for Company business and/or using Boston Scientific Communication Systems, even from an off-premises location." **Id.**

19. Denied as stated.  The expectation of employees at BSC acting professionally, honestly and ethically are contained in the "Examples of Appropriate and Commendable Conduct" on page 2 of Heckman Decl., Ex. 6.

    Denied as stated.  It is admitted only that BSC's standards of employee conduct gives an example of inappropriate conduct as "providing false or incomplete verbal-written information on any document relating to Company business. (e.g. time records, applications, statements, work products, reports) or in any other manner in the course of conducting Company Business."  Heckman Decl., Ex. 6 at p.3.  It is also asserted that defendant, BSC is in direct violation of this policy.  BSC testified, via its Director of Employment Policy and Employment Relations, Lynn Prust that she altered a company document after the Complaint in this case was filed.  **(Exhibit F, p. 88:16-21; p. 110:2-19, Prust 13, and Prust 22, Prust Dep and Exhibits).**

    Denied as stated.  The third sentence of this paragraph is quoted out of context and states in full, "[A] violation of this policy may result in corrective action up to and including unpaid suspension and/or termination from employment."  Heckman Decl. Ax 6 at p.7.

20. Denied as stated.  While it is true that BSC's policy against harassment does state these things, it also states, "An employee may chose to discuss the incident with the immediate supervisor, the next level of management or any member of the Human Resources Management Staff."  Heckman Decl., Ex. 7 at BSC 635.

21. Denied.  Camille Chang Gilmore testified that she did not believe there was any formal policy on actual steps and protocol to be followed when there was a problem between two employees and an employee could go to the person and advise them of the problem so that they could correct the behavior.  **(Exhibit G, p. 59:22-60:4, Gilmore Dep).**

    It is also submitted that this fact, even if true, is irrelevant as once plaintiff spoke with defendant Lickovitch about Jillian Rothwell.  Mr. Lickovitch reported himself to Human Resources the same day.  By the time plaintiff decided he might report Lickovitch, he had already spoken with HR.  **(Exhibit A, p. 210:11-16, Simons Dep).**

22. Admitted that BSC is an "At Will" employer, but so are all employers, unless they discriminate.

Plaintiff admits with the following two statements in paragraph 22, but specifically denies he did any of those behaviors.

23. Denied as stated. BSC's Corrective Action Program does include the language quoted by BSC, but fails to include additional relevant language: The Written Corrective Action will document the nature and scope of the performance problem(s) or conduct and will:  Identify the action(s) needed to address and improve the performance problem(s); include a Subsequent Review Date (e.g., 30, 60 days, or other time frame as deemed appropriate by the supervisor in consultation with Human Resources) for reviewing the employees' performance against the Performance Improvement Plan contained in the Written Corrective Action Document.  Heckman Decl., Ex. 29, p. 3.

24. Admitted.

25. Denied. Denied that "[a]n employee who has received a corrective action relating to behavior and judgment issues is expected not to repeat these issues during the rest of their employment." BSC's Corrective Action Policy specifically states that there are recommended deadlines for corrective actions, and while the manager has the discretion to change these, it is certainly not anticipated that a corrective action could continue indefinitely.  This policy states a Corrective Action "will include a Subsequent Review Date (e.g., 30, 60 days, or other time frame as deemed appropriate by the supervisor in consultation with Human Resources) for reviewing the employees' performance against the Performance Improvement Plan contained in the Written Corrective Action Document.  Heckman Decl., Ex. 29, p. 3.

26. Denied as stated.  It is admitted that BSC is an "At Will" employer, but so are all employers unless they discriminate.

27. Admitted.

28. Denied.  Even if true, this information is irrelevant to this case as plaintiff was not reprimanded for any such instance and this instance was not proper as any reason for plaintiff's termination.  It is simply an effort to paint the plaintiff in a negative light in order to try to counter the real, pre-textual reasons for firing plaintiff.

29. Denied.  Even if true, this information is irrelevant to this case as plaintiff was not reprimanded for any such instance and this instance was not proper as any reason for plaintiff's termination.  It is simply an effort to paint the plaintiff in a negative light in order to try to counter the real, pre-textual reasons for firing plaintiff.

30. Denied as stated.  Admitted only that plaintiff was charged with physical assault, but denied that he was guilty of this.  As to remaining averments of paragraph 30, even if true, this information is irrelevant to this case as plaintiff was not reprimanded for any such instance and this instance was not proper as any reason for plaintiff's

termination. It is simply an effort to paint the plaintiff in a negative light in order to try to counter the real, pre-textual reasons for firing plaintiff.

31. Denied. These averments are irrelevant to this case as plaintiff was not reprimanded for any such instance and this instance was not proper as any reason for plaintiff's termination. It is simply an effort to paint the plaintiff in a negative light in order to try to counter the real, pre-textual reasons for firing plaintiff.

32. Denied. Even if true, this information is irrelevant to this case as plaintiff was not reprimanded for any such instance and this instance was not proper as any reason for plaintiff's termination. It is simply an effort to paint the plaintiff in a negative light in order to try to counter the real, pre-textual reasons for firing plaintiff.

33. Denied. Even if true, this information is irrelevant to this case as plaintiff was not reprimanded for any such instance and this instance was not proper as any reason for plaintiff's termination. It is simply an effort to paint the plaintiff in a negative light in order to try to counter the real, pre-textual reasons for firing plaintiff.

34. Denied. Even if true, this information is irrelevant to this case as plaintiff was not reprimanded for any such instance and this instance was not proper as any reason for plaintiff's termination. It is simply an effort to paint the plaintiff in a negative light in order to try to counter the real, pre-textual reasons for firing plaintiff.

35. Denied as stated. It is admitted only that Conaway began supervising plaintiff in approximately July of 2013. **(Exhibit D, p. 10:17-11:12, Conaway Dep).**

    Conaway did commend plaintiff for his strong sales performance, including being the only Regional Manager to achieve his sales plan, but not only in the East. Plaintiff believed he was the only Regional Manager in the country to do this. **(Exhibit A, p. 131:4-132:3, Simons Dep).** It also said, "[I]n addition, you won the prestigious Stauberg Award for multiple P-Club Wins," meaning 5 P-Club wins in his career. **(Exhibit A, p. 132:4-11, Simons Dep).**

    Denied as stated. It is admitted only that Conaway pointed out that plaintiff needed to improve in the area of sales leadership. **(Exhibit A, p. 132:12-18).**

36. Denied as stated. It is admitted only that plaintiff received a Written Corrective Action in February of 2014. Plaintiff did not agree with everything that was in it and felt that each case was exaggerated and overbroad to the actual situation. **(Exhibit A, p. 53:8-12; p. 139:5-13, Simons Dep).** Plaintiff felt the examples included in the Corrective Action were merely Sam Conaway's interpretation of things, as he had not received a Corrective Action in 14 years of being with the Company. **(Exhibit A, p. 139:17-25, Simons Dep).** For example, the February 2014 Written Corrective Action included "exhibited unprompted outbursts of laughter." Plaintiff testified that there very well may have been laughter, as he and the doctor they were having dinner with (Dr. Chiu Wong), had a personal relationship and were friendly. He also remembered

that at the same dinner, "Sam Conaway had a confrontation with Dr. Wong about not involving Dr. Wong in his studies because Dr. Wong didn't favor Boston Scientific for their stent business." In fact, Conaway's exact quote was, "You know how this works, Chiu." Following this, Conaway left the dinner angry and before the dinner was over. **(Exhibit A, p. 140:8-22, Simons Dep).**

37. Denied as stated. It is admitted only that the Written Corrective Action stated plaintiff must demonstrate, "Immediate, significant, and sustained improvement with respect to your performance and/or conduct as noted above. . .[F]ailure to demonstrate and sustain an acceptable level of performance may result in further corrective action, up to and including termination of employment, at any time." **(Heckman Decl. Exhibit 9, p. 3).**

Denied. While Mr. Conaway may have testified as paraphrased by defendants, however, BSC's policy dictated otherwise, providing that: A Written Corrective Action and/or Final Corrective Action cannot continue indefinitely. **(See Responses to Defendants' Statement of Facts, paragraphs 23 and 24).**

38. Denied.

39. Admitted in part; denied in part. Admitted only that plaintiff did sign the Written Corrective Action acknowledging that he had received the information provided, however, it was plaintiff's understanding that when you sign a Corrective Action, it's an acknowledgment of the corrective action as opposed to agreement with what is contained in the Corrective Action. **(Exhibit A, p. 150:19-25, Simons Dep).**

It is admitted only that the February 2014 Written Corrective Action states: "It is also important that he prepare for meetings, prepare for presentation, and be on time. During the discussions with customers, leaderships or your own team members, you should be engaged in the conversation, focus on the business strategy and goals of the meeting at hand." Heckman Decl. Ex. 9, p. 2. The Written Corrective Action also stated: "I am available if you have any questions or need advice or if you are faced with a difficult decision and need to make a judgment decision. Michele DeCoux, HR Business Partner, is also a resource to you if you have questions or need assistance." Heckman Decl. Ex. 9, p. 2.

Admitted only that Conaway testified to this.

Denied as stated. Plaintiff testified that he felt like when he received the February 2014 Written Corrective Action, "In the minds of [h]is supervisors," they thought he had an issue with alcohol at the time. **(Exhibit A, p. 54:5-9, Simons Dep).**

40. Denied. Even if this information were true, it is irrelevant to this case as this behavior is alleged to have occurred outside of the workplace. It is simply an effort to paint the plaintiff in a negative light in order to try to counter the real, pre-textual reasons for firing plaintiff.

41. Denied. Even if this information were true, it is irrelevant to this case as this behavior is alleged to have occurred outside of the workplace. It is simply an effort to paint the plaintiff in a negative light in order to try to counter the real, pre-textual reasons for firing plaintiff.

42. Denied as stated. It is admitted only that plaintiff commented on his Performance Against Business Objectives as, "[r]egion 3 had a strong year in 2013. We were the only region to show growth in this tough year. I felt like we utilized all resources available to us with currencies, VIP trips with key customers, senior leadership visits and utilizing selling tools. We closed several large deals, i.e., Morristown, as well as grew in some key accounts, i.e. Beth Israel, Methodist, NYU. I feel like I developed my team through coaching and regular performance evaluations. I feel like I communicated well with my boss, Sam Conaway, and had a good working relationship." Heckman Decl. Ex. 8, p. 3.

    The remaining averments of this paragraph are admitted.

43. Denied as stated. Conaway did share plaintiff's opinion about his sales performance, stating, "Mike, as you know, I've enjoyed working with you for the last 8 months. You are passionate about winning and you have a strong work ethic. In 2013, you are the only RM to hit plan for the year in the East, and the only RM in the East to win P-Club. In addition, you've won the prestigious Stauberg Award for multiple P-Club wins." Heckman Decl. Ex. 8, p. 5.

    It is admitted only that Conaway was concerned only with plaintiff's abilities as a sales leader. Heckman Decl. Ex. 8, p. 5.

44. Denied. Defendants' paraphrasing of plaintiff's deposition testimony is out of context. For example, defendant's reference to plaintiff's comments about Conaway occurred during his alcohol rehabilitation and are not date specific. **(Exhibit A, p. 88:21-24; 135:20-136:19; p. 138:21-23, Simons Dep).**

45. Denied as stated. Admitted only that in early 2014, plaintiff was drinking more alcohol, but he testified that he felt like it was not affecting his performance because he had just won President's Club and had a "great year." **(Exhibit A, p. 142:24-143:4, Simons Dep).**

    Denied as stated. It is admitted only that plaintiff testified there was an "Our Evolution Regional Manager Meeting in the first week of June 2014." **(Exhibit A, p. 161:25-162:3, Simons Dep).**

    It is admitted only that Conaway testified that the purpose of this meeting was to create a new sales model for the organization and that the meeting was critical to the future of the company.

It is admitted only that Conaway stated the focus of the meeting was not on fun, but rather work. **(Exhibit A, p. 162:5-8, Simons Dep)**.

46. Admitted in part, denied in part. It is admitted only that plaintiff, "had alcohol that night with several managers prior to dinner. We had free time and we went and met for drinks, which was pretty common at sales meetings. **(Exhibit A, p. 165:9-12, Simons Dep)**. The remaining averments of this paragraph are denied.

47. Denied.

48. Denied as stated.

49. It is admitted only that this is how Conaway and Ballinger testified.

50. Denied.

51. Admitted.

52. Denied as stated. It is admitted only that Conaway did meet with the plaintiff the following morning, but Conaway relayed to plaintiff that he felt Kevin Ballinger was upset that plaintiff had been drinking "at a business meeting . . . that was supposed to be focused on business." **(Exhibit A, p. 166:14-167:4, Simons Dep)**.

Admitted only that Conaway expressed to plaintiff that, "He would rather that [p]laintiff not drink when we were . . . at meetings." **(Exhibit A, p. 167:10-14, Simons Dep)**.

53. Admitted in part; denied in part. It is admitted only that with respect to plaintiff's Final Corrective Action, he asked Conaway whether this meant he should not drink at BSC meetings for the rest of his career, and Conaway said yes. However, BSC policy dictates that a corrective action must include a subsequent review date to assess the employee's performance related to the corrective action, and cannot continue indefinitely. Heckman Decl. Ex. 29, p. 3.

Admitted that plaintiff committed that he would not drink at any future BSC meetings.

Admitted that plaintiff testified that he knew it would not be acceptable to drink alcohol or exhibit poor judgment in the future, but this was not his intention. Plaintiff kept his word "for an extended period of time," but admittedly, he is an alcoholic. **(Exhibit A, p. 167:20-22, Simons Dep)**.

54. Admitted in part; denied in part. It is admitted only that plaintiff received a document titled Final Corrective Action, dated June 13, 2014.

It is admitted only that this Final Corrective Action states that plaintiff committed not to drink alcohol during BSC meetings and behave professionally.

The final averment of this paragraph is denied. As previously stated, BSC policy dictates that corrective actions are not to continue indefinitely.

55. Admitted in part; denied in part. It is admitted only that the Final Corrective Action stated that modification of the plaintiff's behavior was critical to his continued employment with BSC, but this same exact boiler plate language was also contained in plaintiff's Written Corrective Action, which was over.

It is admitted only that Conaway wrote that he stressed the importance of plaintiff's changing his behavior.

It is admitted only that the Final Corrective Action included a review date of July 31, 2014, with periodic reviews through June 2015.

The remaining averments of this paragraph are specifically denied.

56. Admitted in part; denied as stated. Admitted only that plaintiff was told that Conaway and HR were resources for plaintiff but again, this is boiler plate language from plaintiff's February 14, 2014 Written Corrective Action which ended on March 14, 2014.

Admitted only that plaintiff and Conaway discussed whether plaintiff had a drinking problem and Conaway offered to help plaintiff find help, but plaintiff believes Conaway has a bias against alcoholics from some of the conversations they had. **(Exhibit A, p. 367:24-368:10, Simons Dep)**.

Denied as stated. Plaintiff said he did not think he had a problem "at that point." He testified, "[Sam] had offered to get me help. So at that point, I feel like because I didn't go on Sam's timeframe, that when I finally felt ready to go get help, that he said, well, too late. I've already asked you if you wanted help almost a year ago and you said no, so now you're done, was my feeling about Sam's thought." **(Exhibit A, p. 365:10-23, Simons Dep)**.

57. Admitted in part; denied as stated. While plaintiff did testify that he knew this was now two strikes, he had attributed these two strikes as "according to Sam," and involving his drinking too much and behavior resulting from drinking too much. However, plaintiff did feel BSC would keep him due to the consistent path he had shown in not drinking at meetings, the fact that his team was doing well, Lickovitch was giving him many accolades, and his successful 15 year track record at Boston Scientific. **(Exhibit A, p. 169:4-170:2, Simons Dep)**.

Admitted only that plaintiff believed it was prudent to update his resume, and part of that reason was the fact of him receiving two corrective actions, however, he also

testified, "I don't recall my mindset of why I did it." **(Exhibit A, p. 178:13-21, Simons Dep)**.

Admitted only that plaintiff sent his resume to a manager at another medical device company, but the reason he did so was he "just wanted to explore other opportunities that may be, you know, within the field," and "it's wise to always see what else is out there and if there is an interesting new opportunity. I obviously didn't make any move to leave or go to them, but I would always explore opportunities." **(Exhibit A, p. 179:23-180:18, Simons Dep)**.

Defendants' citation to plaintiff's deposition, p. 45:11-16 is inaccurate, as in those pages, plaintiff was talking about his efforts to find other jobs after being wrongfully terminated from BSC.

58. Admitted.

59. Admitted.

60. Denied as stated. Admitted only that plaintiff said, "I believe that's what the understanding of the law is, but I felt still at this point concerned about exposing my disease to the company's superiors." **(Exhibit A, p. 183:18-24, Simons Dep)**.

Defendants again misstate plaintiff's testimony. More accurately, plaintiff testified that it was possible that the "incident that happened" to which his sister was referring could have been when Tom came to his house and he had been arrested. He was not definitive as defendants would have you believe. **(Exhibit A, p. 183:25-184:14, Simons Dep)**.

61. Admitted in part; denied as stated. Defendants again misrepresent plaintiff's testimony. Admitted only that "[r]eflecting back," plaintiff believes his sister's requests for him to get help were warranted. **(Exhibit A, p. 181:14-19, Simons Dep)**.

It is admitted only that plaintiff's sister did write these things, however, plaintiff took her writing of these things as her being unhappy that plaintiff did not take her advice to go to treatment, and, therefore, she escalated it to try to convince him to go. **(Exhibit A, p. 186:20-24, Simons Dep)**.

Denied as stated. Plaintiff's testimony was, more accurately, that it was his sister's perception of what was happening, but she was not around daily, and was prone to exaggeration. **(Exhibit A, p. 181:23-24; p. 187:10-25, Simons Dep)**.

62. Admitted in part; denied as stated. Admitted only that Lickovitch became plaintiff's direct supervisor in July of 2014. **(Exhibit A, p. 110:15-17, Simons Dep; Exhibit B, p. 13:7-17, Lickovitch Dep)**.

Defendants mischaracterized plaintiff's testimony regarding Lickovitch. It is admitted only that Jillian Rothwell stated plaintiff referred to Lickovitch as a "moron" or an "idiot," but it was clear that most people felt this way about Lickovitch. **(Exhibit A, p. 163:14-164:4, Simons Dep; Exhibit I, p. 12:16-13:10, Dunn Dep).**

63. Denied as stated. It is admitted only that Lickovitch testified that the first time he rode with plaintiff, plaintiff punched a taxi cab, but Lickovitch did not testify as to any reason why as proffered by defendants. **(Exhibit B, p. 155:14-21, Lickovitch Dep).** In addition, plaintiff testified that Lickovitch laughed about this. **(Exhibit A, p. 170:18-25, Simons Dep).**

   Testimony is mischaracterized by defendants. Plaintiff did not definitively state he said these things to Lickovitch. Instead, he testified, "[t]hat conversation could have taken place, yes." **(Exhibit A, p. 171:7-12, Simons Dep).** In addition, plaintiff testified that he thought Lickovitch was being brought in to fire him because he had two corrective actions from Conaway and "it was clear to people throughout the company that Gary was Sam's, 'boy' that he put into the spot. And so I felt - - initially threatened to have one of Sam's own there, especially after being with the company for 14 years prior to that without a black mark on my record. I felt that, you know, that Sam was being overboard with his corrective actions and then Gary was put in place to - - as kind of a watchdog for Sam." **(Exhibit A, p. 171:14-172:3, Simons Dep).**

64. Admitted in part. Admitted only that Lickovitch discussed with plaintiff two incidents, the first involving an "unapproved attendance" of his girlfriend. What defendants fail to mention, however, is that plaintiff testified these incidents were based on incorrect assumptions and that Lickovitch would not allow him to explain his position on any of these events. **(Exhibit A, p. 194:9-195:13; p. 206:23-207:16, Simons Dep).** In fact, Conaway testified he never found any evidence that contradicted plaintiff's account of the events. **Exhibit D, p. 81:13-16, Conaway Dep).**

65. Admitted in part; denied; denied as stated. It is admitted only that Lickovitch discussed with plaintiff a situation involving plaintiff spending time with his daughters in lieu of a dinner meeting with a doctor. It is specifically denied that plaintiff did not spend time with his daughters as is intimated by defendants. In fact, plaintiff picked his daughters up and took them to dinner, and then returned to the hotel in the evening as he already had the room reserved. **(Exhibit A, p. 200:17-201:18, Simons Dep).**

   It is admitted that Lickovitch saw plaintiff and his girlfriend on the elevator of the hotel, because plaintiff returned to the hotel after taking his daughters to dinner to stay with his girlfriend because he already had the room reserved.

Denied as stated.  Plaintiff did not tell Lickovitch he was "late to a meeting."
Lickovitch testified differently.  He said, "I think he said he had an appointment."
**(Exhibit B, p.30:24-25, Lickovitch Dep)**.

It is admitted only that Lickovitch testified plaintiff looked like he was "out all
night," but this was just Lickovitch's perception.  Again, Lickovitch did not state
plaintiff was heading to a "work meeting."  Rather, Lickovitch stated "appointment."

Denied as stated.  Rather, plaintiff told Rothwell "he was probably going to be in a lot
of trouble with Gary."  **(Exhibit A, p. 30:25-31:1, Simons Dep)**.  This was true due
to assumptions Lickovitch might have made.

66. Admitted in part; denied as stated.  It is admitted only that Lickovitch spoke with
DeCoux about the elevator incident, not both incidents.
Admitted only that DeCoux testified that Lickovitch should provide coaching to
plaintiff, sent him an e-mail and drafted an e-mail for Lickovitch to use as a guide.

Denied as stated.  DeCoux testified that plaintiff was on Corrective Action, not
"Final" Corrective Action.  **(Exhibit H, p. 39:8-17, DeCoux Dep)**.

67. Admitted in part; denied in part.  It is admitted only that Lickovitch and plaintiff
spoke on November 21, 2014 regarding the two incidents.  It is specifically denied
that plaintiff did not express any concerns about Lickovitch's behavior during the
call.  In fact, plaintiff testified he raised the issue of Lickovitch's behavior and that it
was "not appropriate for a senior leader at Boston Scientific in regards to other
employees."  **(Exhibit A, p. 194:15-19, Simons Dep)**.

68. Admitted.

69. Denied.

70. Admitted in part; denied in part.  It is admitted only that plaintiff told Lickovitch that
members of his team had raised concerns about Lickovitch's behavior when he visits
New York City.  **(Exhibit A, p. 209:1-4, Simons Dep)**.  All other averments in this
paragraph are denied.

71. Admitted in part.  It is admitted only that Lickovitch testified that he told plaintiff if
there were concerns about his behavior he needed to report them to HR and that
Lickovitch encouraged him to do so.

Other averments contained in this paragraph are admitted.

72. Admitted in part; denied; denied in part.  Denied that Lickovitch directed plaintiff to
report Lickovitch's inappropriate behavior.  Admitted that plaintiff did not report his
concerns about Lickovitch to HR, but by the time plaintiff decided he might report

Lickovitch, Lickovitch had already spoken with HR the same day. **(Exhibit A, p. 210:11-16, Simons Dep)**.

Denied as stated. It is admitted only that on December 4, 2014, plaintiff sent an e-mail to Lickovitch following up on their conversation and laying out issues that his team had expressed to him. The conclusion of this e-mail was not stated in full by defendants. Plaintiff concluded the e-mail by stating, "Gary, this e-mail will stay in my files and I would fully expect that you and I will continue a strong working relationship. That being said, I think some of your behavior is unbecoming of a director at Boston Scientific. Thank you for your attention to this matter." Heckman Decl. Ex. 15.

73. Denied.

74. Denied. BSC's Vice President of Human Resources testified that she did not believe that there was any formal policy on actual steps and protocol to be filed when there was a problem between two employees and an employee could go to the person and advise them of the problems so that they could correct the behavior. **(Exhibit G, p. 59:22-60:4, Gilmore Dep)**. Plaintiff also asserts that the averments made by defendants in this paragraph are irrelevant as the issue was, in fact, reported to HR shortly after plaintiff's conversation with Lickovitch about the events. **(Exhibit A, p. 210:11-16, Simons Dep)**.

75. Admitted in part. Admitted only that Prust's handwritten notes state that Lickovitch spoke to DeCoux who advised Lickovitch to forward plaintiff's e-mail to her and copy plaintiff. Admitted that Lickovitch forwarded plaintiff's e-mail to DeCoux the same day as he received plaintiff's e-mail and asked DeCoux to "please follow up with Mike on this." Heckman Decl. Ex. 15. Admitted only that Lickovitch's perception was that the allegations were false and plaintiff was trying to blackmail him.

76. Admitted in part; denied in part; denied as stated. It is admitted only that Conaway never received a copy of plaintiff's e-mail and was not aware of the specifics regarding the situation between Lickovitch and Rothwell. It is specifically denied, however, that Conaway never knew "whether plaintiff was claiming Lickovitch engaged in sexual harassment." In fact, Conaway testified that he did know "at a high level without details" that plaintiff told Lickovitch he made Rothwell feel uncomfortable in texts. **(Exhibit D, p. 76:11-25, Conaway Dep)**.

Denied as stated. It is admitted only that Conaway testified he said to Gary, "I need you and Mike to work well together and make sure, you know, you guys are working on the things that will help the business grow, and that's my expectations from both of you." **(Exhibit D, p. 82:10-14, Conaway Dep)**.

77. Denied as stated. Once again, defendants paraphrased plaintiff's testimony out of context. Plaintiff explained that he apologized to Lickovitch, "[b]ecause when

situations like this occur in the workplace, it puts a negative mark on . . . the accused," and "it was the first time I've ever had to turn a superior in for doing anything inappropriate - -." **(Exhibit A, p. 221:24-222:7, Simons Dep)**.

Objection. The remaining averments contained in this paragraph are moot, as Lickovitch reported the allegations to DeCoux himself on the same day that plaintiff told him about them.

78. Admitted in part. It admitted only that DeCoux referred plaintiff's allegations to Prust for investigation. It is also only admitted that Prust testified that she took "down what the person sa[id]." **(Exhibit F, p. 32:14-16, Prust Dep)**.

79. Admitted in part; denied in part. It is admitted only that Prust testified that she spoke with plaintiff on December 9, 2014. Plaintiff testified, however, that he did not remember the specific date of this conversation. **Exhibit A, p. 216:6-12, Simons Dep)**. It is also admitted only that plaintiff reported Lickovitch's texting of younger female sales representatives about meeting up and encouraging male sales representatives to meet girls. The remaining averments of this paragraph are specifically denied. In fact, plaintiff testified that he did not hear through the "grapevine" that Lickovitch asked Rothwell to stay at the W Hotel; he was standing right next to her when Lickovitch did so. **(Exhibit A, p. 212:3-13; p. 216:13-217:13, Simons Dep)**.

80. Admitted in part; denied as stated. It is admitted only that Lickovitch had not "gone [as] far," yet as to proposition anyone, but plaintiff was present when Lickovitch asked Jillian Rothwell to stay at the W Hotel. **(Exhibit A, p. 211:8-10; p. 212, p. 3-13; p. 218:9-12, Simons Dep)**.

Denied as stated. It is admitted only that plaintiff did state this about Mr. Lickovitch, but defendants conveniently omit plaintiff's explanation as to why he said it. Plaintiff testified, "I did not believe [he was a good director and didn't want to get him in trouble], but what I did believe is that this would get back to Gary and there would be repercussions from that." **(Exhibit A, p. 218:1-8, Simons Dep)**.

Note: Defendants cite to plaintiff's deposition, p. 225:3-226:4. This citation has nothing to do with what is included in this paragraph.

81. Admitted in part; denied in part. Admitted that plaintiff told Prust he was fine with Lickovitch's coaching but upset that he put it in an email. It is also admitted only that Prust testified that she told plaintiff she was obligated to follow up on the allegations he raised. The remaining averment of this paragraph is denied.

82. Admitted in part; denied in part. It is denied that the matter between Garrett and Lickovitch had been resolved. The remaining averments of this paragraph are admitted.

83. Admitted in part; denied in part.  It is admitted only that on December 19, 2014, Prust told plaintiff that his concern had been investigated and that the matter was closed. Denied that plaintiff was happy with this outcome.  The remaining averment of this paragraph is also denied as it is unclear which investigation defendants are talking about when they state that Prust found no policy violations.

84. Denied as stated.  Denied as to the use of the word "frequently,"  The remaining averment is also denied as stated, and it is pointed out that plaintiff testified he would "rarely" be intoxicated on the phone during a work day when subordinates called him. **(Exhibit A, p. 75:19-22, Simons Dep.).**

85. It is admitted only that Rothwell testified in this manner.

86. It is admitted only that Dunn testified in this manner.

87. It is admitted only that Rothwell testified in this manner.

88. Denied.  This paragraph is irrelevant as, by defendants' own omission, the averments deal with plaintiff's personal life and not his work life.

89. Denied.  This paragraph is irrelevant as, by defendants' own omission, the averments deal with plaintiff's personal life and not his work life.

90. Admitted.

91. Admitted in part. It is admitted only that Dunn testified that the doctor was "world-renowned," and that he described the meeting in this manner.

92. Admitted in part; denied as stated.  It is denied that "plaintiff showed up for a meeting 'visibly intoxicated.'"  Instead, Dunn testified that plaintiff appeared "visibly intoxicated to [him]." **(Exhibit I, p. 8:24-25, Dunn Dep)**.  The remaining averments of this paragraph are admitted.

93. Admitted in part; denied as stated.  It is admitted that Dunn did not report plaintiff's conduct to BSC.  While Dunn and plaintiff did have a close working relationship and Dunn considered plaintiff a mentor and exceptional salesman, he also testified that "Mike was a very good manager. Mike taught me a great deal.  He was a very good mentor. Even though I'd been with the company a long time, Mike taught me how to close deals in very difficult situations.  I've never met a better salesman than Mike Simons, so I thank him very much for the mentoring.  He was always someone you could talk to.  He always conducted himself, you know, very well in front of the customers." **(Exhibit I, p. 7:15-24, Dunn Dep)**.

The remaining averment of this paragraph is denied as stated, as the incident is described incorrectly by defendants.  Defendants state that Dunn asked plaintiff to leave, but that is now how Dunn testified.  Dunn did not ask plaintiff to leave.  He

simply took the lead on the meeting. **(Exhibit I, p. 26:13-19; p. 27:14-16, Dunn Dep)**. In fact, Dunn also testified that the doctor never said anything about plaintiff's condition, and he doesn't even know if the doctor noticed. **(Exhibit I, p. 28:10-17, Dunn Dep)**.

94. Admitted in part; denied as stated. It is admitted only that BSC's 2015 National Sales Meeting took place on February 4-6, 2015 and that plaintiff consumed alcohol at this meeting. It is specifically denied that plaintiff's Filed Corrective Action was still in effect, as BSC's policy dictates that no corrective action plan is to be indefinite.

95. Admitted.

96. Denied as stated. Defendants take the events out of context as described by plaintiff. Plaintiff and Ms. Bankes were friends, and they have given each other a kiss hello "multiple times" previously. **(Exhibit A, p. 223:10-18, Simons Dep)**. Plaintiff also testified he found it "hard to believe" that Ms. Bankes would make this complaint "with the relationship that Jeanette and [plaintiff] had that it was also normal for us to give a kiss hello and say how are you." **(Exhibit A, p. 226:9-15)**.

97. Admitted in part; denied in part. It is admitted only that Prust testified in this manner. Bankes was never deposed, but plaintiff's version of the events were supported by other employees who testified that plaintiff's behavior was appropriate. In addition, HR found no corroborating evidence at all of any inappropriate actions and plaintiff was not disciplined for this. **(Exhibit A, p. 228:2-14; p. 382:2-12, Simons' Dep, Exhibit F, p. 115:20-24, Prust Dep)**.

98. Admitted.

99. Admitted in part; denied in part. It is admitted only that Prust stated she "learned of other concerns relating to plaintiff's behavior," however, plaintiff believes Prust was investigating him as a person. It is specifically denied that Jillian Rothwell told Mike Willick to make false allegations against Lickovitch. Rothwell testified to the exact opposite of this. **(Exhibit J, p. 39:16-22, Rothwell Dep)**.

It is admitted only that Prust said Gentile told her plaintiff sounded like he had been drinking alcohol and told Gentile he had evidence to "bring down" Lickovitch and Conaway. In fact, plaintiff testified that he did not recall saying this. While he did claim it was possible, he also stated several times that he had no reason to say that, and no benefit from saying that to a superior. **(Exhibit A, p. 173:3-175:9, Simons Dep)**.

100. Admitted in part. It is admitted only that Prust testified in this manner and it is, therefore, her perception. Gentile was never deposed.

101. Admitted in part. It is admitted only that Prust testified in this manner and it is, therefore, her perception. Gentile was never deposed.

102.   Admitted in part; denied as stated.  It is admitted only that Lickovitch testified as paraphrased by defendants.

103.   Admitted in part. It is admitted only that plaintiff did feel like Conaway and Lickovitch were "on a witch hunt" after him, but this was not just due to Prust investigating a complaint made about the National Sales Meeting.  This had to do with all kinds of things plaintiff learned Prust and Lickovitch were investigating about him, to the point of where he believed it "turned into an investigation of Mike Simons as opposed to an incident." **(Exhibit A, p. 24-26:4, Simons Dep).**

104.   Denied as stated; denied.  It is admitted only that Prust did contact plaintiff to set up a time to interview him regarding Bankes' complaint, but the transcript citation provided by defendants does not confirm the date of this was March 6, 2015.  The remaining averments of this paragraph are specifically denied.

105.   Admitted in part; denied in part; denied as stated.  It is admitted only that when Prust spoke with plaintiff about the Bankes complaint, plaintiff said he did not feel that he was overly affectionate and hoped he hadn't made her feel uncomfortable.

It is admitted only that plaintiff denied kissing a clinical employee at the National Sales Meeting.  It is denied that plaintiff made up this allegation, and it is asserted that Lickovitch and Conaway did, as Prust told plaintiff that Conaway and Lickovitch had made these allegations against him.   **(Exhibit A, p. 227:15-21, Simons Dep).**

In addition, the page of the Prust dep cited by defendants does not deal with the incident at the National Sales Meeting involving plaintiff, but rather with plaintiff's report of the sexual harassment of Jillian Rothwell by Gary Lickovitch.

The remaining averment is denied as stated, as defendants' paraphrasing of plaintiff's testimony is not entirely accurate.  Plaintiff testified that he "believed" Prust and HR would have an obligation to look into the situation. **(Exhibit A, p. 381:21-24, Simons Dep).**

106.   Admitted in part. It is admitted only that Prust wrote these things in her notes.

107.   Denied.

108.   Admitted in part; denied as stated.  It is admitted only that Prust characterizes that plaintiff feels "persecuted," and only that Prust's notes state that that is what plaintiff said to her.

It is specifically admitted that Conaway did hold such private parties and DeCoux has attended them. **(Exhibit A, p. 149:18-150:2; p. 294:13-295, Simons dep.,**

18

**Exhibit I, p. 9:11-10:4, Dunn Dep, Exhibit B, p. 164:4-165:7, Lickovitch Dep, Exhibit F, p. 128:5-16; p. 137:11-19; p. 141:17-24; p. 202:25, Prust Dep.)**

It is specifically denied that plaintiff said that he had pictures from these parties.

109.   Admitted in part; denied as stated.  It is admitted only that the Prust notes states that plaintiff said these things.  While it is admitted that plaintiff did not provide these text messages, he testified that he "could not" because he had deleted them. **(Exhibit A, p. 175:25-176:1, Simons Dep).**

110.   Admitted in part; denied in part; denied as stated.  It is admitted that Prust concluded there was no policy violation with respect to the Bankes incident, and plaintiff was not disciplined for it.

Denied.  It is denied that Prust did not make a determination as to whether plaintiff kissed a clinical employee at the 2015 NSM when her investigation concluded.  In fact, Prust testified that it was her understanding, "that Mike did not kiss Rachel Little, again, accordingly to Rachel Little, and based on the information that Mike had shared with me.  That's what I had determined at that point in time." **(Exhibit F, p. 193:17-22, Prust Dep).**

Denied as stated. Defendants attempt to insinuate that plaintiff had actually kissed an employee at the 2015 NSM due to the fact that he was concerned about the follow up investigation.  This is disingenuous, however, because plaintiff testified that he was concerned about the issue because he believed Conaway and Lickovitch were fabricating a story about him. **(Exhibit A, p. 255:18-256:19, Simons Dep).**

It is admitted that plaintiff was never disciplined regarding the allegation that he kissed an employee at the 2015 NSM.

111.   Denied as stated; denied.  It is admitted only that Prust followed up with plaintiff regarding pictures and text messages, but the testimony cited by defendants state the call was on March 11, 2015, not March 10, 2015.

It is specifically denied that plaintiff refused to provide anything.  He testified that he could not, specifically stating that he "[would] not be able to." **(Exhibit A, p. 309:15-24, Simons Dep).**

112.   Admitted in part; innuendo denied.  It is admitted only that plaintiff told Prust he was recording a call between them and that Prust testified she told plaintiff he could not because it was not legal in Minnesota.  Any innuendo that plaintiff changed what he was saying is specifically denied.  When plaintiff told Prust he was recording the call at all times he meant he was taking notes. **(Exhibit A, p. 257:23-260:1, Simons Dep).**

113.    Denied; Denied as stated.  Plaintiff never said he had any photos, only texts, and
        said they were accessible by BSC because it controlled plaintiff's text messages.
        **(Exhibit A, p. 260:2-21; p. 261:18-24, Simons Dep).**

        Plaintiff did not "assert" that he did not tell Lickovitch or Conaway about kissing
        someone, but rather explained why he said he had these texts.  He explained that
        he felt like BSC was investigating Mike Simons and not the incident.  **(Exhibit A;
        p. 260:24-261:4, Simons Dep).**

        The remaining averment of this paragraph is specifically denied.

114.    Admitted in part; denied as opinion. Admitted only that quarterly sales calls are
        held with Regional Managers and senior leadership and that Regional Managers
        report on sales performance and answer questions. It is merely Bromm's opinion
        that Regional Managers need to have their "A Game" for quarterly sales calls.

115.    Admitted in part; denied in part.  It is admitted only that the meeting was
        scheduled as averred and that Lickovitch sent plaintiff a text message to join the
        call, but this text message came, "immediately after [the call] started," and
        plaintiff was busy on a call closing a deal and winning a contract with Catholic
        Health Systems.  He had "just finished up [the] call."  **(Exhibit A, p. 323:1-8,
        Simons Dep).**

        In addition, Lickovitch testified that when he hopped back on the call after texting
        and calling plaintiff, plaintiff was on the call talking.  **(Exhibit B, p. 111:2-14,
        Lickovitch Dep).**

        Denied as to the use of the word "consistently" when describing plaintiff's
        tardiness for conference calls.  In fact, plaintiff explained that there are many
        reasons why someone might be late to a conference call, such as it not being in
        someone's calendar or facing customer issues with business.  **(Exhibit A, p.
        252:7-10, Simons Dep).**

        It is admitted only that plaintiff may have missed calls because he was
        intoxicated, however, plaintiff testified this was "not likely."  **(Exhibit A, p.
        251:5-10, Simons Dep).**

116.    Denied as stated.  Other BSC employees may have commented on the fact that
        they believed plaintiff sounded different on the call, but those who were deposed
        admitted they had no proof that he had any alcohol prior to the call.  Therefore, it
        is important to note the actual testimony of the witnesses rather than accept
        defendant's incorrect paraphrasing of it.  For example, Peter Simmerson testified
        that "it sounded like [plaintiff] could have had a couple of beers . . . how would I
        know what he actually drank . . . he seemed to have been under the influence of
        some type of alcohol or other - - you know, or something else and it sounded like
        he was under the influence of alcohol.  I don't know how many beers or whatever

he could have consumed, he sounded like he was someone impaired by some type of alcohol or other substance." **(Exhibit K, p. 19:12-20:2, Simmerson Dep)**.

Mr. Heuler testified that he did not recall using the word "intoxicated" in referring to plaintiff's condition on the conference call. He also agreed that he had no ability to observe plaintiff have any other symptoms of being intoxicated except he felt like he was slurring his words. He also agreed that he assumed plaintiff was slurring relating to drinking as opposed to other factors because he had a history of being a drinker. **(Exhibit L, p. 19:13-20:6, Heuler Dep)**.

Most significantly, Richard Maher testified that he sent a text message to Lickovitch stating "Mike must be drunk," because Mike volunteered to accept more sales volume and that this was "so far out of character because no Regional Manager in the history of a forecast has ever asked for more quota to be put on them. And so based on that and what he said before, that's the reason I sent that text to his supervisor, Gary Lickovitch." **(Exhibit M, p. 20:9-25, Maher Dep)**.

117.    Admitted in part; denied in part. Admitted only that Lickovch was surprised that plaintiff was volunteering to take on more sales quota. Denied that Conaway himself believed plaintiff was drunk on the conference call. In fact, Conaway never mentioned this to Prust or discussed it with her or HR until March 10, 2015. **(Exhibit D, p. 104:5-105:8; Conaway Dep; Exhibit F, p. 172:3-173:15; p. 175:15-176:3; p. 178:3-9, Prust Dep)**. In fact, the first time plaintiff heard about any allegations concerning his conduct on the February 27, 2015 conference call was at his wrongful termination. **(Exhibit A, p. 253:16-21, Simons Dep)**.

The last averment of this paragraph is denied as stated as Mr. Conaway also testified that plaintiff also "wasn't concise." **(Exhibit D, p. 112:23, Conaway Dep)**.

118.    Admitted in part; denied in part. It is admitted only that neither Lickovitch nor Conaway addressed the issue of plaintiff's conduct on the February 27, 2015 conference call with the plaintiff directly, but they did not do so because they did not think he was drunk.

It is specifically denied that Conaway immediately spoke with Lickovitch about plaintiff's conduct on the call and that due to the ongoing investigation, Prust and HR were taking the lead with respect to issues relating to plaintiff's employment.

It is asserted that the investigation was not into "plaintiff's behavior at the NSM" as defendants would have the Court believe, but rather an extensive investigation into Michael Simons, the person. In addition, Conaway testified he talked to Lickovitch regarding it and asked Lickovitch to talk to plaintiff. **(Exhibit D, p. 105:16-106:6, Conaway Dep)**. Most telling, concerning the credibility of Conaway's testimony concerning this issue is the fact that if they did speak, they never reported it to HR or spoke to plaintiff about it.

119.   Denied as stated.  It is admitted that only when Prust reached out to Conaway and
        Lickovitch as part of her Bankes investigation, did each report they heard plaintiff
        was intoxicated on the conference call.  **(Exhibit D, p. 101:23-102:7, Conaway
        Dep)**.  In fact, Lickovitch testified that he never reported this, and that he didn't
        personally hear plaintiff slurring, but only "heard from others that plaintiff was
        slurring." **(Exhibit B, p. 113:9-114:7; p. 116:22-117:15, Lickovitch Dep)**.

120.    Admitted in part; denied in part.  It is admitted only that Prust testified that when
        Conaway told her about plaintiff's behavior on the call, Prust had not told
        Conaway that plaintiff made accusations regarding inappropriate behavior by
        Conaway.

        Denied as stated that Prust was investigating plaintiff's behavior.  Rather, Prust
        was investigating the person Mike Simons.

121.   Admitted in part; denied.  It is admitted only that Prust testified that she contacted
        the individuals who expressed that plaintiff appeared intoxicated on the call.  The
        remaining averments of this paragraph are specifically denied.

122.   Admitted in part; denied as stated.  It is admitted only that Prust states she spoke
        to four individuals other than plaintiff who were on the call, however, Maher
        testified that he texted that plaintiff must have been intoxicated because of the
        increased sales volume for which plaintiff volunteered.  The remaining averment
        in this paragraph is denied as stated as Prust concluded that plaintiff was "under
        the influence," and makes no mention of the word alcohol.

123.   Admitted in part; denied as stated.  It is admitted only that in his deposition,
        plaintiff testified he was certain that he had no alcohol prior to the call and was
        not drunk on the call.  **(Exhibit A, p. 236:20-237:11, Simons Dep)**.  It is also
        admitted only that plaintiff was also not aware of whether he slurred his speech.
        He also admitted alcohol use caused him to fail to recall "small things," made it
        difficult to concentrate "at times," affected his judgment, and caused him to say
        and do things he otherwise would not.  **(Exhibit A, p. 58:4; p. 57:10-12, Simons
        Dep)**.

124.   Denied.  Plaintiff denied that these e-mails showed anything as he believed his ex-
        wife got the dates wrong.  Furthermore, plaintiff objects to these averments as
        they involve his personal life and not any business or employment with BSC.

125.   Admitted.

126.   Admitted in part; denied in part.  It is admitted only that plaintiff consumed
        alcohol during the work day and drove to his daughter's school to pick them up
        around 2:00 p.m. and that Wyckoff Police Officers were dispatched to respond to
        a report of a disturbance at a school.  It is also admitted that Officer Noon testified

22

that he arrived at the school at approximately 2:18 p.m.  With respect to the remaining averment in the paragraph, it is admitted only that Noon was reading from the police report during this testimony.  This police report is not an adoptive admission by plaintiff.

127.   Admitted in part. It is admitted only that this is how Officer Noon testified based on his review of the police report.  Reference to same does not constitute an adoptive admission.

128.   Admitted in part. It is admitted only that the police report states these averments. Reference to this police report is not an adoptive admission.  In addition, plaintiff testified that the breathalyzer was faulty and, therefore, inaccurate. **(Exhibit A, p. 266:-267:15, Simons Dep)**.

129.   Admitted in part. It is admitted only that plaintiff testified in his deposition that the police "misrecorded" what he told them about drinking from 8:00 a.m. to 12:00 p.m.  It is also admitted only that the police report states that plaintiff claimed he drank "3 or 4" glasses of Prosecco between 8:00 a.m. and noon. Reference to the police report does not constitute an adoptive admission.

130.   Admitted in part; denied in part. Denied that plaintiff does not have support or proof that the breathalyzer used in his case was faulty.  Defendants never asked for such support.  It is admitted only that Officer Noon testified that he had no knowledge that the breathalyzer the police used was faulty or improper, but Officer Noon also testified that he was not aware of any protocol for breathalyzer machines in regard to maintenance, "storing and calibration and things like." **(Exhibit N, p. 28:23-29:5, Noon Dep)**.

It is admitted only that Officer Noon testified that it was his understanding that this printout confirmed the machine was working properly.  An examination of this printout, however, does not appear to confirm this information, just the results.  Also, Officer Noon did not, in the testimony cited by the defendants, mention anything about the report being prepared "contemporaneous" to the breathalyzer being administered.  He simply testified that it was generated "after the breath test is administered." **(Exhibit N, p. 32:15-19, Noon Dep)**.

131.   Admitted.

132.   Admitted in part; denied in part. It is admitted only that at 5:29 a.m. on the morning after his arrest, plaintiff e-mailed Lickovitch that he was taking an FMLA leave and "needed to go get healthy."  It is also only admitted that plaintiff did not tell anyone at BSC that he had been arrested for DUI.  It is specifically denied that he did not tell anyone he was unable to work that Thursday and the testimony cited to by defendants only addresses the DUI, not plaintiff's ability to work.  In addition, defendants' citation to plaintiff's deposition, p. 70:25-71:5 is an incorrect citation.

133.  Admitted.

134.  Admitted in part; denied in part. It is admitted only that Gilmore provided plaintiff with information regarding a leave of absence and that she relayed the information she had received from plaintiff to Conaway, Lickovitch, and DeCoux. It is denied that Gilmore told plaintiff the company supported his desire to get help, as the citation provided by defendants does not support this assertion.

135.  Admitted in part. It is admitted only that plaintiff placed individual calls to his subordinates, notifying them he was taking a leave and told other subordinates he was taking a leave for treatment for alcoholism or because he had a drinking problem. It is further admitted only that Dunn testified that plaintiff told him he had a drinking problem and was going to try to fix it.

136.  Admitted in part; denied in part. Admitted only that the first two averments are true, except the paraphrasing of plaintiff's testimony (i.e., "alleging Conaway said 'why did you do this to me?'") is denied. The last averment of this paragraph is denied as hearsay.

137.  Admitted.

138.  Admitted in part; denied in part. Admitted only that plaintiff entered a 30 day inpatient treatment program as Solid Landings in California. The remaining averments are specifically denied.

139.  Denied.

140.  Denied.

141.  Denied.

142.  Denied.

143.  Admitted in part; denied in part. It is admitted only that on April 5, 2015, there was an article posted about plaintiff's DUI which identified him by name, age, and town of residence. It is also only admitted that defendants have paraphrased what the articles says, but any reference to this article is not an adoptive admission. It is specifically denied that plaintiff searched the internet for reports about his DUI while he was in treatment.

144.  Denied as stated. Prust was not investigating plaintiff's behavior, but rather plaintiff as a person in retaliation for his reporting Lickovitch's sexual harassment of Rothwell.

145.    Admitted in part; denied in part. It is admitted only that plaintiff's return to work date was Tuesday, April 14, 2015 and that he spoke with Prust the day before he returned. It is also only admitted that Prust said during this call that plaintiff made the averred allegations. Denied as to the use of the words "unloaded a deluge of claims and allegations," as this infers a false negative connotation.

146.    Denied; denied as stated. The averment that plaintiff told Prust that Conaway was a "scum bag" is inconsistent with plaintiff's testimony. He testified that he did not remember using that word, but was "so frustrated with compliance" at this point. **(Exhibit A, p. 302:10-14, Simons Dep).** The remaining averments of this paragraph are specifically denied.

147.    Denied. Plaintiff testified that Prust recorded what he told her incorrectly, and that he had called Ballinger and Ballinger didn't call him back. **(Exhibit A, p. 300:22-301:10, Simons Dep).** The remaining averment of this paragraph is specifically denied as defendants' cite does not corroborate their statement.

148.    Denied.

149.    Admitted in part; denied in part. Admitted only that on April 14, 2015, Prust e-mailed Ballinger regarding her claim that plaintiff said that he spoke with Ballinger and the content of Ballinger's response. Admitted only that it was Ballinger's perception that a "senior leader lying to a BSC investigator was very serious and called plaintiff's integrity and judgment into serious question." It is specifically denied that Prust proceeded to investigate plaintiff's new allegations.

150.    Admitted in part; denied in part. It is admitted only that Prust claims she investigated plaintiff's claims that Lickovitch spoke badly about plaintiff to his subordinates, commented that he hoped that plaintiff would "get better," and contacted a regional manager and sales representatives in another region about plaintiff's behavior at the NSM.

Averment that Prust learned Lickovitch had told plaintiff's team plaintiff was taking a leave and they wished him well is denied as hearsay.

Denied that paraphrasing of Dunn dep testimony is accurate. In fact, Dunn testified that ". . . because Gary never did say anything to me negative about Mike Simons. Now, it should be noted: Gary was very guarded with his words around me as well." **(Exhibit I, p. 18:2-5, Dunn Dep).**

It is admitted only that Prust stated that her conclusion was that Lickovitch's actions did not violate BSC policy. It is asserted, however, that his actions were definitely inappropriate, and BSC policy dictates that plaintiff had a duty to report them. In fact, BSC's Policy Against Harassment specifically states, "this policy forbids harassing conduct even when it does not rise to the level of a violation of law" and "[i]t is the responsibility of each and every employee of Boston

Scientific Corporation to give our Policy Against Harassment real meaning and full support." **(Exhibit P, BSC Policy Against Harassment, p. 2, 3, 5)**.

151.   Admitted in part; denied in part.  It is admitted only that BSC arranged for an in-person meeting to take place in New York City with plaintiff, Conaway, and Vice President of HR, Camille Chang Gilmore on Monday, April 20, 2015.

It is specifically denied that the purpose of the April 17, 2015 conference call was for "to discuss the outcome of Prust's investigation and plaintiff's employment."

It is also specifically denied that on April 20, 2015 BSC had any intention of having a "serious discussion about plaintiff's behavior," as they had previously planned to terminate plaintiff's employment even hiring security ahead of time to monitor this termination.

152.   Admitted in part; denied in part.  It is admitted only that BSC produced an e-mail dated 4/16/15 from DeCoux to Prust and BSC's Senior Global Security Manager about arranging security for the April 20, 2015 meeting.

It is admitted only that BSC's security team ran a check into plaintiff's background.

It is admitted only that Prust and Gilmore testified that this check revealed plaintiff's DUI.

It is specifically denied that security was arranged due to any disciplinary action, as it is clear BSC was planning the execution of plaintiff's wrongful discharge.

153.   Admitted in part; denied as stated.  It is admitted only that Prust spoke with plaintiff concerning why neither Lickovitch nor Conaway had spoken to him about the February 27, 2015 conference call, and the Prust note states the day this conversation took place was 4/16/15.

Denied as stated.  It is admitted only that Prust's notes say she represented that Lickovitch and Conaway had not discussed it with him at the time because she was in the middle of an investigation and plaintiff subsequently went on leave. This is specifically denied, as Lickovitch and Conaway simply did not think plaintiff was drunk on the call.

154.   Admitted in part; denied as stated. It is admitted only that Prust asked plaintiff what he was doing on March 12, 2015 and that plaintiff initially told her he was on a plane traveling that day.  It is specifically denied that plaintiff claimed he could not remember what he was doing on March 12th.  Rather, plaintiff testified that he was not great with dates and at first thought she was talking about for work and then she clarified that she was asking him about his personal doings that day and he did admit to the DUI. **(Exhibit A, p. 303:14-305:6, Simons Dep)**.

155.   Admitted in part; denied as stated.  It is admitted only that plaintiff admitted he received a DUI and told Prust he had been working at home in the morning of March 12th.

Denied as stated.  Although plaintiff mentioned he was on his computer and scheduled to be working and doing computer work at home, he wasn't sure what he did, testifying that ". . . the following morning I just did regular things.  You know, I don't recall exactly what regular things, but . . . checked e-mails, you know, whatever - - whatever normal work that I had." **(Exhibit A, p. 263:3-8, Simons Dep)**.

It is admitted only that the Prust notes say that plaintiff stated he assumed an employee couldn't use company equipment while intoxicated.

Denied as stated.  It is admitted that plaintiff would not tell Prust how much he had to drink on March 12th, but conveniently, defendants leave out plaintiff's testimony that his DUI attorney advised him not to reveal this information. **(Exhibit A, p. 305:3-18, Simons Dep)**.

156.   Admitted in part; denied; denied as stated.  It is admitted only that Gilmore testified that she shared the information about plaintiff's DUI with Ballinger. Defendants' citation to <u>Heckman Decl. Ex. 33</u> is incorrect.

Denied as stated.  Ballinger's testimony was not as definitive as defendants would have this Court believe.  Ballinger testified that, "I was aware of the pattern of the behavior issues with Mike.  I was aware of the pattern of corrective actions, and certainly was aware, not instantly but certainly aware of the deliberations that were going on in the final days." **(Exhibit C, p. 18:2-6, Ballinger Dep)**.

The remaining averments of this paragraph are specifically denied as the final decision to terminate plaintiff had already been made at this time.  When questioned about whether he spoke with plaintiff on or about April 13, 2015 as Prust represented plaintiff said to her, Ballinger testified that he did not and "[i]f he insists he talked to me I would like to terminate him myself as he is not trustworthy." **(Exhibit C, p. 47:20-49:4, Ballinger Dep)**.  This e-mail chain between Ballinger and Prust occurred on February 14, 2015. **(<u>Id</u>.)**

157.   Admitted in part; denied in part.  It is admitted only that during the conference call on April 17, 2015, Prust stated she provided information from her ongoing investigation into the issues surrounding plaintiff's "behavior."  It is specifically denied that Prust was in fact investigating plaintiff's behavior, but was rather she was investigating plaintiff as a person.

It is specifically denied that the April 17, 2015 conference call was related to "plaintiff's status." It is asserted that this conference call was specifically held to discuss plaintiff's termination.

The remaining averments of this paragraph are specifically denied.

158. Admitted in part; denied in part. It is admitted only that Gilmore notified Ballinger of the decision to wrongfully terminate plaintiff's employment and Ballinger supported it.

It is specifically denied that the decision to terminate plaintiff's employment was made during the call of April 17, 2015 call. It is asserted that this decision was made at a time prior to that date and that this call was a call to discuss plaintiff's wrongful termination.

It is admitted only that Ballinger testified that at the time of plaintiff's termination he had no knowledge that plaintiff had raised any concerns about Lickovitch and that he was not aware that plaintiff was claiming Lickovitch or Conaway were out to get him.

Denied as stated that Gilmore was not aware of plaintiff claiming that Lickovitch or Conaway were out to get him "at the time of plaintiff's termination." The testimony of the Gilmore depositions cited by defendants states that Gilmore was not aware of this "prior to Mike's leaving the company." **(Exhibit G, p. 61:12-24, Gilmore Dep).**

159. Admitted in part; denied in part. It is admitted only that talking points were prepared for the April 20, 2015 meeting which was a termination meeting. The remaining averments of this paragraph are specifically denied as the "talking points," laid out the real, pre-textual reasons for wrongfully terminating plaintiff's employment.

160. Admitted in part; denied as stated. It is admitted only that on Friday, April 17, 2015, plaintiff was notified of an in-person meeting scheduled for the following Monday with Conaway and Gilmore.

Denied as stated that plaintiff was concerned he would be fired because he knew BSC had learned of his DUI. Plaintiff also testified that he "was unsure whether they would fire [him] because [he] was not found guilty of anything at that point," and "felt that [he] had completed a rehabilitation program, so maybe they just wanted to discuss with [him] going forward what their expectations were." **(Exhibit A, p. 306:6-307:1, Simons Dep).**

161. Objection. Admitted in part; denied as stated. Denied as these averments are irrelevant as they have nothing to do with plaintiff's work and are related to his personal life.

Denied as stated. It is admitted only that plaintiff did send this e-mail to DeCoux. He explained that it was due to his feeling a great deal of stress from the concern of being dismissed from BSC and not knowing what to do. He explained he was "trying to invoke the FMLA so [he] could sort things out in [his] head and figure out what [he] was doing." He explained that he understood one of the benefits of FMLA to be if an employee if having stress in the workplace, he can take a break and get his life back in order, stating as an example giving him time to reorganize with his family and get visitation with his children back in order. **(Exhibit A, p. 312:4-313:1, Simons Dep)**.

162.   NOTHING DICTATED.

163.   Admitted in part; denied as stated. It is admitted only that on the morning of the April 20, 2015 meeting with Conaway and Gilmore, plaintiff sent a number of text messages to Conaway, but defendants once again conveniently fail to cite to plaintiff's reasons for saying what he did. Plaintiff testified that these texts were "just the result of extreme amount of stress. And I did end up going. . . That was my thought, to get myself together, from whether it's personal or business, that I would be more productive as an employee of Boston Scientific if I handled the stress things in my life. . . I realized [proceeding with an FMLA request] was a knee jerk reaction and I really needed to face the company and see what they thought the result was going to be. I wasn't positive I was being fired. In fact, I held out hope that because I had gone to get treatment, they would stand behind me." **[Exhibit A, p. 318:13-319:12, Simons Dep)**. The remaining averment of this paragraph is denied as it is related to plaintiff's personal life and, is therefore, irrelevant to his employment with BSC.

164.   Admitted in part; denied as stated. It is admitted only that plaintiff was frustrated that Conaway was not responding to his text messages, but again, defendants once again conveniently fail to cite to plaintiff's reasons for saying what he did. Plaintiff testified that these texts were "just the result of extreme amount of stress. And I did end up going. . . That was my thought, to get myself together, from whether it's personal or business, that I would be more productive as an employee of Boston Scientific if I handled the stress things in my life. . . I realized [proceeding with an FMLA request] was a knee jerk reaction and I really needed to face the company and see what they thought the result was going to be. I wasn't positive I was being fired. In fact, I held out hope that because I had gone to get treatment, they would stand behind me." **[Exhibit A, p. 318:13-319:12, Simons Dep)**.

165.   Admitted in part; denied in part. It is admitted only that plaintiff did show up for the meeting in the lobby of the hotel in downtown Manhattan and was told his employment was terminated, Gilmore provided plaintiff information relating to the separation process and plaintiff's last work day at BSC was April 20, 2015. The remaining averments of this paragraph are specifically denied. Instead,

plaintiff testified that Conaway brought up the two corrective actions and the fact that he heard plaintiff was drunk on a conference call on February 27, 2015. This is the first time plaintiff heard anything about the February 27th conference call. Following this, plaintiff was told his employment with BSC was terminated and Conaway patted him on the shoulder. He stated he was shocked to hear the words and Conaway said, "this is going to be really hard on you." Following this, plaintiff went to his car and drove home. **(Exhibit A, p. 321:2-19, Simons Dep)**.

166. Admitted in part; denied in part. It is admitted only that plaintiff was replaced by Danielle Farbanec, and that after his discharge, plaintiff sent Farbanec a text message which included the quotes cited by defendants. Once again and not surprisingly, defendants failed to include the reason plaintiff sent this text message. Plaintiff testified, "I was informed from other managers at Boston Scientific that at a Regional Manager Meeting that she had bad-mouthed me and the job that I had done before she took over the region. And I just brought it to her attention that she made a common practice of bad-mouthing Gary Lickovitch and his competency in the role. And I was angry and frustrated that someone who I considered a strong colleague would have to resort to bad mouthing me in front of a group of people after I was terminated." **(Exhibit A, p. 331:11-20, Simons Dep)**. Plaintiff explained that "it will soon bury you," meant "if Gary continues to find out that you are saying bad things about him, it comes back to haunt you. When you gossip about people, oftentimes that comes back to bite you." **(Exhibit A, p. 332:4-9, Simons Dep)**.

167. Admitted in part; denied as stated. It is admitted only that plaintiff sent a text message to Ballinger on October 6, 2015 and Ballinger did not respond. Defendants' excerpts from this text message are denied as stated. Plaintiff's entire text message was "Kev. I am going to win my lawsuit. You know that too. Letting go [of] Gary was smart. I also know you're letting go of Sa[m] (Small Industry). Kevin, I am really good at what I do. After I sought help, I have been sober. Eight Months. I am strong. Would you consider making me VP of East? Lawsuit dropped and arguably best candidate for the job. I am sober and know that market better than anyone. I know it sounds better but if u can trust I will [kill it] for you." Heckman Dec'l. Ex. 24.

168. Admitted in part; denied in part. It is admitted only that plaintiff did not return his laptop when his employment ended, and did not recall if he deleted any files or tried to wipe things, and that he ultimately did return the laptop. The remaining averments of this paragraph are denied as stated. Plaintiff testified, "It wasn't my obligation to collect the equipment from Boston Scientific. Protocol is when you are terminated from Boston Scientific, that your direct supervisor comes and collects all your - - all your Boston Scientific equipment. That never happened to me." **(Exhibit A, p. 346:15-21, Simons Dep)**.

169. Denied as stated.  It is admitted only that plaintiff used his laptop to view pornography sites, but he testified that he didn't understand it was a terminable offense. **(Exhibit A, p. 347:7-18, Simons Dep)**.

170. Denied as stated.  It is admitted only that plaintiff used his BSC computer to access cites to meet other people and testified that "I don't know all of those websites that I visited there.  They kind of link into each other and they spam, some of them . . . I think when you register at one, they have your information at others." **(Exhibit A, p. 348:2-10, Simons Dep)**.  Therefore, the specific cites referenced by defendants are denied and any use of the words "hook up" or variation thereof is strictly defendants' reference, not plaintiff's.

171. Denied, and plaintiff testified that he was not aware that this was a terminable offense.

172. Denied.

173. Denied as stated; denied.  Plaintiff did not remember this incident, and there is no proof that plaintiff was "intoxicated" for that meeting, as Pete Dunn never reported the incident and certainly could have while plaintiff was still employed with BSC.  Defendants' use of "renowned cardiologist" is the opinion of defendants.  The remaining averment of this paragraph is denied.

174. Admitted.

175. Admitted.

176. Admitted in part; denied in part.  It is admitted only that plaintiff explained that certain behaviors were part of his disease of alcoholism.  The remaining averments of this paragraph are specifically denied.  In fact, defendants misquote plaintiff's testimony.  He does not testify that what caused BSC to investigate him were his fault at all.  Plaintiff believes that what caused BSC to investigate him was the direct result of retaliation by Gary Lickovitch and Sam Conaway for reporting sexual harassment by Gary Lickovitch.

177. Denied.  There is much more evidence of plaintiff's claims than is posited by defendants here.

178. Admitted in part; denied in part.  It is admitted only that plaintiff agreed he had been criticized for not taking responsibility for his conduct in the past, but he testified, "[a]s we sit here, . . . I've taken accountability for my actions." **(Exhibit A, p. 270:2-3, Simons Dep)**.  Defendants' statement that when plaintiff wants something or feels backed into a corner is not accurate as Ms. Knighten testified that that was part of plaintiff's past and that since treatment, "he really hasn't made any of these statements." **(Exhibit O, p. 61:1-4, Knighten Dep)**.  The remaining averment of this paragraph is admitted.

Respectfully submitted,

MARTIN, GUNN & MARTIN, P.A.

_____
WILLIAM J. MARTIN

Dated: 6/5/17