NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **MICHAEL SIMONS,** | |
| *Plaintiff,* | Civil Action No. 15-7519 |
| **v.** | |
| **BOSTON SCIENTIFIC, et al.,** | OPINION |
| *Defendants.* | |

**ARLEO, UNITED STATES DISTRICT JUDGE**

**THIS MATTER** comes before the Court on Defendants Boston Scientific Corporation ("Boston Scientific"), Gary Lickovitch ("Lickovitch"), and Samuel Conaway's ("Conaway") (together, "Defendants") motion for summary judgment. ECF No. 48. For the reasons set forth below, Defendants' motion is **GRANTED**.

I.    **BACKGROUND**

This case arises from the termination of Plaintiff Michael Simons' ("Simons" or "Plaintiff") employment by his former employer, Boston Scientific. Boston Scientific terminated Plaintiff's employment on April 20, 2017 as a result of Plaintiff's pattern of unprofessional behavior and poor judgment. Plaintiff brings this action under the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. § 10:5-1 et seq., the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq., and the New Jersey Conscientious Employee Protection Act ("CEPA"), N.J.S.A. § 34:19-1 et seq., to challenge his termination.

**A.  Plaintiff's Employment as Regional Manager**

Plaintiff began working for Boston Scientific, a medical device company, in February 2000 and served as a Regional Manager from January 2009 until his termination on April 20, 2015. Def. R.56 Stmt. ¶ 5, ECF No. 48-2. Plaintiff was generally a high-performing Regional Manager and received several awards from Boston Scientific for his sales performance. Id. ¶ 27. However, beginning in approximately 2011, Plaintiff began exhibiting a pattern of excessive drinking that ultimately interfered with his work performance. See, e.g., id. ¶ 28-29, 33, 36, 45-50, 54, 64-65, 84-87, 90-92, 94-96, 115-17.

**B. Plaintiff's Unprofessional Behavior Due to Alcohol Consumption**

In approximately 2011, Plaintiff participated in a multi-day leadership conference at Boston Scientific's headquarters in Boston and failed to appear for a day of the conference. Id. ¶ 28. Boston Scientific personnel asked hotel staff to check Plaintiff's room, where he was found "passed out" with open liquor bottles. Id.; id., Ex. 51, ECF No. 48-61, 10/26/16 DeCoux Dep. Tr. 104:4-6. Plaintiff's supervisor instructed Plaintiff to leave the conference and return home. Def. R.56 Stmt. ¶ 28. Another time, also in approximately 2011, Plaintiff attended a meeting led by his supervisor in Maple Grove, Minnesota at which he drank multiple alcoholic drinks, slurred his words, and made off-topic comments to the extent that Plaintiff's Human Resources ("HR") manager, Michelle DeCoux, asked the waitress to stop serving Plaintiff alcohol. Id. ¶ 29.

Sometime after that, in approximately 2011 or 2012, Plaintiff spoke with DeCoux about taking a leave from Boston Scientific to seek inpatient treatment for alcohol dependency. Id. ¶ 30. Subsequently, Plaintiff checked into an inpatient treatment facility in Minnesota but did not complete the program; he stayed there for approximately 10 days. Id. ¶ 31. Plaintiff suffered no adverse employment consequences as a result of this leave. Id.

Plaintiff's alcohol use continued to interfere with his job performance. In 2013, Defendant Conaway began supervising Plaintiff and, while Conaway commended Plaintiff on his strong sales performance, Conaway observed multiple instances of poor judgment and inappropriate behavior by Plaintiff brought on by alcohol use. Id. ¶ 35. Conaway observed that during an October 30, 2013 business dinner, Plaintiff had several drinks, was unable to follow the conversation, and had unprompted outbursts of laughter. Id. ¶ 36. Conaway observed that during a December 18, 2013 business dinner, Plaintiff slurred his speech, repeated comments several times, and made comments related to consuming alcohol. Id. Conaway observed that Plaintiff brought his girlfriend to a December 29, 2013 national sales meeting, to which significant others were not invited, and at which Plaintiff engaged in unprofessional conduct including allowing his girlfriend to sit "on [Plaintiff's] lap." Id.; id., Ex. 51, 10/26/16 DeCoux Dep. Tr. 108:2-10. Conaway also observed that Plaintiff seemed disengaged and exhibited an inconsistent thought process during a February 5, 2014 business call. Def. R.56 Stmt. ¶ 36.

Based on these four incidents, Conaway issued Plaintiff a Written Corrective Action on February 14, 2014 which directed Plaintiff to "immediately exhibit professional behavior and good judgment" and which warned that failure to do so could result in termination. Id. ¶ 36; id., Ex. 9, ECF No. 48-19. Soon after issuing the Written Corrective Action, Conaway completed an evaluation of Plaintiff's 2013 performance in which he referenced Plaintiff's poor judgment, cautioned that "any future lapse in good judgment could lead to termination," and emphasized that "[c]orrecting your leadership judgment is critical for you to remain in your current role." Id. ¶ 43; id., Ex. 8, ECF No. 48-4.

Four months later, Plaintiff further engaged in inappropriate behavior on the job while under the influence of alcohol. From June 2-4, 2014, Plaintiff attended a strategy meeting for

regional managers and Boston Scientific leadership during which plaintiff consumed alcohol. Def. R.56 Stmt. ¶ 46. Plaintiff was reportedly disengaged during the meeting and failed to complete his assignments. Id. Plaintiff was observed slurring his words and exhibiting difficulty focusing on the matters being discussed. Id. Plaintiff's inebriation was further observed during the dinner after the meeting. While the group walked to dinner, "Plaintiff grabbed a basketball from some children and brought it with him down the street." Id. ¶ 47. A colleague "had to wrest the ball from Plaintiff and return it to the children." Id. Plaintiff continued to slur his speech, laugh excessively, and make inappropriate comments. Id. During the dinner, Plaintiff continued to drink alcohol and became increasingly incoherent. Id. ¶ 48. Over a period of approximately half an hour, Plaintiff and another Boston Scientific employee ordered eight shots on a colleague's bar tab. Id. ¶ 50. At one point, "Plaintiff sat down at the wrong table and began eating food someone else had ordered." Id. ¶ 48.

The following morning, Plaintiff met with his supervisor, Conaway, who warned Plaintiff not to drink at any future Boston Scientific meeting, and Plaintiff promised he would not. Id. ¶ 53.

Fewer than ten days later, on June 13, 2014, Plaintiff received a Final Corrective Action which referenced the events of the June 2-4, 2014 meeting. Id. ¶ 54. The Final Corrective Action reiterated Plaintiff's commitment "not to drink during any future BSC meetings" and to "behave professionally at all times," and it cautioned Plaintiff that "modifying [his] behavior [was] critical for [his] continued employment with BSC." Id.; id., Ex. 11, ECF No. 48-21. The Final Corrective Action included an "anticipated review date" of July 31, 2014 with "[p]eriodic reviews thereafter through June 2015." Def. R.56 Stmt. ¶ 55. The Final Corrective Action provided Plaintiff with information about Boston Scientific's Employee Assistance Program. Id. ¶ 56.

Plaintiff responded to the Final Corrective Action by updating his resume, which he acknowledged in his deposition was "prudent" because "[t]wo corrective actions is concerning." Id. ¶ 57. In November 2014, Plaintiff sent his resume to a manager at another medical device company and acknowledged in an email to his girlfriend regarding a work event they were both planning to attend that they would refrain from alcohol so as to "redeem ourselves." Id. ¶ 58. Plaintiff also engaged in email correspondence with his sister, who advised Plaintiff to take a leave of absence to get treatment for alcohol use. Id. ¶ 59. His sister wrote:

> [Y]ou can get FMLA for 12 weeks. You can't be fired!! If you do not go into treatment and get caught drinking during work hours, or Joe or Tom tell anyone about the incident that happened, you can be fired immediately. If you seek treatment before they find out and go under FMLA, they can't do anything to you . . .
>
> Id.

Plaintiff, however, continued to consume alcohol while on the job. Plaintiff and his subordinates testified that in the first few months of 2015, Plaintiff drank during the work day and frequently appeared intoxicated, and Plaintiff testified that he drank during the work day on more than one occasion. Id. ¶ 84. Members of Plaintiff's team testified that Plaintiff was also increasingly difficult to reach and that when he was reached, he had difficulty remembering details and would often repeat things that had already been discussed. Id. ¶ 85. One subordinate testified that Plaintiff would call him drunk four out of the five days of the work week and that Plaintiff "sound[ed] drunk on the phone more often than not." Id. ¶ 86. Another subordinate testified that it was "painful to have a conversation with [Plaintiff]" because he frequently slurred his words or brought up matters they had already discussed, and estimated that Plaintiff was intoxicated on over 20 separate occasions on which they spoke about work matters. Id. ¶ 87.

### C. Plaintiff's Attempts to Blackmail His Supervisor

Plaintiff also continued to display poor judgment in multiple incidents from late 2014 to early 2015.[1]  In late 2014, he brought his girlfriend to a work reception and misrepresented to his supervisor, Lickovitch, that he had received approval to do so.  Id. ¶ 64.  Also in late 2014, he requested permission from Lickovitch to skip a dinner meeting with a customer in New York City so that he could go home to New Jersey to take his daughters out to dinner, but the next morning, Lickovitch spotted Plaintiff and his girlfriend on the elevator of a New York City hotel.  Id. ¶ 65.

Plaintiff maintains that he did, in fact, get permission to bring his girlfriend, id. ¶ 68, and that he did go to New Jersey to take his daughters out to dinner and returned to the New York City hotel for the night.  Pl. R.56 Stmt. ¶ 30-31, ECF No. 73.  What is not in dispute is Plaintiff's reaction to being reprimanded by Lickovitch for these two incidents. Lickovitch spoke to Plaintiff about these incidents and on December 1, 2014, he summarized that conversation in an email to Plaintiff.  Id. ¶ 67-68.  Plaintiff was angry that Lickovitch addressed these concerns in an email because he believed that "emails at Boston Scientific are permanent documents" and left Lickovitch a voicemail to that effect.  Id. ¶ 68-69.  The voicemail, which Lickovitch described as "scathing," contained "yelling" and "screaming."  Id. ¶ 69.  Plaintiff also "threaten[ed]" Lickovitch by indicating that he had received "so many complaints" from members of his team about Lickovitch.  Id. ¶ 69-70.

On December 4, 2014, Plaintiff sent Lickovitch an email which purported to "lay out issues that [his] team ha[d] expressed . . ." including a claim that Lickovitch had made a female subordinate uncomfortable and had "dragg[ed]" a male subordinate "around to meet girls."  Id. ¶

---

[1] Plaintiff claims he performed for Boston Scientific during the seven months following his Final Corrective Action Plan "without incident."  Pl. R.56 Stmt. ¶ 22.  This claim is unsupported by the record.  When a party's story "is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  Scott v. Harris, 550 U.S. 372, 380 (2007).

72. Plaintiff concluded his email by writing: "Gary, [t]his e mail will stay in my files and I would fully expect you and I will continue a strong working relationship." Id. Plaintiff did not report his alleged concerns about Lickovitch to HR.[2] Id. After receiving the email, Lickovotch forwarded it to DeCoux. Id. ¶ 75. Lynn Prust, Boston Scientific's Director of Employment and Employee Relations, conducted an investigation of Plaintiff's allegations and determined that no policy had been violated. Id. ¶ 83.

### D. Plaintiff's Worsening Behavior

In another incident in February 2015, Plaintiff and a subordinate were scheduled to meet with a physician regarding a patient who had died during an operation involving a Boston Scientific device. Id. ¶ 90. Plaintiff's subordinate called this meeting, which occurred during normal business hours, "the most significant meeting of my entire career." Id. ¶ 91. Plaintiff showed up for the meeting "visibly intoxicated." Id. ¶ 92. He "slurred his speech, his eyes were not fully open, and he smelled like he had been drinking." Id. Plaintiff would normally have taken the lead during such a meeting, but Plaintiff's subordinate was forced to conduct the meeting instead. Id.

And finally, on February 27, 2015, Plaintiff was scheduled to participate on an important quarterly sales call scheduled for 5:30 pm. Id. ¶ 114-15. When Plaintiff did not appear at the beginning of the call, Lickovitch sent him a text message reminding him to join. Id. ¶ 115. Plaintiff eventually joined the call but several other individuals on the call observed that he sounded intoxicated. Id. ¶ 116, 122. Conaway reported that Plaintiff slurred his words, "could hardly [give

---

[2] Plaintiff contends, in his Amended Complaint, and in his Counter Statement of Undisputed Facts, that he did report his concerns about Lickovitch to HR. See Am. Compl. ¶ 6, ECF No. 19; Pl. R.56 Stmt. ¶ 50. This claim is unsupported by Plaintiff's own deposition testimony, Pl. R.56 Stmt., Ex. 1 at 210:11-211:1, 220:5-18, and by the plain text of his email, Def. R.56 Stmt., Ex. 15, ECF No. 48-25. See also Def. R.56 Stmt. ¶ 72 n.13.

a sales update]," "wasn't clear," and "was just mumbling, talking all over himself." Id. ¶ 117.[3] Lickovitch and Conaway received text messages from other individuals on the call stating that Plaintiff appeared drunk. Id. ¶ 116-17.

### E. Plaintiff's Arrest and FMLA Leave

On Thursday, March 12, 2015, at approximately 2:18 pm on a work day, Plaintiff drove to his daughters' school to pick them up and was arrested for driving under the influence of alcohol ("DUI") while in a school zone and for reckless driving. Id. ¶ 125-26, 131. Plaintiff's speech was reportedly "slurred" and "at times slow and incoherent," and he failed both a field sobriety test and a breathalyzer test. Id. ¶ 127-28. Plaintiff did not tell anyone at Boston Scientific about the arrest, but sent an email to Lickovitch the following morning, on March 13, 2015, stating that he would be taking FMLA leave and that he "need[ed] to go get healthy." Id. ¶ 132. Plaintiff told Camille Chang Gilmore, Boston Scientific's Vice President of HR, that he had a "drinking problem" or that he was an "alcoholic." Id. ¶ 133. Plaintiff also told his subordinates that he would be taking leave for treatment for alcoholism or because he had a drinking problem. Id. ¶ 135. Plaintiff then checked into, and completed, a 30-day inpatient treatment program in California. Id. ¶ 138.

While Plaintiff was on leave, Prust continued to investigate outstanding allegations against Plaintiff, including allegations relating to the February 27, 2015 sales call. Id. ¶ 15, 144. Ultimately, Prust concluded that Plaintiff was under the influence of alcohol during that call. Id. ¶ 122.

On April 13, 2015, the day before Plaintiff returned to work, Prust spoke to Plaintiff over the phone. Id. ¶ 145. During this call, Plaintiff brought up a new concern: that Lickovitch had

---

[3] Plaintiff claims he was not drunk but rather "extremely excited" during the February 27, 2015 call. Pl. R.56 Stmt. ¶ 99-100. This claim is unsupported by the record.

made disparaging comments about Plaintiff to Plaintiff's subordinates during Plaintiff's leave from work.  Id. ¶ 145.  Plaintiff claimed he relayed these concerns to Kevin Ballinger, the division president of Plaintiff's division at Boston Scientific, and that Ballinger assured Plaintiff he would "take care of it." Id. ¶ 145.[4]  Plaintiff also threatened to sue Boston Scientific if Lickovitch did not get fired and made a series of allegations that Conaway had engaged in inappropriate behavior. Id. ¶ 146.  A subsequent investigation of Lickovich's comments determined that no policy had been violated.  Id. ¶ 150.

**F. Plaintiff's Termination**

On April 14, 2015, Plaintiff returned to work.  Id. ¶ 145.  That day, Prust spoke with Ballinger, who denied having spoken with Plaintiff.  Id. ¶ 149.  Ballinger indicated that Plaintiff's claim that the two had spoken made Plaintiff seem "not trustworthy."  Id. ¶ 149.  Also on that day, DeCoux scheduled a conference call for Friday, April 17, 2015, with Conaway, Lickovitch, Gilmore, Prust, and in-house counsel to discuss the outcome of Prust's investigation and Plaintiff's employment.  Id. ¶ 151. Boston Scientific also scheduled an in-person meeting between Plaintiff, Conaway, and Gilmore to take place on Monday, April 20, 2015 in New York City.  Id.  At the time this meeting was scheduled, Boston Scientific officials "knew it was likely to include either a serious discussion about Plaintiff's behavior or termination of Plaintiff's employment."  Id. ¶ 151.

On Thursday, April 16, 2016, out of concern over how Plaintiff might react during the April 20, 2015 meeting, DeCoux arranged for security to be present.  Id. ¶ 152.  Boston Scientific's security team also ran a criminal background check on Plaintiff in preparation for the meeting.  Id.

---

[4] In his deposition, Plaintiff claimed that he did not tell Prust that he spoke with Ballinger, but the record does not support this contention.  Id. ¶ 147-48.

This check revealed Plaintiff's March 12, 2015 DUI arrest.  Id.  Upon learning about Plaintiff's DUI, Prust called Plaintiff and asked him what he had been doing on March 12, 2015.  Id. ¶ 154. Plaintiff first told Prust that he had been on a plane that day, but then claimed that he could not remember what he had been doing.  Id.  When Prust continued questioning him, Plaintiff admitted that he had received a DUI that day.  Id. ¶ 155.  Prust conveyed this information to Ballinger, who conveyed the information to Gilmore.  Id. ¶ 156.

The following day, on April 17, 2015, Conaway, Lickovitch, Gilmore, Prust, DeCoux, and Boston Scientific's in-house counsel conducted their scheduled conference call to discuss Plaintiff's employment.  Id. ¶ 157.  After discussing "Plaintiff's historical performance, ongoing behavior, the fact that he had falsely stated he had spoken to Ballinger, his DUI on March 12, 2015 at his children's school during work hours, his initial denial that anything extraordinary happened on March 12, and his continued poor behavior and judgment," the parties collectively decided to terminate Plaintiff's employment.  Id. ¶ 157-58.

The parties prepared a list of "talking points" that laid out the reasons for Plaintiff's termination: (1) Plaintiff's Written Corrective Action; (2) Plaintiff's Final Corrective Action and his commitment to not drink alcohol at any future meetings and to behave professionally at all times; (3) Plaintiff's slurring his words and sounding intoxicated during the February 27, 2015 conference call; (4) Plaintiff's consuming alcohol during the work day on March 12, 2015, the day of his DUI; and (5) Plaintiff's false claim to Prust that he had spoken with Ballinger.  Id. ¶ 159.

Also on April 17, 2015, Plaintiff was notified about the in-person meeting scheduled for that Monday and began to realize that he was about to be terminated.  Id. ¶ 160-61.  In an email exchange with his ex-wife between April 16-17, 2015, Plaintiff stated that he was "about to lose [his] job" and said wrote "[t]hey're coming to fire me Monday . . . ."  Id. ¶ 161.  At 9:10 pm the

night before the meeting, Plaintiff sent an email to DeCoux in which he attempted to avoid the meeting by writing "I feel stress and am going out for help of FLMA [sic] leave tomorrow." Id. ¶ 162. The morning of the meeting, Plaintiff sent a series of text messages to Conaway threatening to not show up to the meeting and telling Conaway that he needed "to leave on FMLA again." Id. ¶ 163. Plaintiff also sent an email to his girlfriend stating that he was "[h]eaded to get fired." Id. ¶ 163. Plaintiff ultimately attended the meeting and was informed that his employment was terminated for the reasons stated in the prepared talking points. Id. ¶ 165.

### G. Plaintiff's Claims

Plaintiff filed this action against Boston Scientific, Lickovitch, Conaway, and John Does 1-30 in state court on August 31, 2015. ECF No. 1-1. On October 15, 2015, Defendants removed this action to federal court. Id. Plaintiff brings six claims for: (1) discriminatory discharge based on disability in violation of NJLAD; (2) retaliation in violation of FMLA; (3) retaliation in violation of NJLAD; (4) retaliation in violation of CEPA; and (5) aiding and abetting disability discrimination by Lickovitch and Conaway in violation of NJLAD; and (6) discrimination and retaliation by John Does 1-30.

## II. LEGAL STANDARD

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, admissions, and affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986). "Summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988).

When the Court considers a motion for summary judgment, "all facts and inferences are

construed in the light most favorable to the non-moving party." Boyle v. Cty. of Allegheny Pennsylvania, 139 F.3d 386, 393 (3d Cir. 1998). However, "a plaintiff cannot resist a properly supported motion for summary judgment merely by restating the allegations of his complaint, but must point to concrete evidence in the record that supports each and every essential element of his case." Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir. 1995).

## III. ANALYSIS

### A. Plaintiff's Disability Discrimination Claim under NJLAD

Plaintiff argues that Defendants terminated his employment for a discriminatory reason—because he is an alcoholic—and that in doing so, Defendants violated NJLAD. Defendants maintain they terminated Plaintiff's employment due to his poor judgment and unprofessional behavior brought on, in part, by his alcohol use. The Court agrees with Defendants.

An NJLAD claim is analyzed using the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Sarnowski v. Air Brooke Limousine, Inc., 510 F.3d 398, 403 (3d Cir. 2007); Zive v. Stanley Roberts, Inc., 182 N.J. 436, 447-48 (2005). To establish a prima facie claim for disability discrimination under NJLAD, Plaintiff must show: (1) he belongs to a protected class; (2) he held a position for which he was objectively qualified; (3) was terminated from that position; and (4) the employer sought to, or did, fill the position with a similarly-qualified person. Viscik v. Fowler Equipment Co., 173 N.J. 1, 14 (2002).

Plaintiff has demonstrated that he meets the first, third, and fourth prongs of the prima facie test. He is an alcoholic, Pl. R.56 Stmt. ¶ 5, he was terminated from his position as Regional Manager, id. ¶ 26, and he was replaced by a similarly-qualified person. Def. R.56 Stmt. ¶ 166. Plaintiff has also demonstrated that he meets the "objectively qualified" prong, which requires him

to show that he was "meeting the employer's legitimate or reasonable expectations," Viscik, 173 N.J. at 21, and that he was "actually performing [his] job prior to the termination." Zive, 182 N.J at 454. Plaintiff has demonstrated that he received numerous sales awards and repeatedly exceeded his sales quotas, so he has satisfied this prong as well.[5] Pl. R.56 Stmt. ¶ 3.

Once the plaintiff has pled a prima facie case of discrimination in violation of NJLAD, the burden shifts to the defendant to "articulate a legitimate, non-discriminatory reason for the adverse employment action." Viscik, 173 N.J. at 14. After the defendant does so, the burden shifts back to the plaintiff to show that "the employer's proffered reason was merely a pretext for discrimination." Id.

The Court is satisfied that Defendants have articulated a legitimate, non-discriminatory reason for terminating Plaintiff's employment. The record contains ample evidence of Plaintiff's indiscretions in the course of his performance as Regional Manager. Defendants have demonstrated that Plaintiff drank excessively and behaved inappropriately at multiple business meetings and conferences, Def. R.56 Stmt. ¶¶ 28, 29, 36, 46-50, that he received two written corrective actions and promised not to drink during work or to behave inappropriately in the future, id. ¶¶ 36, 43, 53-55, that he continued to drink during the work day and was frequently difficult to reach, id. ¶¶ 84-87, that he was drunk during an important meeting with a physician, id. ¶¶ 90-92, that he was drunk during an important strategy conference call, id. ¶¶ 114-17, that he was arrested for DUI in the middle of a work day, id. ¶¶ 125-26, 131, and that he lied to Prust during Boston

---

[5] Defendants contend that Plaintiff has not met the second prong of his prima facie test because testimony from his subordinates and managers demonstrate that he was frequently drunk during the work day, that he was unable to participate sales calls, and that he was ineffective in supporting his team of sales representatives. Def. Brief at 20-21, ECF No. 48-1. But when determining the sufficiency of Plaintiff's prima facie case, "only the plaintiff's evidence should be considered." Zive, 182 N.J. at 455. "[P]erformance markers like poor evaluations" should not be considered until the Court reaches the second and third stages of the burden shifting framework. Id.

Scientific's investigation into his conduct, id. ¶ 145. See Casseus v. Elizabeth Gen. Med. Ctr., 287 N.J. Super. 396, 405 (N.J. Super. Ct. App. Div. 1996) ("it should require no citation to state that an employee's poor performance in discharging his duties is a legitimate nondiscriminatory reason to fire or demote the employee.").

Finally, Plaintiff has not met his burden of demonstrating that Defendant's proffered reasons are pretext for discrimination against Plaintiff on the basis of disability. To establish pretext, Plaintiff must submit evidence that "either casts sufficient doubt upon the employer's proffered legitimate reason so that a factfinder could reasonably conclude it was fabricated, or that allows the factfinder to infer that discrimination was more likely than not the motivating or determinative cause of the termination decision." Svarnas v. AT&T Communications, 326 N.J. Super. 59, 82 (N.J. Sup. Ct. App. Div. 1999). At issue at the pretext stage "is whether discriminatory animus motivated the employer." Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994).

First, Plaintiff argues that Boston Scientific's reasons for terminating his employment are pretext for discrimination on the theory that Boston Scientific took no issue with his alcohol use until he disclosed his status as an alcoholic and took his FMLA leave in March of 2015. Plaintiff states: "the evidence is undisputed that prior to plaintiff's acknowledgement of his alcoholism, request for FMLA leave and seeking 30 days in-patient alcoholism rehabilitation, plaintiff had not been subjected to any investigation regarding his alcohol use." Pl. Opp. Brief at 12, ECF No. 72. This statement is simply untrue, and flies in the face of the two corrective actions Plaintiff received in February and June 2014.[6] Plaintiff writes of himself, "[h]e was not reported for any alleged

---

[6] Plaintiff claims that his corrective actions had "expired" by the time he was terminated. Pl. Opp. Brief at 18. This is one of Plaintiff's many claims that is directly contradicted by evidence in the record. His Final Corrective Action explicitly states that he "committed . . . not to drink during

violation of the Corrective Action Plans or Alcohol Use policy before he admitted his alcoholism and requested FMLA leave to rehabilitate from the disability." Id. Plaintiff appears to be claiming that the absence of reported violations of his corrective action plans suggests that his workplace behavior was adequate, without acknowledging the fact that the corrective action plans themselves suggest otherwise.

Next, Plaintiff suggests that he was not actually drunk during the February 27, 2015 conference call. This contention is contradicted by the record, which includes testimony from five individuals, including supervisors and subordinates, who testified that Plaintiff sounded drunk on the call. Def. R.56 Stmt. ¶ 116. But even if all five individuals were incorrect, that would merely demonstrate that Plaintiff's colleagues inaccurately assessed his job performance, not that they were motivated by a discriminatory reason in doing so. See Chambers v. Heidelberg USA, Inc., 2006 WL 1281308 at *12. (D.N.J. May 5, 2006) ("it is insufficient for [plaintiff] to show merely that the employer's decision was wrong or mistaken because the relevant issue is 'whether discriminatory animus motivated the defendant, not whether the defendant is wise, shrewd, prudent, or competent.'") (quoting Fuentes, 32 F.3d at 763).

Third, Plaintiff argues that Boston Scientific misrepresented the time at which it made the decision to terminate his employment: specifically, that it made the decision before the April 17, 2015 conference call. Pl. Opp. Brief at 16. He then makes a gigantic leap, claiming this means "a reasonable jury can easily conclude that every single reason set forth [for Plaintiff's termination] is a complete post hac [sic] fabrication . . . ." Id. Plaintiff's contention mischaracterizes the record. Defendants have demonstrated that the April 20, 2017 meeting was scheduled on April 14, 2015

---

any future BSC meetings and . . . would behave professionally at all times," and indicated that he would be subject to period reviews through June 2015. Def. R.56 Stmt. ¶¶ 54-55 (emphasis added).

to discuss seriously "Plaintiff's behavior" or possible "termination of Plaintiff's employment." Def. R.56 Stmt. ¶ 151. Defendants have demonstrated that Plaintiff was "trending toward termination" by April 16, 2015. Id. ¶ 156; see also id., Ex. 11, ECF No. 48-21 (Plaintiff's Final Corrective Action issued on June 13, 2015, stated: "modifying your behavior is critical for your continued employment with BSC" and "[f]ailure to demonstrate and sustain an acceptable level of performance may result in . . . termination of employment, at any time."). They have demonstrated that a final decision regarding Plaintiff's continued employment had not been made as of April 16, 2015 but that the discovery of Plaintiff's lie to Prust and of his work day DUI helped sway senior management towards deciding to terminate Plaintiff's employment. Def. R.56 Stmt. ¶ 156. And Defendants have demonstrated that the ultimate decision to terminate Plaintiff's employment was made on April 17, 2015. Id. ¶ 158. Furthermore, Plaintiff cannot point to facts to suggest that the ultimate decision to terminate was made prior to the April 17 conference call.

Even if Plaintiff were correct in asserting that the decision to terminate him was made before the April 17 call, that would not support a finding of pretext. Plaintiff's attempt to call into question the timing of Boston Scientific's decision does not cast doubt on the validity of its reasons for making the decision. There are plenty of nondiscriminatory reasons for Boston Scientific to have terminated Plaintiff's employment prior to April 17, 2015. By the time Plaintiff took FMLA leave in March 2015, he had already been subject to two disciplinary actions and Boston Scientific was in the process of investigating allegations of Plaintiff's further inappropriate behavior on the February 27, 2017 call. Id. ¶¶ 36, 54, 119-120.

Ultimately, Plaintiff has not demonstrated that Boston Scientific's proffered reasons for termination are false, or that the decision was motivated by animus. He has failed to demonstrate that Boston Scientific's reasons were terminating his employment are pretext for discrimination.

As Plaintiff has failed to raise a genuine issue of material fact as to pretext, his discriminatory discharge claim must be dismissed.

### B. Plaintiff's FMLA Disability Claim

Next, Plaintiff argues that Boston Scientific terminated his employment in retaliation for his request to take FMLA leave, in violation of FMLA. Defendants contend that Plaintiff's termination was unrelated to his request to take leave. The Court agrees with Defendants.

To establish a <u>prima facie</u> case of FMLA retaliation, Plaintiff must show that (1) he engaged in protected activity by requesting FMLA leave; (2) he suffered an adverse employment decision; and (3) the adverse decision was casually related to his request for leave. <u>Capps v. Mondelez Global, LLC</u>, 847 F.3d 114, 152 n.6 (3d Cir 2017). FMLA retaliation claims are also analyzed under the <u>McDonnell Douglass</u> burden-shifting framework. <u>Id.</u> Plaintiff has demonstrated that he requested FMLA leave and that he was terminated, but he cannot establish that his termination was casually related to his request for leave.

Temporal proximity between the FMLA request and the adverse employment decision may suggest a causal connection. "To demonstrate a causal connection, a plaintiff generally must show 'either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link.'" <u>Budhun v. Reading Hosp. & Med. Ctr.</u>, 765 F.3d 245, 258 (3d Cir. 2014) (quoting <u>Lauren W. ex rel. Jean W. v. DeFlaminis</u>, 480 F.3d 259, 267 (3d Cir. 2007)); <u>see also</u> <u>Marra v. Philadelphia Hous. Auth.</u>, 497 F.3d 286, 302 (3d Cir. 2007) ("[i]n certain narrow circumstances, an 'unusually suggestive' proximity in time between the protected activity and the adverse action may be sufficient, on its own, to establish the requisite causal connection."). However, "[a]n employee cannot easily establish a causal connection between his protected activity and the alleged

retaliation when he has received significant negative evaluations before engaging in the protected activity." Ross v. Gilhuly, 755 F.3d 185, 194 (3d Cir. 2014).

Boston Scientific made the decision to terminate Plaintiff's employment on April 17, 2015, over a month after Plaintiff requested FMLA leave on March 13 of that year. It is true that the decision came only three days after his return from FMLA leave, but it is also true that the decision came 14 months after Plaintiff's first Written Corrective Action, ten months after Plaintiff's Final Corrective Action—which warned Plaintiff that future instances of drinking while on the job "may result in . . . termination of employment," Def. R.56 Stmt, Ex. 11—and very soon after Prust concluded that Plaintiff was drunk during the February 27, 2015 call. It is not clear that this is "certain narrow circumstance[]" in which the temporal proximity is "unusually suggestive." Marra, 497 F.3d at 302.

Plaintiff alleges no proof of causation other than timing. He suggests that Defendants displayed a "pattern of antagonism" against him, but merely states in support the false claim that "Plaintiff had not been investigated for an alcohol related issue" prior to "admitting alcoholism." Pl. Opp. Brief at 22. As such, Plaintiff has failed to plead a prima facie case of FMLA retaliation. And even if he had, he has not alleged any facts, other than timing, to overcome Defendants' legitimate, nondiscriminatory reasons for terminating his employment. Pl. Opp. Brief at 23.

### C.  Plaintiff's Retaliation Claim

Plaintiff next contends that he engaged in protected activity when he reported in a December 4, 2014 email an allegation that Lickovitch sexually harassed a female subordinate, and that Boston Scientific retaliated against him in violation of NJLAD and CEPA. Am. Compl. ¶¶

36-41.[7]  Defendants argue that Plaintiff cannot avail himself of CEPA because his report was not made in good faith.  The Court agrees with Defendants.

To establish a <u>prima facie</u> case of retaliation in violation of CEPA, Plaintiff must show that (1) he reasonably believed the conduct he reported violated a law, rule, regulation, or clear mandate of public policy; (2) he performed a "whistle-blowing" activity described in N.J.S.A. § 34:19–3; (3) an adverse employment action was taken against him; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.  <u>Winters v. North Hudson Regional Fire and Rescue</u>, 212 N.J. 67, 89 (N.J. 2012) (citation omitted).

Plaintiff's claim fails because he cannot prove prongs two and four of his <u>prima facie</u> case. First, Plaintiff cannot point to any facts demonstrating that he performed "whistle-blowing" activity.  He claims that he reported an allegation of sexual harassment "to his supervisor"—but the allegation in question concerned that same supervisor.  That is, he seeks CEPA protection for reporting allegations against Lickovitch to Lickovitch himself, rather than to Boston Scientific's HR department, as he was instructed to do per its Harassment Policy, and as he knew to do and had done when he made similar allegations in the past.  Def. R.56 Stmt. ¶¶ 71, 74.  And Plaintiff never formally reported his allegation.  He claims that he did in his Amended Complaint, ¶ 6, but testified in his deposition that "Gary [Lickovitch]," not he "elevated it" to HR.  Pl. R.56 Stmt., Ex. 1 at 210:23.  He explicitly disclaimed any intention to make a formal report when he wrote: "Gary, [t]his email will stay in my files and I would fully expect you and I will continue a strong working relationship."  <u>Id.</u> ¶ 72.

<hr>

[7] Because Plaintiff's NJLAD and CEPA retaliation claims are based on the same facts, the NJLAD retaliation claim is deemed waived.  N.J.S.A. § 34:19-8 (commencing a CEPA action "shall be deemed a waiver of the rights and remedies available under any other  . . . State law"); <u>Ehling v. Monmouth-Ocean Hosp. Serv. Corp.</u>, 961 F. Supp. 2d 659, 672 (D.N.J. 2013) ("retaliation claims under the LAD necessarily fall within the CEPA waiver provision") (citation omitted).

Moreover, Plaintiff's "whistle-blowing" activity was not made in good faith.  See Cottrell v. Family Practice Assocs., No. 15-2267, 2016 WL 3029921, at *3 (D.N.J. May 26, 2016) (finding that Plaintiffs could not claim to have engaged in protected activity under NJLAD when they could not demonstrate "a good faith basis" for filing a citizen's complaint); Carmona v. Reports Int'l Hotel, Inc. 189 N.J. 354, 373 (N.J. 2007) ("an unreasonable, frivolous, bad-faith, or unfounded complaint cannot satisfy the statutory prerequisite necessary to establish liability for retaliation under the LAD.").   Plaintiff told his subordinates that he planned to send the email to Lickovitch months before he actually sent it on December 4, three days after Lickovitch reprimanded Plaintiff for unprofessional behavior, and soon after Plaintiff's "scathing," "threatening" voicemail to Lickovitch.  Def. R.56 Stmt. ¶ 68-70, 73 n.14.

CEPA aims to protect employees who suffer retaliation after reporting violations in the workplace.  But it is not intended to be used to "assuage egos or settle internal disputes at the workplace."  Capanna v. Tribecca Lending Corp, No. 06-5314, 2009 WL 900156 at *8 (D.N.J. Mar. 31, 2009); Carmona, 189 N.J. at 373 (cautioning that NJLAD is not intended to be used "as a sword . . . wielded by a savvy employee against his employer.").   Here, Plaintiff cannot demonstrate that he engaged in protected activity under CEPA.  He cannot show that he even engaged in whistle-blowing activity, let alone that the report was in good faith.  And even if he could, for the reasons indicated in Part III.A, supra, he has not demonstrated that his termination was causally related to his December 4 email.  Accordingly, Plaintiff's CEPA claim fails.

### D.  Plaintiff's Aiding and Abetting Claims

Plaintiff alleges Conaway and Lickovitch aided and abetted Boston Scientific in disability discrimination in violation of NJLAD.  Am. Compl. ¶ 43-44.  NJLAD provides for claims against individual employees who "aid, abet, incite, compel or coerce" any acts forbidden under the

statute. N.J.S.A. § 10:5-12(e); see Tarr v. Ciasulli, 181 N.J.70, 83 (2004). To establish a claim for aiding and abetting liability under NJLAD, a plaintiff must show that: "'(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation.'" Tarr, 181 N.J. 70, 84 (quoting Hurley v. Atlantic City Police Dep't, 174 F.3d 95, 129 (3d Cir. 1999)).

Here, Plaintiff's claims against Conaway and Lickovitch fail because there is no underlying wrongful act which they aided. See Guarneri v. Buckeye Pipe Line Servs. Co., 205 F. Supp. 3d 606, 619 (D.N.J. 2016) (dismissing aiding and abetting claims against individual defendants when underlying NJLAD claim was dismissed).

### E. Plaintiff's John Doe Claims

Plaintiff alleges that unidentified John Does 1-30 discriminated and retaliated against him. Am. Compl. ¶ 46-49. These defendants have not been identified and there is no indication that they were ever served with the Amended Complaint. Accordingly, Plaintiff's claims against John Does 1-30 are dismissed. See Guarneri, 205 F. Supp. 3d at 619 (granting summary judgment on John Doe claims when plaintiff failed to identify or serve John Does within the time required by Fed. R. Civ. P. 4(m) or show good cause for failing to effectuate service).

## IV. CONCLUSION

For the reasons set forth herein, Defendants' motion for summary judgment is **GRANTED**. An appropriate Order accompanies this Opinion.

**Dated: November 30, 2017**

*/s Madeline Cox Arleo*_____
**Hon. Madeline Cox Arleo**
**United States District Judge**